UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Western Division

FILED
IN CLERK'S OFFICE

2001 OCT 31  A 8: 54

U.S. DISTRICT COURT
DIST OF MASS.

ROSIE D., by her parents John and Debra D.;       )
TYRIEK H., by his mother Christine H.;            )
JOSHUA D., by his mother Emelie D.;               )
SHEENA M., by her mother, Deborah D.;             )
DEVIN E., by his grandmother Barbara E.;          )
ANTON B., by his mother Lisa A.;                  )
NATHAN F., by his mother Tracey F.;               )
SHAUN E., by his grandmother Jacquelyn E.;        )
JERRY N., by his mother Susan P.                  )
                                                  )
     on behalf of themselves and                 )
     all others similarly situated,              )
                                                  )
     Plaintiffs,                                 )
                                                  )
     v.                                          )     Civil Action No. 01-30199-MAP
                                                  )
JANE M. SWIFT, Acting Governor                    )
ROBERT GITTENS, Secretary of the                  )
Executive Office of Health and Human Services     )
STEPHEN CROSBY, Secretary of the Executive        )
Office of Administration and Finance;             )
WENDY E. WARRING, Commissioner of the             )
Division of Medical Assistance,                   )
                                                  )
     Defendants.                                 )
_____)

DOCKETED

**COMPLAINT**

## I.    INTRODUCTION

    1.     Rosie D., Tyriek H., Joshua D., Sheena M., Devin E., Anton B., Nathan F.,

Shaun E., and Jerry N. are Medicaid-eligible children who have been screened and diagnosed

with behavioral, emotional, or psychiatric disabilities, but who are not being provided with



the preventive and rehabilitative treatment required by the federal Medicaid program. 42 U.S.C. § 1396a *et seq.* In particular, each child needs and has requested more appropriate mental health services, but is not receiving intensive home-based mental health services, including behavioral support services, psychiatric and other clinical services, professionally acceptable assessments, crisis services, and case management (hereafter, collectively, "intensive home-based services"), in order to treat or ameliorate their impairments. Most have been hospitalized because of the lack of intensive home-based services. Each has been and is being harmed because s/he is not receiving medically necessary, intensive home-based services.

2.     The nine named plaintiffs are part of a class of similarly disabled and needy children who are eligible for, but have not been promptly assessed and considered for, intensive home-based services. The class includes thousands of children who have been hospitalized or are at risk of hospitalization because of the absence of intensive home-based services. The individual plaintiffs and those like them are either forced to leave their families and communities in order to obtain the very limited, episodic mental health services which have been made available by the defendants, or are compelled to forego these limited and unduly restrictive services altogether, leaving them with inadequate treatment and supports.

3.     As Medicaid-eligible children under the age of 21, the plaintiffs are entitled to receive Early and Periodic Screening, Diagnostic and Treatment Services (EPSDT services), which include "necessary health care, diagnostic services, treatment, and other measures ... to correct or ameliorate defects and physical and mental illnesses and conditions discovered

2

by the screening services ...." 42 U.S.C. § 1396d(r)(5). The defendants have failed to establish an adequate and effective screening and assessment process for children with behavioral, emotional, or psychiatric conditions. The plaintiffs are eligible for and would benefit from intensive home-based mental health services. Nevertheless, they are not receiving these Medicaid-covered services which are necessary to treat their conditions in a manner that allows them to remain with their families and in their home communities and thus avoid unnecessary and often harmful institutionalization.

4.     In violation of federal law, the defendants have failed to provide these medically necessary, intensive home-based services to the plaintiffs at all, let alone in a timely manner. As a result of the defendants' actions and inactions, many of the most vulnerable children in the Commonwealth who have behavioral, emotional, and psychiatric impairments are inadequately assessed and denied the care and medically necessary treatment which they desperately need to function successfully in the community, including case management, crisis, and in-home supports. The denial of these medically necessary services at a critical point in the plaintiffs' development has caused and will continue to cause serious, long term, and potentially irreversible harm.

5.     The plaintiffs seek prospective injunctive relief ordering the defendants to provide the intensive home-based services that the plaintiffs need and that they are entitled to receive in accordance with federal law.

## II.   JURISDICTION AND VENUE

6.     This is a civil action authorized by 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights, privileges, and immunities guaranteed by

federal law.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 1343(3), and 1343(4).

7.     This Court has jurisdiction over this action for declaratory relief pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.  Injunctive relief is authorized by 28 U.S.C. § 2202, 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure.

8.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to these claims occurred within the Commonwealth of Massachusetts.  A majority of the individual plaintiffs reside in the four counties of western Massachusetts.

**III.   PARTIES**

*A.     Individual Plaintiffs*

9.     Rosie D. is a thirteen year old girl who has intensive mental health needs. She is a resident of Berkshire County and brings this action through her parents John and Debra D.

10.    Tyriek H. is an eight year old boy with intensive mental health needs.  He is a resident of Berkshire County and brings this action through his mother Christine H.

11.    Joshua D. is a twelve year old boy with intensive mental health needs.  He is a resident of Berkshire County and brings this action through his mother Emily D.

12.    Sheena M. is a sixteen year old girl with intensive mental health needs.  She is a resident of Berkshire County and brings this action through her legal guardian Deborah D.

13.    Devin E. is an eight year old boy with intensive mental health needs.  He is a

4

resident Berkshire County and brings this action through his grandmother Barbara E.

14.   Anton B. is an eight year old boy with intensive mental health needs.  He is a resident of Plymouth County and brings this action through his mother Lisa A.

15.   Nathan F. is a fifteen year old boy with intensive mental health needs.  He is a resident of Norfolk County and brings this action through his mother Tracey F.

16.   Shaun E. is a five year old boy with intensive mental health needs.  He is a resident of Norfolk County and brings this action through his grandmother Jacquelyn E.

17.   Jerry N. is a seventeen year old boy with intensive mental health needs.  He is a resident of Norfolk County and brings this action through his mother Susan P.

*B.    Defendants*

18.   Jane M. Swift, Acting Governor of Massachusetts, is the Chief Executive Officer of the Commonwealth.  She is responsible for seeking funds from the legislature to implement the Medicaid program.  She also oversees the various executive departments of state government including the multiple secretariats and agencies responsible for the care, treatment, and education of children, such as the Executive Office of Health and Human Services (EOHHS), the Executive Office of Administration and Finance (EOAF), the Department of Education (DOE), and the Executive Office of Public Safety.  She appoints the heads of these secretariats and agencies that are responsible for managing and funding of children's mental health services, including the Secretaries of EOHHS and EOAF, as well as the secretaries of other relevant departments, and approves the appointment of the Commissioners of the Division of Medical Assistance (DMA), the Department of Mental Health (DMH), and the Department of Social Services (DSS).  She is sued in her official

capacity.

19.     Stephen Crosby, Secretary of EOAF, is responsible for seeking and approving the expenditure of adequate funds from the legislature to comply with the requirements of the Medicaid program. He is sued in his official capacity.

20.     Robert Gittens, Secretary of EOHHS, is responsible for the oversight, supervision, and control of the health and human services departments within the executive branch. Within EOHHS are many of the multiple agencies responsible for providing, funding, or arranging mental health services to children, including DMA, DMH, and DSS. He is sued in his official capacity.

21.     Wendy E. Warring, Commissioner of the DMA, is responsible for the direction, supervision, and control of the single state agency that operates the Massachusetts Medicaid program. She oversees the development and execution of the Massachusetts Medicaid Plan, all Medicaid policies, procedures, contracts, and practices, including those regarding services provided to children with behavioral, emotional, and psychiatric disabilities. She is sued in her official capacity.

C.     *The Plaintiff Class*

22.     Pursuant to Rule 23(a) and (b)(2) of the Fed. R. Civ. P., the plaintiffs bring this action as a class action on behalf of all current or future Medicaid-eligible residents of Massachusetts under the age of twenty-one who have or may have a behavioral, emotional, or psychiatric disability or impairment and who need or may need intensive home-based services, including professionally acceptable assessments, special therapeutic aides, crisis intervention, and case management services, in order to treat or ameliorate their disability or

6

impairment.

23.   The plaintiff class is so numerous and geographically diverse throughout the Commonwealth that joinder of all members is impracticable.

24.   There are questions of law and fact common to the plaintiff class including, *inter alia*:

a.   whether the defendants' failure (i) to provide or arrange medically necessary behavioral and mental health services, including intensive home-based services under the EPSDT program; (ii) to establish policies and procedures that facilitate access to these services; and (iii) to inform classmembers and their families of their entitlement to these services violates the EPSDT mandate of Title XIX of the Social Security Act (Medicaid);

b.   whether the defendants' failure to promptly provide classmembers with medically necessary, intensive home-based services violates the reasonable promptness requirement of Title XIX of the Social Security Act;

c.   whether the defendants' policies, practices, and procedures with respect to behavioral and mental health services for children comply with the requirements of Title XIX of the Social Security Act; and

d.   whether the defendants' operation and oversight of its behavioral health managed care program is consistent with the requirements of Title XIX of the Social Security Act.

25.   The claims of the named plaintiffs are typical of the claims of the plaintiff class. As a result of the defendants' policies, practices, and procedures, all of the individual

plaintiffs and classmembers are not considered for or provided with intensive home-based services to treat or ameliorate their behavioral, emotional, and psychiatric conditions.

26.     The named plaintiffs will fairly and adequately represent the interests of the class.  The individual plaintiffs have a clearly defined and personally vital controversy with the defendants, which dictates that they will fully and vigorously prosecute this action.  At stake for these plaintiffs is their ability to obtain medically necessary, intensive home-based behavioral and mental health services and to remain at home with their family and friends.

27.     The plaintiffs are represented by attorneys experienced in federal class action litigation and public assistance benefits, particularly the Massachusetts Medicaid program. The named plaintiffs seek relief that will inure to the benefit of the plaintiff class as a whole.

28.     The plaintiffs seek certification of a class pursuant to Fed. R. Civ. P. 23(b)(2) on the grounds that the defendants' policies, practices, and procedures in failing to provide intensive home-based services deny the plaintiffs access to medically necessary services, thereby making initial and final injunctive and declaratory relief appropriate with respect to the whole plaintiff class.

## IV.    THE MANDATES OF THE MEDICAID PROGRAM

### A.    The Federal Medicaid Program

29.     The Medicaid program, authorized and regulated pursuant to Title XIX of the Social Security Act, is a joint federal-state medical assistance program for certain groups of low-income persons.  *See* 42 U.S.C. § 1396, *et seq.*  One of the purposes of the Medicaid program is to provide "services to help such families and individuals attain or retain capability for independence or self-care."  *Id.*

8

30.    At the federal level, the Medicaid program is administered by the U.S. Department of Health and Human Services' Health Care Financing Administration (HCFA).

31.    States are not required to participate in Medicaid, but once a State agrees to participate in Medicaid, it must comply with the requirements imposed by the Act itself and by the Secretary of Health and Human Services.

32.    States are reimbursed by the federal government for a portion of the cost of providing Medicaid benefits.  Massachusetts receives approximately fifty cents in federal reimbursement for every dollar it spends on Medicaid services.

33.    Federal law requires participating States to cover certain "mandatory" services. One mandatory service is Early and Periodic Screening, Diagnosis and Treatment services (EPSDT) for Medicaid-eligible children under age 21.   42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43), 1396a(a)(4)(B); 1396d(r).   In addition, EPSDT requires States to cover all "optional" services listed at 42 U.S.C. § 1396d(a).

34.    States must provide Medicaid benefits to all eligible individuals with reasonable promptness.  42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.930(a).

35.    Even when a particular service or treatment for children is not included in the State's Medicaid Plan for adults, the State must nevertheless provide that service or treatment for children if it is otherwise covered and reimbursed by the federal Medicaid program.  42 U.S.C. § 1396a(a)(43)(C); 42 C.F.R. § 441.57.

36.    The Medicaid Act requires participating States to provide an EPSDT program consisting of the following services:

(a)  informing all persons in the state who are under the age of 21 and who [are]

eligible for medical assistance of the availability of early and periodic screening, diagnostic and treatment services as described in Section 1396d(r);

(b)  providing or arranging for the provision of such screening services in all cases where they are requested;

(c)  arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services.  42 U.S.C. § 1396(a)(43).

37.     EPSDT treatment services must be initiated in a timely manner, as the individual needs of the child require and consistent with accepted medical standards, within six months from the date of request.  42 C.F.R. § 441.56(e).

38.     The purpose of EPSDT services is to ascertain children's physical and mental impairments, and to arrange for or provide such health care, treatment, or other measures to treat or ameliorate impairments and chronic conditions discovered through EPSDT screenings.  The policy underlying the EPSDT mandate is to prevent illness as well as to ensure that health problems are comprehensively diagnosed and then treated as soon as they are detected, before they become more complex and their treatment more costly.

39.     Under EPSDT, States must provide all of the services listed in 42 U.S.C. § 1396d(a) when needed to correct or ameliorate a psychiatric, behavioral, or emotional condition.  Among the services listed in § 1396d(a) are home health care services, § 1396d(a)(7) and 42 C.F.R. § 440.70; rehabilitative services, § 1396d(a)(13) and 42 C.F.R. § 440.130; case management services, §§ 1396d(a)(19), 1396n(g); and personal care services, 1396d(a)(24) and 42 C.F.R. § 167.

40.     EPSDT services include all forms and types of listed behavioral and mental health Medicaid-covered services which are medically necessary for children.  Covered services clearly include behavioral support services, psychiatric and clinical services, professionally acceptable assessments, crisis services, case management, and intensive home-based services.

41.     For children, HCFA has determined that rehabilitative services include, among others, clinical evaluations, the development of treatment plans, basic living skills development, intensive in-home individual and family therapy services, behavioral management services, individual and family crisis intervention services, crisis support in residential settings, therapeutic staff support, behavioral specialists, and a broad array of evaluations and assessments.  Home health services include, among others, home-based mental health services such as training and staff support to improve the basic functioning and skills of the child and of the family.

42.     In order to provide these required services, "[t]he [Medicaid] agency must make available a variety of individual and group providers qualified and willing to provide EPSDT services."  42 C.F.R. § 441.61(b).

43.     While States may adopt managed care concepts and contract with entities to oversee the delivery of services and to arrange services through provider networks, in doing so, the States remain responsible for ensuring compliance with all relevant Medicaid requirements, including the mandates of the EPSDT program.  42 U.S.C. § 1396u-2.  The managed care contract must specify all mandatory benefits.  The State must ensure that the managed care entity has the capacity to offer the full range of necessary and appropriate

11

preventive and primary services for all enrolled beneficiaries. 42 U.S.C. § 1396u-2(b)(5).

Moreover, children with special needs, including those in foster care or out-of-home

placements, are exempt from mandatory managed care enrollment provisions. 42 U.S.C.

§ 1396u-2(a)(A).

44.    The State additionally must "provide such methods and procedures to assure

that payments [to providers] are consistent with efficiency, economy, and quality of care and

are sufficient to enlist enough providers so that care and services are available under the Plan

at least to the extent that such care and services are available to the general population in the

geographic area." 42 U.S.C. § 1396a(a)(30)(A).

B.    *The Massachusetts Medicaid Program*

45.    Massachusetts has chosen to participate in the Medicaid program. DMA is the

single state agency that administers the Massachusetts Medicaid program. M.G.L. c. 118E

*et seq.*

46.    As required by the Medicaid Act, Massachusetts has prepared a State Plan that

the Department of Health and Human Services has reviewed and approved. That Plan, along

with relevant federal law and regulations, forms the foundation for the Massachusetts

Medicaid program and establishes the Commonwealth's obligations and responsibilities to

Medicaid recipients. The Plan includes all treatment, services, and supports required by the

EPSDT program.

47.    As permitted by the Medicaid program, DMA currently contracts with a

private managed care entity, the Massachusetts Behavioral Health Partnership (the

"Partnership"), to provide behavioral health and mental health services to Massachusetts

12

Medicaid recipients.  In particular, the Partnership is charged with delivering behavioral

health services to Medicaid eligible individuals, including all EPSDT services to children

with behavioral, emotional, or psychiatric impairments.  Some children and families may

also elect to participate in a health maintenance organization (HMO) in lieu of enrollment in

the Partnership.

48.    The Partnership devotes most of its funding and resources to the provision of

short term, inpatient hospital services, acute care, medication, and brief counseling services.

It does not offer most types of residential or intensive home-based services.

49.    Intensive home-based services, which are funded as part of the Medicaid

program in other states, involve trained behavioral support staff who support the child in her

natural or foster home, and in any other educational, after-school, or treatment setting where

the child spends part of her day.  Staff are consistently and routinely available for as long as

necessary and for as many hours each day as necessary to treat or ameliorate the child's

behavioral, emotional, or psychiatric condition.  For some children with intensive needs,

behavioral support staff are provided up to twenty-four hours a day and seven days a week

on an ongoing basis and not just in emergencies.  Trained staff assist the child in learning

new behaviors, routines, and skills so s/he can eventually function as independently as

possible in the community.

50.    Intensive home-based services can also include psychiatric and other clinical

services to complement the ongoing, trained behavioral support staff who assist the child at

home, in school, after school, and at other times.  These additional supports focus on

discrete clinical and other daily living issues, such as, *inter alia,* the development of an

13

individualized treatment plan, the creation and implementation of a special behavioral plan, the supervision and direction of the behavioral support staffperson, the provision of support therapies, the assessment and administration of medication, and the coordination and monitoring of intensive home-based services through an interdisciplinary team.

51.     Intensive home-based services also incorporate certain other supports to achieve desired outcomes.  Professionally adequate assessments are essential to determine the type, level, and intensity of treatment and support services that an individual child needs, particularly where the child has complex or difficult-to-treat behavioral or emotional impairments.  Crisis services must be available to come to the home and offer clinically intensive interventions in the event of a mental health crisis which places the child at risk of hospitalization.  Finally, case management is the program which usually refers the child to screening agencies and intensive home-based service providers, and then ensures that home-based services meet all of the child's individual behavioral and mental health needs by identifying, coordinating, and monitoring the array of supports and staff that allow the child to remain at home.

52.     The defendants have not included intensive home-based services, as described above, as part of the Massachusetts Medicaid program or as a covered EPSDT service. Instead, pursuant to the current contract between DMA and the Partnership, the Partnership provides time-limited, non-intensive, behavioral health interventions to Medicaid eligible children in their homes through two specific programs:  Family Stabilization Teams ("FST") and Community Support Programs ("CSP").  Both programs are organized, administered, funded, and managed in a manner that, by design, systematically renders them unavailable,

insufficient, or unsuitable for most children who need and would benefit from intensive home-based services.

53.     FST services normally are offered for thirty days or less, even when long term, home-based treatment is necessary, although they can be extended, at least theoretically, for up to ninety days in exceptional cases.  Moreover, FST services generally are delivered for approximately six to eight hours a week, and are designed to address acute crises or short-term conditions where a child is at imminent risk of hospitalization or is being discharged from a hospital.  FST services ordinarily are not prescribed for multiple days per week for multiple weeks or months.  Most FST programs do not have the capacity or non-professional staff to sustain intensive home-based supports to the most needy children for long periods.  Finally, FST services are not regularly provided to children in other settings where individuals receive educational, after-school treatment, or supports.  When FST services are terminated because the situation is no longer acute, CSP services may be authorized if the child still needs home-based supports.  CSP services generally are delivered for two to three hours per week, primarily to assist the family or child with basic living skills and similar tasks.

54.     FST and CSP services do not provide the intensive home-based services needed to treat or ameliorate the plaintiffs' conditions.  Because of the limitations in the design and implementation of the FST and CSP program models, neither of these programs provides meaningful access to intensive home-based services for the most needy and vulnerable children with behavioral, emotional, or psychiatric conditions.

55.     Because intensive home-based services have not been made available, children,

15

families, clinicians, and doctors are not informed of the possibility of obtaining medically necessary, intensive home-based services. Indeed, some eligible and needy children and their families, as well as clinicians and doctors, are not aware of even the limited and restricted FST and CSP programs. The lack of notice to families and professionals prevents children from even being considered for intensive home-based services.

## V.   THE CHILDREN'S MENTAL HEALTH CRISIS IN MASSACHUSETTS

### A.   *The Crisis for the Plaintiff Class*

56.   Thousands of children with behavioral, emotional, and/or psychiatric disabilities in the Commonwealth desperately need, but are not being provided, medically necessary services in the community. This crisis is confirmed by numerous reports prepared by the defendants' own agents, published research, position papers of major professional associations, and the frequent and consistent media articles. While the precise parameters of this crisis and the exact number of children it impacts may be unclear, a number of state officials have publicly acknowledged the gravity of the current situation and the likely prospect of its further deterioration. The documented impact on the Commonwealth's children and families is measured mostly in lost lives and damaged families.

57.   The severity of this crisis is revealed in a litany of reports generated by the Department of Social Services (DSS), the Department of Mental Health (DMH), and the Massachusetts Behavioral Health Partnership (Partnership) over the past several years. In a probing and still relevant 1999 report to DMA on the dysfunctional system of children's services, former DSS Commissioner Linda Carlisle stressed the medical necessity of home-based treatment for children with behavioral, emotional, or psychiatric disabilities, rather

16

than confinement in hospitals or other institutions:

> [E]very effort needs to be made to keep children at home or with relatives in their own communities and schools. We exacerbate the mental health problems of abused and neglected children by removing them not just from homes, but also from friends, schools, and communities.

Linda Carlisle, *Meeting the Behavioral Health Needs of Children in the Custody of the Department of Social Services* at 7 (1999).

58.    One small measure of the extent of this crisis is the number of children who are needlessly hospitalized or unnecessarily retained just in private psychiatric hospitals due to the lack of appropriate community alternatives like intensive home-based services. These child are now referred to as "stuck kids." DMA, DSS, and DMH, among others, have tracked the phenomena of these "stuck kids" for several years. As indicated in the Carlisle report, the "stuck kid" phenomenon had reached emergency proportions by 1999:

> The weekly "stuck case" lists have grown to about 35 children today from about ten children a year ago. Many residential programs have waiting lists. The number of children in residential care has risen. The DMA has asked whether or not DSS needs to add capacity in order to facilitate hospital discharges by developing more high-end [non-home-based] capacity. I believe the answer to this question is no.

Carlisle Report at 19.

59.    A much more accurate measure of this crisis is the vastly larger number of children who are needlessly hospitalized or needlessly retained in *all* types of institutions, including general hospitals, state hospitals, DSS and other adolescents units in public hospitals, children's programs on the grounds of state hospitals (Intensive Residential Treatment Programs), DSS and DHM congregate care programs, and other restrictive facilities. Ironically, there is no parallel tracking or accurate data on these stuck kids. The number of children in these institutions and facilities is growing, as is the number who

are needlessly institutionalized due to the absence of appropriate intensive home-based services. These children, who are often more vulnerable and suffer as much or more from disabling conditions than those in private hospitals, are less visible but no less deserving of appropriate behavioral and mental health treatment.

60. Moreover, despite concerted efforts by several agencies and additional funding for inpatient and restrictive residential beds, and despite the obvious incentives for the agencies to undercount these children, even the number of "stuck kids" in private psychiatric hospitals which is publicly reported by the agencies actually has increased rather than decreased. This escalating crisis is primarily due to the defendants' failure to remedy persistent deficiencies in less restrictive community treatment options such as intensive home-based services. The number of "stuck kids" as reported by the defendants is now approaching one hundred.

61. The inappropriate and excessive use of psychiatric hospital beds, and the attendant backlog of admissions, have forced the defendants and the Partnership to transport children far from their homes when hospitalization is the only available option for children in crisis. Often children are hospitalized at the other end of the Commonwealth from where they live, or even to other states, which further complicates and delays the individual's discharge to an appropriate community living arrangement.

62. A corollary of the defendants' excessive reliance on costly inpatient psychiatric beds is the frequent need to place mentally ill children on even more costly pediatric wards because of a lack of psychiatric beds. As "stuck kids" remain hospitalized beyond when it is medically necessary, defendants and the Partnership have conscripted pediatric units in

18

general medical facilities to "house" children with severe behavioral, emotional, or psychiatric conditions. Even with protests from pediatricians and hospital associations, as well as focused media attention, additional funding for more inpatient psychiatric beds has only partly alleviated this egregious and expensive situation.

63.      Another aspect of this crisis is the interminable waiting list for case management services. DMH currently estimates that 2,497 children have been determined to need, and are still awaiting, case management services. DMH Report (Fall/Winter 2000). Case management, like other EPSDT services, is a mandatory Medicaid service for children which, under federal law, must be provided promptly. Case management is also the critical entry point to accessing and coordinating all other treatment and support services. In the absence of a case manager, families independently must negotiate the maze of state bureaucracies, broker the array of services, and locate available providers willing and able to serve their children. As a result, children without case managers are not informed of, and, therefore, cannot request or access appropriate home-based services.

64.      Although DMH has acknowledged the magnitude of the waiting list for case management services, the defendants have taken no meaningful action to address the failure to provide these Medicaid services promptly. Similarly, DMH proposals to expand intensive home-based services from an isolated pilot program in the Cambridge-Somerville area to a statewide Medicaid-funded initiative have gone unheeded.

65.      The unavailability of mobile crisis services and the limited availability of emergency services for children further aggravate this crisis and intensify the demand for more costly and inaccessible inpatient beds. Similarly, inadequate reimbursement rates for

19

providers of children's mental health services results in high staff turnover and the inability of existing programs to serve the most needy children.

66.    Each of the named plaintiffs and members of the plaintiff class would benefit from access to medically necessary, intensive home-based services.  Medicaid-covered services which would benefit the named plaintiffs and members of the class include the development and implementation of an individualized, intensive home-based program incorporating behavior-management services and a one-on-one behavioral support staffperson, personal care in the home, psychiatric and clinical services, comprehensive assessments and treatment planning, crisis intervention instead of hospitalization in an emergency, transportation, and case management.

B.    *The Crisis for the Individual Plaintiffs*

Rosie D.

67.    Rosie D. is a thirteen year old girl who suffered sexual and physical abuse prior to her pre-adoptive placement in 1993.  Rosie experienced at least eight temporary placements by the Department of Social Services before she was placed with Mr. and Mrs. D, just before her fifth birthday.  When Rosie began banging her head against the wall and pulling out her hair, Mr. and Mrs. D. desperately contacted DSS for assistance, to no avail. Within weeks of beginning kindergarten, they were told to remove her from school because of her aggressive behavior.  She was forced to spend hours a day in restraints.  Over the next six years, Rosie was institutionalized at numerous facilities for extended periods of time, primarily due to the lack of appropriate home-based services to address her serious mental health condition.

68.    As Rosie's mental health needs became more problematic, Mr. and Mrs. D's efforts to secure mental health treatment were thwarted and unsuccessful, as DSS squabbled with the Department of Mental Health over the cost of treatment.  At age six, Rosie was placed in the psychiatric ward at Baystate Medical Center, where she remained for three months pending a more appropriate placement.  Upon discharge, she embarked on a twenty-two month odyssey through three more facilities -- Franciscan Children's Hospital, Three Rivers residential facility, and the Children's Study Home.  At the last program, she broke her wrist, was slammed and bruised in a quiet room, and received several stitches for other injuries.  Ultimately, in November 1996, she returned to the home of Mr. and Mrs. D, who love and care for her very much but were unable to manage her mental health needs without additional assistance.  Five months later, she was placed at the Northampton Center for Children & Families, where she stayed for almost two years before being discharged, once again, to Mr. and Mrs. D., who formally adopted her in June 1997.

69.    Family stabilization therapy and community support services have been offered, but have not been adequate to address the severity of Rosie's needs.  In recent years, Rosie has been held on several occasions at the Berkshire County Crisis Stabilization Unit for up to one week at a time.  She was institutionalized in New York for twenty days in the fall of 2000 at the Four Winds-Saratoga Hospital.  Unless Rosie receives intensive, around-the-clock, home-based services, her mental health condition will continue to worsen, and her behavioral issues will continue to escalate, until she again faces hospitalization.

70.    Rosie suffers from Post Traumatic Stress Disorder, Oppositional Defiant Disorder and Attention Deficit Hyperactivity Disorder.  She presently is living at Children's

21

House, a DMH facility in Pittsfield.  Until late May 2001, she had been living at home with her adoptive parents.  They agonized about putting her on the waiting list for a residential placement, but felt it was necessary due to increasing fears that they could not care for her and her mental health needs without more assistance.

71.   If Rosie were provided with adequate and appropriate EPSDT mental health services, she would improve significantly and be able to live safely and continuously with her adoptive mother and father.  Rosie is a young child who deserves and needs to live at home with her loving adoptive mother and father, rather than in an institution.  Without intensive home-based services through the MassHealth EPSDT program, there is little hope that Rosie's condition will improve or that she will be able to receive necessary treatment to return to her adoptive parents.

Tyriek H.

72.   Tyriek H. is a eight year old boy who has exhibited out-of-control behaviors since he was a toddler.  Before he was one, he engaged in severe head-banging behaviors and held his breath until he passed out.  By age two, he began to physically hurt others.  At age three, he was throwing rocks and threatening relatives with knives.  His mother pleaded for help from physicians and unsuccessfully sought treatment from DSS for his mental health needs.  Tyriek was thrown out of five day care centers and suspended from kindergarten ten times before being expelled from one school and then assigned to a special education classroom in another school.

73.   When he was six, Tyriek attacked his mother and two year old cousin with a knife.  She was forced to place him in restraints and called the local crisis program, which

advised her to call her family doctor or to go to the local emergency room. Three months later, Tyriek was removed from his kindergarten class in leather restraints, transported by ambulance to the local emergency room, but promptly discharged without any additional supports. Two days later, he was finally admitted to the crisis stabilization unit for one week. Although his mother has requested and was eligible services from DMH, Tyriek was not assigned a case manager for almost six months. Family stabilization therapy was offered, but services were inadequate and too brief to address his ongoing needs.

74. Tyriek H. suffers from Psychosis or a psychotic disorder. His prior diagnoses include Attention Deficit Disorder, Oppositional Defiant Disorder, and Bipolar Disorder. Because of his intensive mental health needs, he presently is placed at Three Rivers residential facility in Springfield, Massachusetts. He has been residing at Three Rivers, located fifty miles away from home, since November 2000. Immediately prior to his placement at Three Rivers, he had been held for two months at the Berkshire County Crisis Stabilization Unit (CSU). He previously had spent a week at the stabilization unit in June 2000.

75. Tyriek's placement at the Berkshire County CSU from September 19, 2000, through November 16, 2000, at least allowed his mother to visit and interact daily. She could not visit with him regularly at Three Rivers for three months, since she had no access to a car and was dependent on DMH vouchers for buses and taxis to visit her son. No vouchers were provided for many months. Tyriek's physical separation from his family and the prolonged time between visits has exacerbated his mental health issues.

76. Tyriek's current therapist at Three Rivers had informed his mother that if

intensive home-based services were in place, he could return home for weekend visits prior to the completion of the Three Rivers residential program, and ultimately, could return to live with his mother and receive ongoing treatment and support in their home. As a result of the absence of these services, and other clinical events, Tyriek's condition has deteriorated and temporarily requires further hospitalization.

77.     Tyriek's mother cares for him and loves him very much, but is unable to manage his mental health needs without assistance. Unless he is provided with intensive home-based services, he will have to remain institutionalized while his mental health continues to worsen and his behavioral issues continue to escalate. If Tyriek were provided with appropriate EPSDT mental health services, he would improve significantly and be able to live with his mother.

Joshua D.

78.     Joshua D. is a twelve year old boy who suffers from a Non-Verbal Learning Disability, Dysthymia Disorder, and Anxiety Disorder. Other diagnoses have included Oppositional Defiant Disorder and Pervasive Developmental Disorder. Because of his mental health needs, he was placed last fall at Lakeview NeuroRehabilitation Center. Upon discharge in April 2001, to his adoptive mother's home, he has not received any home-based services. He attended local schools last spring with a full-time aide.

79.     Joshua was initially raised by his maternal grandmother because his biological parents had schizophrenia. His mother was admitted to a psychiatric hospital shortly after his birth. His adoptive parents became his primary caretakers when he was about five months old. He has routinely performed far below grade level at school. He is excessively

overweight, and has been an easy target for taunts and bullying. These conditions exacerbate his mental health problems. His adoptive mother loves him and cares for him very much but cannot manage his mental health needs without assistance. Unless Joshua is provided with intensive home-based services, his mental health will continue to worsen and his behavioral issues will continue to escalate, risking another residential placement.

80.     Due to his mental health needs, Joshua has seen numerous physicians, therapists and social workers. In the past, he has received outreach services in the community, including after-school programming and twice-weekly in-home visits by support workers. However, he is now too old to attend the younger group's after-school program, and too young to participate in the teen-oriented program. His current therapist maintains Joshua's mental health needs, especially his Anxiety Disorder, interfere with his ability to interact with peers or engage in interaction with other people.

81.     Joshua has advised his therapist that he wishes to attend a day program so that he may continue to live at home with his adoptive mother. However, the absence of intensive home-based services may leave the family no option but to separate and have Joshua live in a congregated residential program.

82.     If Joshua were provided with adequate and appropriate EPSDT mental health services, he would improve significantly and be able to stay at home and live with his adoptive mother. Joshua is a young child who deserves and needs to live in his home with his adoptive mother, rather than in an institution. Without intensive home-based services through the MassHealth EPSDT program, Joshua has little hope of receiving necessary treatment while remaining home with his adoptive mother.

Sheena M.

83.     Sheena M. is a sixteen year old girl who suffers from Attention Deficit
Hyperactivity Disorder, and mild mental retardation.  Because of her intensive mental health
needs, she has periodically been held at the Berkshire County Crisis Stabilization Unit.  Until
August 1, 2001, she lived with her mother, at home, where Sheena required intensive home-
based services.  At best, she received time-limited and inadequate supports.  Due to her
mental health needs, Sheena presently sees a psychiatrist and social workers.

84.     Due to delayed speech and motor skills, Sheena was held back in pre-school
and repeated kindergarten.  Her sister, two years her junior, is ahead of her in grade level,
which has "emotional repercussions" for Sheena, who remains in special education classes.
From September 2000 to March 2001, Sheena missed eleven days of school as a result of
suspensions due to disruptive and/or assaultive behaviors.  Such an incident led to her recent
stay at the CSU in February 2001.  The experience of being repeatedly held back in school,
channelled into special education classes, and held in the Crisis Stabilization Unit has
exacerbated her mental health problems. Her mother cares for her and loves her, but cannot
manage her mental health needs without assistance.  Unless Sheena is provided with intensive
home-based services, her mental health will continue to worsen and her behavioral issues will
continue to escalate, risking further suspensions and/or longer stays at the Crisis Stabilization
Unit.

85.     Family stabilization therapy and respite programs have been made available to
Sheena but have not been appropriate or beneficial because of significant restrictions on their
frequency and intensity.  Due to staff changes or staff turnover, the original FST therapist

26

left and a new therapist was assigned during the course of the short-term program. FST was not extended, despite her ongoing need for intensive home-based supports. Sheena and her family received respite services through a twice-monthly overnight program at Key Shelter.

86.   For several months, Sheena was on a wait list for a long-term placement at Howard House, a six-bed DMH-funded facility. She entered the residential facility on August 1, 2001. The absence of intensive home-based services has left her family with no option but to separate and have Sheena live in a congregated residential program. Sheena's former therapist warned that a residential placement would be detrimental to her treatment because of Sheena's attachment to her mother. In-home services would be far more beneficial to secure Sheena's own long-term goal of finishing high school and becoming an independent woman.

87.   If Sheena were provided with adequate and appropriate EPSDT mental health service, she would improve significantly and be able to live with her mother. Sheena is a child who deserves and needs to live in her home with her loving mother, rather than in an institution. Without intensive home-based services through the MassHealth EPSDT program, Sheena has little hope of receiving necessary treatment and remaining at home with her mother.

<u>Devin E.</u>

88.   Devin E. is a eight year old boy who was neglected and possibly abused as an infant. He was born to a teenage mother who, immediately after his birth, was incarcerated for thirty days on a drug charge. There are reports of additional incidents involving drugs during the short time he lived with his mother. When he was eighteen months old, Devin

was traumatized when he witnessed a police raid in his home, the arrest of his mother's boyfriend, and the loss of other important people in his life. Shortly thereafter, he stopped speaking. Psychiatric evaluations refer to Devin as a permanently damaged child.

89.    Devin's maternal grandmother, Barbara, assumed guardianship and now has legal custody of him. His grandmother loves him and cares very much for him, but she requires assistance managing his mental health needs. Unless he is provided with intensive home-based services, his mental health will continue to worsen and his behavioral issues will continue to escalate.

90.    Because of his mental health needs, Devin's grandmother sought assistance through Early Intervention programs and the local school system. He continually was sent home due to unmanageable behaviors. He is impulsive, easily agitated, aggressive, and occasionally assaultive. As a result, he has been kept in an isolated classroom with a teacher and/or aide, and was forced to eat lunch alone. Eventually, he attended school only for twice-weekly, 30-minute occupational therapy sessions. The experience of these programs failing him repeatedly has exacerbated his mental health problems.

91.    Devin suffers from Pervasive Developmental Delay and significant speech and language delays. Throughout the years, several other diagnoses have described his condition, including Global Developmental Delay, Post Traumatic Stress Disorder, Reactive Attachment Disorder, Oppositional Defiant Disorder, Attention Deficit Hyperactivity Disorder, and autism. Because of his mental health needs, he was held at the Intensive Treatment Unit of the Hillcrest Educational Center from February 7 to May 30, 2001, for evaluations and assessments, after which he was returned to his grandmother's house.

28

92.     If Devin were provided with adequate and appropriate EPSDT mental health services, he would improve significantly and be able to live safely with his grandmother. Devin is a young child who deserves and needs to live in his home with his loving grandmother, rather than in an institution.  Without intensive home-based services through the MassHealth EPSDT program, Devin has little hope of receiving necessary treatment while living with his grandmother.

Anton B.

93.     Anton B. is an 8 year old boy who suffers from Attention Deficit and Hyperactivity Disorder and Bipolar Disorder.  Because of his mental health needs, he recently underwent back-to-back hospitalizations at two different institutions, Pembroke Hospital and Franciscan Children's Hospital.  He was discharged from Franciscan Children's Hospital to his mother's (Lisa A.'s) home.  When Anton was discharged, Lisa and her family needed and requested intensive home-based services to cope with his return, but received none.

94.     Anton's mother first observed his serious behavioral problems and temper tantrums when he was three years old.  Subsequently, Anton has suffered numerous violent episodes since he was five that have culminated in suicidal behavior.  At age five, Anton's explosions occurred almost daily, and on one occasion, he threatened his mother's life with a knife.  By the time he was six years old, Anton regularly experienced seizure-like shakes, and underwent a four-day evaluation at Children's Hospital, during which time he was on a constant EEG.  Anton was prescribed multiple medications that were designed to stabilize his behavior, but he still experienced regular outbursts that became increasingly violent.

29

95.     Anton attended first and second grades at Hancock Elementary School, where his anxious behavior continued.  During the summer of 2000, Anton told his mother that he wanted to kill himself, and then ran away from home.  A month later, Anton exploded in a supermarket, swept everything off the shelves onto the floor and ran out of the store into oncoming traffic in an attempt to kill himself.  Anton was restrained, taken to the local emergency room, and then by ambulance to Pembroke Hospital for about ten days.

96.     When Anton returned home, his behavior escalated even more.  He returned to school, threatened other children, tore apart the vice principal's office, and was again hospitalized, this time at Franciscan Children's Hospital for about six weeks.  When he returned home, he was banned from returning to Hancock Elementary School and received no in-home services whatsoever.  This lack of support set back Anton's recovery significantly.  Since that time, he has attended two different schools.  After months of seeking help from various state agencies, Lisa has been able to arrange for a DMH paraprofessional to visit with Anton four hours per week.  Recently and without any warning, Lisa was told by DMH that "the policy has just changed" and that the paraprofessional's services would be cut in half, and then after another few weeks, cut entirely.  No one from DMH spoke with Lisa or Anton's doctors before making this decision.  Four hour per week was never enough to meet Anton's mental health needs, and now the only service he does receive will be taken away altogether.  DMH's decision to terminate services is not based upon Anton's individual needs, but instead on a policy edict and a unilateral and unsubstantiated administrative determination that he needs these services less than other children.

97.    If Anton were provided with adequate and appropriate EPSDT mental health services, he would improve significantly and be able to live at home with his family. Anton is a young child who needs to live in his home with his loving mother, rather than in an institution. Without intensive home-based services through the MassHealth EPSDT program, Anton has little hope of receiving necessary treatment while remaining with his mother.

Nathan F.

98.    Nathan F. is a fifteen year old boy who almost died from Sudden Infant Death Syndrome and has experienced severe mental health and behavioral problems since then. By age four, he was diagnosed as suffering from Attention Deficit and Hyperactivity Disorder (ADHD) and prescribed medication. He has been subsequently diagnosed as having a bipolar thought disorder. Because of his mental health needs, he is presently placed in Granite House. Immediately preceding his placement at Granite House, Nathan was shuffled between three other institutions.

99.    From the time Nathan was two years old, he experienced violent tantrums that would often last two hours or more. By the time he was four years old, his mother Tracey was forced to tie up the kitchen chairs so that Nathan could not climb them and jump off. As the years went by, his daily tantrums became more violent, and Nathan regularly overturned furniture, trashed the house, and threw objects at his family. At night, Nathan does not sleep. When Nathan was five years old, Tracey learned that he was being physically abused by his father.

100.    When Nathan entered third grade, his behavior worsened significantly, and by the time he entered sixth grade, he had become completely unmanageable. He regularly

refused to get out of bed, get dressed or go to school. During the summer of 1998, Tracey tried to take her family on a week's vacation to the beach. However, she was forced to return in just two days after Nathan destroyed the rented cabin and refused to eat or participate in any family activities.

101.   When Nathan was in seventh grade, his therapist recommended that he go to a residential school. His mother did not welcome the idea of her son leaving her home, and tried, unsuccessfully, to obtain treatment services from DMH. Later that year, however, he physically assaulted his younger sister, and threatened Tracey with a knife, a baseball bat and a pool cue on separate occasions. He was hospitalized for six days at Westwood Lodge and was prescribed medication that was supposed to alleviate his depression and treat his ADHD. However, just a few weeks after his release, Nathan ran onto the roof of his house, tore off his clothes and threatened to jump. He was again admitted to Westwood Lodge, this time for a week. He was prescribed different medication that made his behavior even more bizarre, according to his mother.

102.   A few months after his second hospitalization, he attacked both of his sisters due to a delusion that they had stolen money from him. When Tracey tried to call the police, Nathan pulled the phone cords out of the wall, grabbed a carving knife and yelled that no one was taking him alive. Eventually, his mother called the police, and Nathan was placed at the Department of Youth Services Howland Detention Center, a place where delinquent children are sent for punishment. He slept on the office floor for six nights because he was too vulnerable to be integrated with the inmates.

103.   Immediately upon returning home from DYS, Nathan began acting out

sexually and again attacked his sister. That day, he was again hospitalized at Pembroke, and remained there for two weeks. Directly upon his release, he was sent to the Community Intervention Program for almost four months, on the recommendation of DMH. He did not improve, and was immediately transferred to a mental health residential program, the Granite House residential program in Quincy, MA, where he is today.

104. Granite House has told Tracey that Nathan could be released any day, because his "time is up." No in-home supports ahve been offered to facilitate Nathan's transition home, although Tracey has repeatedly asked for them. Without intensive in-home supports, Tracey will be unable to care for Nathan safely and without risk to other family members from Nathan's explosive outbreaks.

105. If Nathan were provided with adequate and appropriate EPSDT mental health services, he would improve significantly and be able to live at home with his family. Nathan is a child who needs to live in at home with his family, rather than in an institution. Without intensive home-based services through the MassHealth EPSDT program, Nathan has little hope of receiving necessary treatment and returning home to his mother and family.

### Shaun E.

106. Shaun E. is a five year old boy who, together with his two younger sisters, was severely neglected and then abandoned by their teenage parents when Shaun was less than three years old. Initially, DSS took custody of the children. About a week later, his grandmother, Jacki E., assumed guardianship of Shaun and now has legal custody of him. Since Shaun has lived with Jacki, he has regularly engaged in explosive and violent behavior that endangers himself, his sisters and his grandmother. In the past year, this behavior has

escalated.  For this reason, Shaun's sisters have remained in foster care, even though Jacki wants them to come home and live with her.

107.   Over the years, Shaun's grandmother has repeatedly requested for services to be provided to her from both DSS and from DMH, but has never received any home or community based services.  Jacki does have a DSS case manager, but that person's involvement was limited to setting up a visitation schedule between Jacki and Shaun's sisters. In fact, Jacki has repeatedly asked for home-based services for Shaun from DSS, and has repeatedly been told that the DSS case manager only coordinates services for the girls, who are in DSS custody.  At this point, Jacki has had to stop the family visitation because Shaun's behavior is so violent and explosive that Jacki fears for his sisters' lives.  Jacki enrolled Shaun in the Head Start Program at his school herself, without any guidance or assistance from his case manager.

108.   Jacki, without any support from DSS or any other state agency, sought out services by contacting DMH.  The person with whom she spoke told her that DMH could not provide her with any services at all, but simply referred her back to DSS.  Recently, Jacki contacted the Department of Mental Retardation, again of her own volition, in an attempt to procure the intensive home-based services she desperately needs and has been denied by the other agencies.  She was informed that the waiting list for these services is at least a year and a half long, and that Shaun was not eligible for them anyway.  Since July, Jacki has formally applied to DMH for services, and included with application all of the letters from other agencies which she has received rejecting her pleas for services.  Despite her repeated inquiries concerning the status of her application, no one from DMH has ever

returned her calls or communicated with her in any way.  Despite years of requesting and even begging for home-based services from various state agencies, Shaun still has not been provided any in-home supports.

109.   Shaun suffers from Attention Deficit and Hyperactivity Disorder (ADHD), Post Traumatic Stress Disorder (PTSD), and Bipolar Disorder.  Because of his mental health needs, he presently resides with his grandmother and sees numerous physicians, psychiatrists and social workers.  He wants to remain at home with Jacki, and Jacki wants Shaun to remain at home with her.  Jacki loves Shaun very much and does all she can to care for him, but she cannot manage his mental health needs without assistance.  Unless Shaun is provided with intensive home-based services, his mental health will continue to worsen and his behavioral issues will continue to escalate until he is institutionalized.

110.   If Shaun were provided with adequate and appropriate EPSDT mental health services, he would improve significantly and be able to live at home with his grandmother without endangering himself or his family.  Shaun is a young child who needs to live in a home-like setting with someone who loves him rather than an institution.  Without intensive home-based services through the MassHealth EPSDT program, Shaun has little hope of receiving necessary treatment while remaining with his grandmother and family.

### Jerry N.

111.   Jerry N. is a seventeen year old boy who, from age four, has had difficulty controlling his anger.  He has a long history of engaging in destructive behaviors, such as punching holes in the walls of his house, tearing apart his bed and mattress, throwing furniture, and urinating on the floor and in electrical sockets in his room.  Although Jerry is

35

sixteen years old, he behaves like a child ten years younger—he plays with toys and cannot be left unsupervised for any length of time. For example, when his mother recently asked him take out the trash, Jerry went down the street to a nearby wooded area and started a fire.

112.   Jerry's father was killed by a drunk driver in an automobile accident when Jerry was an infant. Although he never knew his father, Jerry feels a strong connection with him and carries around pictures of him, and of his grave, in his pocket. To make ends meet and support her family, Jerry's mother must work eight hours a day, seven days a week.

113.   By the fall of 1998, Jerry's out-of-control behavior escalated to the point where he needed to be hospitalized. He was admitted to Westwood Lodge for repeatedly scratching the skin on his wrists, and he remained there for four days. Jerry returned home for five days, during which time his self-abusive behavior continued. He was then admitted to Pembroke Hospital for a ten-day hospitalization. He was prescribed Depakote, Adderal, Risperidal and Prozac upon his release. The medication did not help, and Jerry returned to Pembroke a month later for three days. Just a few weeks ago, Jerry fell down and cut open his head. With this injury, he should be receiving constant care. However, Susan works full time, and was therefore forced to place Jerry in a day care facility in Brockton during the day. Jerry is dropped off at his house at 4 p.m., but Susan does not return home until after 5 p.m. Susan contacted Project Connect to try to find someone to care for him until she gets home, but was told that no one was available.

114.   Jerry suffers from a chromosome disorder, mild mental retardation, and Attention Deficit and Hyperactivity Disorder (ADHD). Despite his mother's efforts, Jerry has not been able to integrate successfully into community programs, such as the YMCA and

a children's tae kwon do class. He was asked to leave both programs and responded by threatening to kill himself. Jerry now attends the Cardinal Cushing School and Training Center in Hanover, MA, and lives at home with his mother. Jerry's mother loves him very much and does all she can to care for him, but she cannot manage his mental health needs without assistance. Unless Jerry is provided with intensive home-based services, his mental health will continue to worsen and his behavioral issues will continue to escalate until he is again institutionalized.

115. If Jerry were provided with adequate and appropriate EPSDT mental health services, he would improve significantly and be able to remain at home. Jerry is a child who needs to live at home with someone who loves him rather than in an institution. Without intensive home-based services through the MassHealth EPSDT program, Jerry has little hope of receiving necessary treatment while remaining with his mother.

C.    *The Defendants' Responsibilities for the Crisis*

116. The defendants and their predecessors have long known of the extent, severity, and consequences of the children's mental health crisis in Massachusetts, and, in particular, of the lack of medically necessary, intensive home-based services for children with behavioral, emotional, or psychiatric impairments.

117. Despite this knowledge, the defendants have failed to conduct qualified, comprehensive assessments of children with behavioral, emotional, and psychiatric conditions to determine which children need and would benefit from intensive home-based services.

118. Similarly, the defendants do not inform children and families of the appropriateness and availability of such assessments or of their entitlement to intensive home-

37

based services under the EPSDT program.

119.    The plaintiffs have no way to gain access to the mental health services they need other than through the Medicaid program.  The defendants have not informed the named plaintiffs or their parents or guardians about intensive home-based services which are covered by EPSDT.  There is no mechanism for informing the plaintiffs and their parents or guardians of intensive home-based services covered by EPSDT, and no procedure available to request or obtain these services.

120.    Although each of the plaintiffs has been screened for his/her psychiatric, behavioral, or emotional condition, none has been comprehensively assessed for nor offered intensive home-based services as an alternative to institutionalization.   Indeed, there is no adequate and effective assessment process to evaluate the suitability of intensive home-based services for children like the plaintiffs with behavioral, emotional or psychiatric conditions. There are no intensive home-based providers available to them who could request authorization for these services from DMA.

121.    The defendants have failed to provide or arrange for medically necessary behavioral and mental health treatment and supports to Medicaid-eligible children under age 21 throughout the Commonwealth, including intensive home-based services when appropriate for children with behavioral, emotional, or psychiatric impairments.

122.    The defendants have not ensured that the managed care entity with which they contract for the provision of behavioral health services for children, including the EPSDT program, has the capacity to provide all of these services.

123.    The defendants have also failed to provide or arrange for these services

reasonably promptly and without lengthy waiting lists.

124.   The defendants administer the State Medicaid system and its programs in a

manner that is inefficient, that is not in the best interest of beneficiaries, and that limits the

availability of intensive home-based services, thereby defeating the purpose of the EPSDT

program and violating federal law.   Limitations on the availability of intensive home-based

services result from:

(a) the lack of information to children, families, clinicians, and doctors about EPSDT

services and specifically about intensive home-based services;

(b) inadequate diagnostic assessments;

(c) inadequacies in the array of community programs and services that the Partnership

is authorized to provide to Medicaid-eligible children;

(d) policies, procedures, durational restrictions, program models, reimbursement

rates, and program definitions which arbitrarily limit access to intensive home-based

services;

(e) financial, administrative, and procedural barriers that diminish participation by

EPSDT and other qualified providers;

(f) inadequacies in the funding of the programs and services that the Partnership is

authorized to provide to Medicaid-eligible children; and

(g) arbitrary and unreasonable administrative funding decisions by the defendants that

improperly limit resources for the provision of intensive home-based services.

125.   DMA's Commissioner, Wendy Warring, administers the Massachusetts

Medicaid program.   Commissioner Warring has failed to ensure that the program complies

with federal Medicaid requirements, in particular applicable statutory provisions, rules, regulations, and the program manual for EPSDT services. Specifically, she has failed to ensure adequate assessments and the timely provision of medically necessary intensive home-based services to which the plaintiffs are entitled under the Medicaid Act.

126.    EOHHS Secretary Robert Gittens is responsible for the oversight, supervision, and control of the health and human services departments within the executive branch, including DMA, DMH, and DSS. Secretary Gittens has failed to coordinate the activities, programs, and resources of the agencies under his control, in order to ensure that the plaintiffs are provided the medically necessary, intensive home-based services to which they are entitled under Title XIX of the Social Security Act.

127.    EOAF Secretary Crosby is responsible for seeking adequate funds from the legislature in order to fulfill Massachusetts' obligations under its Medicaid program. Secretary Crosby has failed to seek and approve the expenditure of sufficient funds in order to ensure that the plaintiffs are provided the medically necessary, intensive home-based services to which they are entitled under Title XIX of the Social Security Act.

128.    Acting Governor Swift is responsible for ensuring that Massachusetts administers the Medicaid program consistent with relevant federal statutes and federal regulations, including the statutory provisions, rules, and requirements governing EPSDT services.  The Governor has failed to ensure that the plaintiffs are promptly provided the medically necessary, intensive home-based services to which they are entitled under Title XIX of the Social Security Act.

129.    Despite an awareness of the children's mental health crisis and despite the

submission of budget requests to fund additional inpatient and restrictive community "beds," the defendants have not developed intensive home-based services, have not established procedures to reimburse and implement such services, and have not sought the necessary funding for such services. Similarly, despite the proven success and cost-effectiveness of intensive home-based services in Cambridge and Somerville, the defendants have not taken the necessary actions to make these services available statewide, as part of the federally-mandated Medicaid program.

130.   The plaintiffs and members of the plaintiff class have no adequate remedy at law and, therefore, seek immediate and permanent injunctive relief to compel the defendants to arrange for the provision of medically necessary, intensive home-based services.

131.   The plaintiffs and members of the plaintiff class have suffered and continue to suffer irreparable harm due to the defendants' policies, practices, procedures, and contracts that cause the denial of, or delay in, the provision of medically necessary intensive home-based services that are required to treat or ameliorate the plaintiffs' conditions.

VI.   **LEGAL CLAIMS**

**Count I - EPSDT**

132.   The plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

133.   The defendants have failed to provide or arrange medically necessary EPSDT behavioral and mental health services, including intensive home-based services, for the plaintiffs and members of the plaintiff class which are required to treat or ameliorate their behavioral, emotional, or psychiatric conditions, in violation of 42 U.S.C. §§

41

1396a(a)(10)(A), 1396a(a)(43) and 1396d(r)(5).

134.   The defendants have failed to establish policies and procedures for obtaining

EPSDT behavioral and mental health services, including intensive home-based services,

which has the effect of denying these services to needy children with behavioral, emotional,

or psychiatric impairments, in violation of 42 U.S.C. §§ 1396a(a)(43)(C), 1396d(a)(4)(B),

1396d(r)(5), and 42 C.F.R. § 441.61(b), and 42 C.F.R. § 441.50 *et seq.*

135.   The defendants have failed to effectively inform children and their families of

the specific behavioral and mental health treatment services available under the Massachusetts

EPSDT program, including intensive home-based services, which has the effect of denying

these services to needy children with behavioral, emotional, or psychiatric impairments, in

violation of 42 U.S.C. § 1396a(a)(43) and 42 C.F.R. § 441.56(a).

136.   The defendants have failed to ensure that there are qualified providers which

are willing to offer EPSDT behavioral and mental health services, including intensive home-

based services, and to reasonably compensate such providers sufficient to facilitate

meaningful access to these services, in violation of 42 U.S.C. § 1396a(a)(43)(C) and 42

C.F.R. § 441.61(b).

137.   By their violation of the Title XIX of the Social Security Act, and its

implementing regulations, the defendants, acting under the color of state law, have denied the

plaintiffs and members of the plaintiff class their rights, privileges, and immunities secured

by the laws of the United States.

### Count II - Reasonable Promptness

138.   The plaintiffs reallege and incorporate by reference the allegations contained in

foregoing paragraphs.

139.    The plaintiffs and members of the plaintiff class are entitled to receive EPSDT behavioral and mental health services, including intensive home-based services, that are required to treat or ameliorate their behavioral, emotional, and psychiatric conditions under the Medicaid Act, 42 U.S.C. § 1396 *et seq.*

140.    The plaintiffs and members of the plaintiff class are not receiving these services in a timely and/or reliable manner at all or to the extent necessary to treat or ameliorate their behavioral, emotional, or psychiatric impairments.

141.    The defendants have failed to provide such medically necessary services with reasonable promptness, in violation of 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 435.930(a).

142.    By their violation of the Title XIX of the Social Security Act, and its implementing regulations, the defendants, acting under the color of state law, have denied the plaintiffs and members of the plaintiff class their rights, privileges, and immunities secured by the laws of the United States.

### Count III - Methods of Administration

143.    The plaintiffs reallege and incorporate by reference the allegations contained in foregoing paragraphs.

144.    The defendants have failed to administer the Medicaid program in an efficient and effective manner, in violation of 42 U.S.C. § 1396a(30)(A).  Specifically, the defendants have not established adequate policies, procedures, service definitions, and reimbursement rates for intensive home-based services and have not ensured a sufficient supply of providers qualified to offer these services.  As a result, the plaintiffs have been and are being denied meaningful

access to medically necessary intensive home-based services.

145.    By their violation of the Title XIX of the Social Security Act, and its implementing regulations, the defendants, acting under the color of state law, have denied the plaintiffs and members of the plaintiff class their rights, privileges, and immunities secured by the laws of the United States.

### Count IV - Managed Care

146.    The plaintiffs reallege and incorporate by reference the allegations contained in foregoing paragraphs.

147.    The defendants are required to ensure that any managed care entity which provides Medicaid services to beneficiaries has the capacity to offer an appropriate range of services and to ensure access to preventive and primary services, including all medically necessary EPSDT behavioral and mental health for children.   In violation of 42 U.S.C. § 1396u-2(b)(5), the defendants have failed to ensure that the managed care entity has the capacity to provide all medically necessary EPSDT behavioral and mental health services, including intensive home-based services, and that the entity maintain a sufficient number, mix, and geographic distribution of qualified providers which offer all of these services.

148.    By their violation of the Title XIX of the Social Security Act, and its implementing regulations, the defendants, acting under the color of state law, have denied the plaintiffs and members of the plaintiff class their rights, privileges, and immunities secured by the laws of the United States.

## REQUEST FOR RELIEF

WHEREFORE, the plaintiffs respectfully request that this Court:

1.    Certify this case as a class action pursuant to Fed. R. Civ. P. 23;

2.    Grant a preliminary and permanent injunction requiring the defendants to:

a.    establish and implement policies, procedures, and practices for screening and evaluating the plaintiffs and members of the plaintiff class to determine whether intensive home-based services are medically necessary to treat or ameliorate their behavioral, emotional, or psychiatric conditions;

b.    conduct professionally-adequate assessments of all plaintiffs who reside in private or public inpatient psychiatric facilities and DMH's Intensive Residential Treatment Programs to determine whether intensive home-based services are medically necessary to treat or ameliorate their behavioral, emotional, or psychiatric conditions;

c.    provide meaningful notice to Medicaid-eligible children and their families of the availability of the full range of Medicaid-funded mental health, and behavioral services available under EPSDT program, including intensive home-based services;

d.    establish and implement policies, procedures, and practices that are sufficient to ensure that the plaintiffs and all members of the plaintiff class promptly receive medically necessary, intensive home-based services,

including professionally-adequate assessments, crisis and case management services;

e.      establish and implement policies, procedures, practices, and reimbursement rates to ensure that a variety of qualified providers are available to offer intensive home-based services, including professionally-adequate assessments, crisis, and case management services;

f.      remove arbitrary or other barriers which prevent Medicaid-eligible children from applying for and accessing EPSDT mental health services, including intensive home-based services;

g.      promptly provide intensive home-based mental health services to all plaintiffs who would benefit from them; and

h.      eliminate the DMH waiting list for case management services for all Medicaid eligible children by providing these children with a case manager within ninety days of application, in order to coordinate assessments and services for intensive home-based services.

2.      Issue a declaratory judgment declaring that the defendants have violated Title XIX of the Social Security Act in their failure to provide medically necessary EPSDT services to Medicaid-eligible children with behavioral, emotional, or psychiatric impairments.

3.      Require the defendants to provide sufficient information on a quarterly basis to allow the plaintiffs and the Court to monitor compliance with the Court's injunction and with the requirements of the Medicaid program.

4.      Award the plaintiffs the costs of this litigation and their reasonable attorneys'

fees and costs.

5.    Grant such further and other relief as may be just and proper.

BY THEIR ATTORNEYS,

Steven J. Schwartz
Cathy E. Costanzo
Center for Public Representation
22 Green Street
Northampton, MA 01060
(413) 586-6024
BBO#448440
BBO#553813

James C. Burling
Sara J. Shanahan
Gabrielle E. Foote
Hale and Dorr, LLP
60 State Street
Boston, MA 02109
(617) 526-6000
BBO#065960
BBO#567837
BBO#645218

Frank Laski
Mental Health Legal Advisors Committee
294 Washington Street
Boston, MA 01208
(617) 338-2345
BBO#287560

Dated: October 29, 2001

47