## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
### Western Division

| | |
|---|---|
| **ROSIE D. et al.,** ) | |
| ) | |
| **on behalf of themselves and** ) | |
| **all others similarly situated,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **NO.  01-CV-30199-MAP** |
| ) | |
| **MITT ROMNEY et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

THOMAS F. REILLY
ATTORNEY GENERAL

Deirdre Roney, BBO No. 652886
Juliana Rice, BBO No. 564918
Assistant Attorneys General
Administrative Law Division
Government Bureau
One Ashburton Place, Room 2019
Boston, MA 02108
(617) 727-2200 ext. 3372, 2062

July 15, 2005

Outline of Findings and Conclusions Requested by Defendants

**Defendants' Proposed Findings of Fact**

**I.  The Massachusetts Medicaid program provides medically necessary behavioral health services to children and adolescents.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. Operation of the Massachusetts Medicaid program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1. Number of members and average length of membership. . . . . . . . . . . . . . . . . . . . . . 1
    2. Medicaid health plans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    3. Enforcement of Medicaid health plan contract provisions. . . . . . . . . . . . . . . . . . . . 3

B. Behavioral health services available under the Massachusetts Medicaid program. . . . . . . . 5
    1. Assessments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    2. Crisis services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    3. Case management. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    4. Clinical teams. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    5. Individualized supports including behavioral specialists. . . . . . . . . . . . . . . . . . . . . 14
        a. Family stabilization team (FST) services. . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        b. Community support program (CSP) services. . . . . . . . . . . . . . . . . . . . . . . . . 16
        c. Community crisis stabilization services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        d. Partial hospitalization services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        e. Community-based acute treatment (CBAT) services. . . . . . . . . . . . . . . . . . 17
        f. Enhanced residential care services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        g. Specialing services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        h. Transitional care unit (TCU) services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

C. Notice of services available under the Massachusetts Medicaid program. . . . . . . . . . . . . . 18
    1. To recipients. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        a. At time of enrollment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        b. At time of selection of a Medicaid health plan. . . . . . . . . . . . . . . . . . . . . . . 19
        c. During eligibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    2. To health care providers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**II.  Massachusetts state agencies provide mental health and child welfare services to children and adolescents.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

A. Department of Mental Health (DMH). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    1. DMH services provided in inpatient and psychiatric residential treatment facilities. 25
    2. DMH services provided in community settings. . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

B. Department of Social Service (DSS). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    1. DSS medical and behavioral health services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    2. DSS placements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

i

3.  DSS family-based services.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
4.  DSS case management. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**III.  The named plaintiffs and the children involved in plaintiffs' clinical review are receiving medically necessary behavioral health services and other state agency services.** 33

A.  Named plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

B.  Children involved in clinical review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**IV.  Massachusetts has not adopted a statewide "system of care" approach to the delivery of children's behavioral health services but instead is testing that approach on a limited basis, consistent with the state's discretion to organize the delivery of Medicaid services, the current state of research, and its own experience.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

A.  A "system of care" is a specific manner of organizing the delivery of children's mental health services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

B.  Plaintiffs' definition of "home and community-based services" describes a system of care, not a discrete clinical intervention. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

C.  Research has not demonstrated that systems of care result in better clinical outcomes for children than traditional service delivery systems or managed care systems, or that systems of care are less costly. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

D.  Massachusetts is experimenting with the system of care approach to delivery of children's mental health services in a deliberate, evidence-driven way. . . . . . . . . . . . . . . . . . . . . . . . 47
1.  The Mental Health Services Program for Youth (MHSPY). . . . . . . . . . . . . . . . . . 48
2.  The Worcester Communities of Care (WCC) program. . . . . . . . . . . . . . . . . . . . . . 50
3.  The Coordinated Family Focused Care (CFFC) program. . . . . . . . . . . . . . . . . . . . 51

E.  Massachusetts' experience with systems of care has not demonstrated that that approach to the delivery of children's mental health services should be adopted statewide. . . . . . . . . . . . . 54

**V.  Plaintiffs' clinical review does not establish that services are inadequate.** . . . . . . . . . 56

A.  The clinical reviewers and the guidelines they followed were not impartial or neutral on the subject of home-based services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

B.  Data was not gathered in a thorough or objective way and was not presented in a way that showed the services being received or obstacles to delivery of other services. . . . . . . . . . . . . 58

C.  Plaintiffs' counsel involved themselves in the review process, calling into question its objectivity and reliability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

D.  The sample size for the clinical review was not selected according to statistical principles and was too small to provide reliable information, given the huge margins of error associated with such a small sample. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

E.  The sample was not randomly selected due to potential selection bias from the large numbers of non-responders and the presence of duplicate names in the sampling frame which were treated inconsistently by plaintiffs.  These deficiencies mean that the margins of error – already large – were actually understated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

F.  Overall, the clinical review does not meet any standard of reliability.  . . . . . . . . . . . . . . . . 63

**VI.  Defendants' efforts to support and enhance children's mental health service delivery are solving the "stuck kid" problem.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

A.  What is the "stuck kid" problem. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

B.  Massachusetts has initiatives to address the "stuck kid" problem.  . . . . . . . . . . . . . . . . . . . 65

C.  The state's "stuck kid" initiatives are working and are a better approach to the problem than plaintiffs' proffered solution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

**Defendants' Proposed Conclusions of Law**

**I.  The Massachusetts Medicaid program provides services to children, and notice of the availability of services, as required by the EPSDT provisions of the Medicaid Act.**  . . . . . 68

A.  EPSDT requires states to provide services necessary to correct or ameliorate children's mental illness and conditions, and to give notice that such services are available. . . . . . . . . . . 68

B.  "Home and community-based services" as plaintiffs have defined them consist of an array of services and a process for providing them.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

C.  The Massachusetts Medicaid program provides the array of services that plaintiffs have defined as "home and community-based services." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

D.  Medicaid law does not require Massachusetts to adopt any specific process for providing services, including that favored by plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

    1.  Plaintiffs' process for providing "home and community-based services" is not a category of medical assistance under 42 U.S.C. § 1396d(a).  . . . . . . . . . . . . . . . . . . . . . 71

    2.  Plaintiffs' process for providing "home and community-based services" is not "necessary" to "correct or ameliorate" mental illnesses or conditions as required by 42 U.S.C. § 1396d(r). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

3.  States have discretion in organizing how their Medicaid programs provide services. 75

E.  Massachusetts gives notice of the availability of EPSDT services. . . . . . . . . . . . . . . . . . . . . 76

**II.  Plaintiffs' clinical review fails to satisfy the standards for admissibility of expert proof.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

**III.  Plaintiffs lack a private cause of action under the Medicaid act.** . . . . . . . . . . . . . . . . 77

## DEFENDANTS' PROPOSED FINDINGS OF FACT

**I.  The Massachusetts Medicaid program provides medically necessary behavioral health services to children and adolescents.**

1.  "Behavioral health services" are mental health and substance abuse services (Norton: 2605).[1]

2.  Massachusetts has the highest rate of use of children's mental health services, and significantly lower unmet need for children's mental health services, compared with twelve other states studied by a respected investigator; the state deserves credit for this (Burns: 275-282).[2]

3.  Medicaid-eligible children are "far better off" in terms of access to services than children with private insurance coverage (Burns: 282).

**A. Operation of the Massachusetts Medicaid program.**

**1.  Number of members and average length of membership.**

4.  Massachusetts has approximately 415,000 Medicaid recipient children and adolescents; 80,000 to 85,000 of them use behavioral health services per year (Norton: 2613, 2775-2776).

5.  The length of Medicaid eligibility in Massachusetts averages twelve to fourteen months, though persons with disabilities may be eligible longer (Norton: 2613-2614).

**2.  Medicaid health plans.**

6.  The Massachusetts Medicaid program has five health plans: Boston Medical Center Health Net Plan, Fallon Community Health Plan, Neighborhood Health Plan, Network Health Plan, and

---

[1]Michael Norton is the Deputy Commissioner for MassHealth Behavioral Health Programs and primarily responsible for Medicaid behavioral health services in Massachusetts; he is a clinical social worker with substantial experience providing behavioral health services. "MassHealth" is a short name for the Massachusetts Medicaid program (Norton: 2604-2612).

[2]Barbara J. Burns, a professor of psychology at Duke University School of Medicine, testified for plaintiffs (Burns: 215).

1

the Primary Care Clinician Plan (Norton: 2625-2626, 2660).

7.  Medicaid recipients subject to mandatory managed care (in general, those under age 65, without other health insurance, and living in the community) must enroll in a Medicaid health plan (Norton: 2620-2621, 2624-2625).

8.  All five Medicaid health plans must have a common set of health care services, a primary care doctor to provide each recipient's medical care and make referrals, 24/7 access to care, multilingual health care professionals, member services departments, a complaint process, and a commitment to providing quality care (Norton:  2626; DX 13 p. DMA071172).

9.  The only statewide Medicaid health plan is the Primary Care Clinician Plan; the other four Medicaid health plans have particular service areas within Massachusetts (Norton: 2627-2628).

10.  All five Medicaid health plans offer behavioral health services to children and adolescents; behavioral health benefits are essentially the same under all five plans (Norton: 2628, 2661).

11.  A Medicaid recipient who enrolls in the Primary Care Clinician Plan chooses one of approximately 3,000 health care providers (such as doctors and health care practices) contracted with MassHealth to participate in the Primary Care Clinician Plan.  Such recipients receive behavioral health services from the Massachusetts Behavioral Health Partnership (MBHP), which is a specialized behavioral health contractor with a network of over 1,000 behavioral health providers (Norton: 2626-2629, 2663, 2682).

12.  MBHP serves the most children with serious behavioral health needs because it serves all children in the care or custody of the Massachusetts Department of Social Services (DSS), the state's child welfare agency, as well as adoptees formerly in DSS care or custody, and also serves all children in the custody of the Massachusetts Department of Youth Services, the state's

2

juvenile justice agency.  Overall, approximately half of the 415,000 Medicaid recipient children

in state Fiscal Year 2004, and half of the 80,000 children who received behavioral health

services in that year, were MBHP members (Norton: 2660, 2723, 2945; Betts: 3514).[3]

13.  Medicaid recipients enrolled in the other four Medicaid health plans receive their behavioral

health services through those health plans, which either provide behavioral health services

themselves or contract with specialty behavioral health vendors to do so (Norton: 2629).

14.  Medicaid recipients can change health plans at any time (Norton: 2630).

**3.  Enforcement of Medicaid health plan contract provisions.**

15.  The MBHP contract requires that MBHP (1) arrange, coordinate, and authorize all medically

necessary services; (2) inform covered individuals of the availability of services and how to

access them; (3) maintain a provider network with sufficient numbers of providers with expertise

treating children and adolescents; (4) take steps to ensure access and availability of services,

including elimination of provider waiting lists; (5) enforce time standards with respect to access

to services; (6) enforce requirements with respect to provider credentialing; (7) enforce

adherence to performance specifications by network providers; (8) create and maintain links

between physical health providers and behavioral health providers to ease referrals; and (9) take

steps to ensure quality management.  The other Medicaid health plans are under similar

requirements (Norton: 2778, 2780-2784, 2792).

---

[3]Kathleen Betts has been the Deputy Assistant Secretary for the Office of Children,
Youth and Families for the Commonwealth of Massachusetts since March 2005; for the four
years prior to that, she was the Director of Child and Adolescent Services at the Massachusetts
Behavioral Health Partnership; prior to that, she was the Director of the Medical Services Unit at
the Massachusetts Department of Social Services (Betts: 3498-3500).

16.  If there is a failure to meet a contract requirement, MassHealth would assess the seriousness of the failure and respond accordingly; typically, it would require a corrective action plan (Norton: 2788).

17.  MassHealth does not receive a notification each time a Medicaid eligible child is identified as having a behavioral health need.  The volume of such notifications would be overwhelming and unmanageable.  Instead, the program pays primary care doctors to be responsible for screening, following up on appointments, and coordination; they are able to take these steps in "real time," meaning more promptly than MassHealth could, since they have an existing relationship with the patient and the relevant data, and since MassHealth does not know that a patient has seen a doctor until it receives a claim, which may be 60 to 90 days after the actual visit (Norton: 2777-2778).

18.  MassHealth negotiates yearly performance incentive projects with MBHP; as one such project, MassHealth requires MBHP to require all of its network providers to measure outcomes using standardized tools (Norton: 2788-2792).

19.  MBHP provides services to primary care doctors in the Primary Care Clinician plan to enhance the quality of care members receive, including creating provider profiles so that MassHealth can compare provider performance, and carrying out provider site visits for quality monitoring and improvement (Norton: 2784-2785, 2787).

20.  The MBHP provider manual, which is available to all MBHP network providers, sets forth performance specifications for various services (Betts: 3534-3535, PX 164).

21.  MBHP monitors its provider network by employing network managers to visit all providers and determine whether they are complying with contract requirements, and through its family

4

advisory committee, consumer advisory committee, and complaint process (Betts: 3535, 3541, 3938-3939).

22.  Where there is a violation of performance specifications, MBHP may impose a corrective action plan, recoup funds, or drop the provider from its network (Betts: 3535, 3542).

23.  MBHP has a treatment improvement series to disseminate best practices in the treatment of children and adolescents to hospitals (Betts: 3542-3543).

**B.  Behavioral health services available under the Massachusetts Medicaid program.**

**1.  Assessments.**

24.  A behavioral health assessment is a method of determining symptoms or deficits in functioning; a "comprehensive strength-based assessment" is a particular kind of assessment that focuses on a child's or family's strengths, as opposed to the more traditional focus on deficits and pathology (Norton: 2684-2688).

25.  The Massachusetts Medicaid program requires its providers to carry out pediatric preventive health care visits on Medicaid recipient children aged one to two weeks, one month, two months, four months, six months, nine months, twelve months, fifteen months, eighteen months, and then every year until the child's 21st birthday (Norton: 2666-2672, DX 12 p. W-1).

26.  In addition to the periodic preventive visits required by the schedule, providers must provide additional visits as needed, known as "interperiodic" visits (Norton: 2672).

27.  MassHealth providers are required to carry out a developmental and behavioral assessment at each pediatric preventive visit, each interperiodic visit, and when there is a concern about the child's behavioral health (Norton: 2672-2673, DX 12 p. W-2).

28.  To carry out this developmental and behavioral assessment, the provider must screen the

5

child for delays and functioning in physical development, cognitive development (including self-help, self care skills, and cognitive skills including problem-solving and reasoning abilities), language development, and psychosocial and behavioral development (including an assessment of social integration and peer relations, behavioral difficulties such as sleep disturbances and aggression, and psychological problems such as depression, risk-taking behavior, and school performance).   "Essential elements" of the assessment include "sensitive attention to parent and guardian concerns about the member," "thoughtful inquiry about parent or guardian observations," observation by the provider and the member's parent or guardian about the member's behaviors, examination of specific developmental attainments, and observation of member and parent or guardian interaction.  The provider is encouraged to use various developmental and behavioral screening instruments; the Medicaid program makes those instruments available to providers  (Norton: 2673; DX 12 p. W-2, DX 34 pp. 11-12).

29.  Primary care providers receive enhanced fees for providing these services (Norton: 2666).

30.  An assessment system that includes regular scheduled visits and additional visits as needed, and a developmental and behavioral assessment of the child at each visit, is "good quality – high standard care" (Burns: 291).

31.  Developmental and behavioral assessments of young children are typically conducted by pediatricians or family practitioners who may not have a background in children's mental health (Norton: 2675-2676).

32.  To assist pediatricians in diagnosing children's behavioral health needs, Massachusetts is implementing a Child Psychiatry Access Project to make available to primary care physicians throughout Massachusetts child psychiatry consultations by telephone within thirty minutes of

request, face-to-face psychiatric consultations when necessary, and referral assistance; it is

available to all children in Massachusetts without regard to insurance (Norton: 2676-2678;

Straus: 3011-3012, 3021-3022, 3024; Lambert: 2427-2428).[4]

33.  Availability of telephone consultations within 30 minutes of request will enable a primary

care doctor to get questions answered while the family is still in his or her office; prior to this

program, it could be very difficult to get timely child psychiatry consultations (Straus: 3030).

34.  While it would be ideal to have a child psychiatrist sitting in every pediatrician's office,

there is a national shortage of child psychiatrists, and a "rapid telephone consult can be just great

as a second choice" (Burns: 293).

35.  The developmental and behavioral assessment available to Medicaid recipient children is a

screening assessment that a primary care clinician might use to determine whether a child needed

a more comprehensive strength-based assessment by an appropriate professional with specialized

training (Norton: 2688-2689).

36.  The contracts between MassHealth and the five Medicaid health plans provide for further

assessments when children and adolescents are referred for behavioral health services (Norton:

2689-2691, 2697).

37.  For example, the contract between MBHP and MassHealth provides that every person

entering treatment receive an individualized written assessment that includes review of the

following: history of presenting problem; chief complaints and symptoms; past behavioral health

---

[4]John H. Straus, Vice President of Medical Affairs for the Massachusetts Behavioral
Health Partnership, is an experienced primary care pediatrician (Straus: 2988-2992, DX 125).
Lisa Lambert, assistant director of the Parent Professional Advocacy League, testified for
plaintiffs (Lambert: 2392).

and medical history; family, social history, and linguistic and cultural background; history of

placement outside the home (for children in state care or custody); current substance use; mental

status exam; previous medication trials, current medications and any allergies; diagnosis and

clinical formulation; level of functioning; strengths and (for children and adolescents) family

strengths; and primary care clinician's name (Norton: 2689-2692, 2966-2967, DX 35 p. 62).

38.  This individualized written assessment must be carried out within 72 hours for inpatient

admissions, within 48 hours for diversionary services, or before the third outpatient visit

(Norton: 2692; DX 35 p. 63).

39.  The individualized written assessment required for anyone entering treatment under the

MBHP contract is a comprehensive strength-based assessment (Norton: 2697).

40.  In addition to the individualized written assessment required before any treatment

commences, the MBHP contract also provides for a variety of specialized assessments, including

(1) diagnostic evaluations (to determine a diagnosis), (2) medication visits (to assess the

appropriateness of medication), (3) assessments for safe and appropriate placement (to determine

appropriate placements for children and adolescents believed to be at risk of committing sexual

offenses or arson), (4) comprehensive child and adolescent assessment protocols (a specialized

evaluation for children in state custody), (5) psychological testing (to assess functioning and the

need for services), and (6) assessments by developmental behavioral pediatricians (Norton:

2692-2697; Straus: 3031-3032; DX 35 Appendix A-1).

41.  Following up referral to a behavioral health provider with additional and more specialized

assessments is a good idea (Burns: 293-294).

42.  The other four Medicaid health plans provide behavioral health assessments like those

8

available under the MBHP contract (Norton: 2697).

**2.  Crisis services.**

43.  The crisis services available statewide in Massachusetts to Medicaid members include crisis screening, medication evaluation, short-term crisis counseling, crisis stabilization, and "specialing" (Norton: 2697, 2704; DX 35 Appendix A-1 section IE).  These are all appropriate crisis services and "a lot more crisis services than I hear most places do" (Burns: 302-306).

44.  Crisis screening is an in-person assessment to determine the level of risk an individual in crisis presents to self and others.  MassHealth requires any member experiencing a psychiatric crisis to go through crisis screening prior to admission to an inpatient setting to prevent unnecessary hospitalizations; the intent is to keep children in the community.  Crisis screenings are not limited to a provider's office but are carried out wherever needed (Norton: 2698-2699; Cohan: 1954-1958, 1970).[5]

45.  A medication evaluation is an assessment of whether a psychiatric crisis was precipitated by a person's failure to take prescribed medication, and whether emergency administration of prescribed medication may abate the crisis (Norton: 2699-2700).

46.  Short-term crisis counseling involves a counselor, the person in crisis, and his or her family developing a plan to get through the crisis (Norton: 2700-2701).

47.  A crisis stabilization unit is a place where a child at risk of hurting himself or someone else can stay until the crisis passes.  It has hospital level services such as daily psychiatric contact, nursing staff, and one-to-one staffing during the day (Norton: 2701-2702; Cohan: 1952-1953,

---

[5]Marjorie Cohan is the executive director of the Brien Center in Pittsfield, a provider of crisis and other services; she testified for plaintiffs (Cohan: 1931, 1952).

2259-2261; DX 121).

48.  In the context of crisis services, "specialing" means that someone from the crisis team remains with the person experiencing the crisis to see them through it (Norton: 2701).

49.  These crisis services (crisis screening, medication evaluation, short-term crisis counseling, crisis stabilization, and specialing ) are available to anyone in the Commonwealth 24 hours per day and 7 days per week (Norton: 2704; Cohan: 1969-1970; DX 120).

50.  Crisis services are provided wherever it is appropriate and safe; that may be in a person's home, or, if that would not be safe, in a hospital emergency room, in which case the patient would be transported to the emergency room by an ambulance or by police (Norton: 2704-2705; Cohan: 1967, 1971).  Half the emergency services episodes provided by the Brien Center (the Berkshire County crisis services provider) take place on a mobile basis (Cohan: 1931, 1976).

51.  The other four Medicaid health plans have provisions concerning crisis services comparable to those under the MBHP contract (Norton: 2706).

### 3.  Case management.

52.  Case management services are available to Medicaid recipients under the contracts between MassHealth and the five Medicaid health plans (Norton: 2706, 2729).

53.  "Case management," "care management," and "clinical management" are different terms that all relate to coordination of services (Norton: 2706-2707).

54.  Medicaid recipient children can be referred for care management services by other state agencies, primary care doctors, other providers, hospital discharge planners, home health agencies, or any other knowledgeable source (Norton: 2707).

55.  The clinical criteria for care management services under the MBHP contract for children

under 19 years of age are (1) two admissions to a 24 hour level of behavioral health care during the past 12 months, (2) unresponsiveness after the provision of three months of family stabilization team services, (3) for children aged 3-8, evidence of a new diagnosis or evaluation for a major mental illness placing the child at risk of 24 hour level of care, (4) a parent with a history of substance abuse or mental health illness that puts the child at risk, (5) a history of trauma, (6) a failed out of home placement during the past six months, (7) multiple state agency involvement necessitating intensive care coordination, (8) multiple utilization of emergency services, or (9) evidence of a chronic or otherwise complex medical condition and greater risk due to a co-existing behavioral health diagnosis or issue (Norton: 2714-2716; DX 35 Appendix A-10).  If a child meets one of these criteria, he or she will be referred for care management (Norton: 2714-2715).  It makes sense to assess whether a child needs clinical management by looking at clinical factors (Burns: 294-295).

56.  There are three levels of care management under the MBHP contract, determined by need and intensity: targeted outreach, care coordination, and intensive clinical management (Norton: 2707-2708, 2717; Kaegebein: 3075, 3083-3084).[6]  It makes sense to provide different levels of case management of varying intensity (Burns: 295).

57.  Targeted outreach, the least intensive care management level, assists Medicaid recipients who have difficulty getting to appointments, making housing and disability applications, or getting referrals to providers (Norton: 2724-2726; Kaegebein: 3084, 3149).

58.  Care coordination, the next level, is to assist Medicaid recipients who have difficulty

---

[6]Deborah Kaegebein, Director of Care Management at the Massachusetts Behavioral Health Partnership, is a licensed psychologist (Kaegebein: 3072-3075, DX 124).

following through with treatment plans; the service is intended to prevent, for instance, repeated hospitalizations caused by failure to follow through on a hospital discharge plan (Norton: 2724-2726; Kaegebein: 3084-3085, 3153-3157).

59. Intensive clinical management, the most intensive level of care management, is intended for the most complex cases; not all children need that level of coordination (Norton: 2708, 2717-2718, 2723-2724; Kaegebein: 3085).

60. The goals of intensive clinical management are to improve coordination and delivery of community-based services, support medical needs, increase integration of medical and behavioral care, decrease the use of unnecessary acute inpatient services, increase the use of diversionary services, promote rehabilitation and recovery, and improve recipients' overall quality of life (Bannish: 3779-3780, PX 164 p. 3-96).[7]

61. An intensive clinical manager is required, among other things, to implement a coordinated approach to the patient's care through a multidisciplinary team, to assist in the development of a discharge plan, to facilitate a schedule of home visits and face-to-face contacts if appropriate, to facilitate communication among interested parties, to provide linkages with other state agencies and actors, to make best efforts to ensure timely and coordinated access to care, to coordinate multiple agency involvement, and to document her activities (Norton: 2721-2722; DX 35 p. 70; Kaegebein: 3086, 3090, 3158-3159, 3168-3169; Bannish: 3769-3771, 3792-3793).

62. An intensive clinical manager works with a family until the situation is stable; this can vary from a couple of weeks to a period of years, with an average duration of 18 months (Kaegebein:

---

[7]Jayne Bannish, an intensive clinical manager employed by the Massachusetts Behavioral Health Partnership, is a licensed independent clinical social worker (Bannish: 3766-3767).

3087, 3160).  There is no time limit on intensive clinical management (Norton: 2724).

63.  A recipient is discharged from intensive clinical management only when discharge criteria are met (Kaegebein: 3087-3088; Bannish: 3781-3782, PX 164 pp. 3-96 to 3-97).

64.  "Intensive clinical management" under the MBHP contract is similar to "case management" as the plaintiffs use that term (Norton: 2723).

65.  Because case management requires discussion among various persons involved with a child, providers can bill for family consultations (when they speak with family members and other significant persons in a child's life), case consultations (conversations among providers), and collateral contacts (when they speak with other significant persons such as teachers, day care staff, or staff of other state agencies) (Norton: 2726-2729), DX 35 Appendix A-1).  "Being able to talk together is very important," and it is helpful to pay providers for doing so (Burns: 296, 300-301).

66.  The state Medicaid agency lacks the authority to designate a case manager for a child with severe emotional disturbance who could serve as the sole point of authority for authorizing and coordinating both Medicaid and non-Medicaid services for that child, because many non-Medicaid services must be provided by other state agencies with statutory mandates concerning, for instance, child protection and juvenile justice; however, when a child has a case manager provided by another state agency, that fact is taken into account in deciding whether an intensive clinical manager will add a benefit to the child and family (Norton: 2729-2733).

### 4.  Clinical teams.

67.  A clinical team exists where more than one person has a clinical responsibility to provide treatment (Norton: 2733-2734).

68.  Under the MBHP contract, multidisciplinary treatment teams review assessments, draw up treatment plans, and participate in discharge planning; assess the need for care management; and provide Family Stabilization Team services (a type of diversionary service described below), Community Support Program services (another diversionary service also described below), and crisis services (Norton: 2734-2739, 2742-2743; Cohan: 2269-2273).  These services are available statewide throughout Massachusetts, and from other Medicaid health plans (Norton: 2743).

### 5.  Individualized supports including behavioral specialists.

69.  An "individualized support" is anything one would use to support someone with a need, and a "behavioral specialist" is someone with training working with people to increase helpful behaviors and decrease unhelpful behaviors (Norton: 2743-2744; Cohan: 2274).

70.  There are a variety of services available statewide under the MBHP contract, and also under the other four Medicaid health plan contracts, that could be considered "individualized supports including behavioral specialists" (Norton: 2744, 2771).

### a.  Family stabilization team (FST) services.

71.  Family Stabilization Teams (FST) offer home-based services to families who need additional support to manage a child at home, or help with a child's transition home from an inpatient hospital admission or residential placement; it is a diversionary service, meaning an alternative to inpatient hospital or acute residential treatment (Kaegebein: 3093-3096, 3103; Marcus: 2183, 2196-2198; DX 123).[8]

---

[8]Jonathan Marcus is the vice president of child and family services at Community Counseling of Bristol County, a provider of FST, CSP and other services; he testified for plaintiffs (Marcus: 2177, 2181).

72.  MBHP has contracts with 26 FST providers throughout the state; all FST providers have licensed mental health clinicians and BA-level paraprofessionals (Kaegebein: 3105-3106; Marcus: 2183).

73.  There are clinical criteria for FST services (Kaegebein: 3097-3099, PX 164 p. 3-19).

74.  FST has "open referral," meaning anyone involved with a child or family can refer them for FST services (Kaegebein: 3104-3105).

75.  A family receiving FST services has contact with the team at least twice per week and 24/7 beeper access.  Among the services available through FST are referral to afterschool programs, team attendance at school special education planning meetings and behavioral health appointments, parent training in behavior management techniques, and arrangement of overnight crisis beds if needed (Kaegebein: 3107-3108, 3119-3122).

76.  While the MBHP provider manual describes FST services as "short term, intensive, therapeutic services in the home setting," the services are available for as long as they are medically necessary, and MBHP has emphasized this point to providers (Norton: 2739-2742; Kaegebein: 3098-3102, 3183, 3218-3219).

77.  MBHP receives approximately 3,000 requests for FST per year and has never denied one (Straus: 3011).

78.  FST services are initially authorized for a period of three weeks, and can be reauthorized thereafter; MBHP has never denied such a request (Kaegebein: 3112-3115).  It is reasonable to review care periodically to ensure that it remains appropriate, and to review relatively intense

15

care more frequently, even every few days (Nace: 1329-1333).[9]

79.  There are specific clinical criteria that must be met before a Medicaid recipient can be discharged from FST (Kaegebein: 3102-3103, PX 164 p. 3-20).

80.  Since MBHP adopted open referral for FST services in July 2004, the number of referrals, which had been approximately 90-110 per month, increased by an additional 60 children per month; the additional open referrals are children being referred earlier, before their needs became acute, which allows families to be stabilized earlier.  FST providers have hired more staff to deal with the increase (Kaegebein: 3108-3109, 3118-3119, 3200, 3218; Marcus: 2188-2189).

81.  FST reimbursement rates were increased 13% during 2004 (Kaegebein: 3107-3108).

82.  "Family stabilization team" services are an "individualized support including behavioral specialists" because the FST paraprofessional teaches the child new skills, such as asking for help in more appropriate ways, or may implement plans to reward appropriate behavior (Norton: 2746-2747; DX 35 Appendix A-1; Burns: 312; Cohan: 2275).

**b.  Community support program (CSP) services.**

83.  Community Support Programs (CSP) provide an array of services delivered by a community-based, mobile, multidisciplinary team of professionals and paraprofessionals, in accordance with a treatment plan (Kaegebein: 3125; PX 164 p. 3-17; Burns: 308-309; DX 122; Marcus: 2205-2206).

84.  CSP is less intense than FST; its paraprofessionals provide transportation, make referrals,

---

[9]David Nace, psychiatrist and former medical director of a large behavioral health company, testified for plaintiffs (Nace: 1289, 1324-1325).

help fill out applications, attend meetings, and do education on the importance of compliance with treatment plans, with the purpose of maintaining recipients in the community (Kaegebein: 3123, 3125; Marcus: 2202).

85.   MBHP has never denied a request for CSP services (Kaegebein: 3135).

86.   There are admission and discharge criteria for CSP services; a child and family would not be discharged until the criteria were met, and CSP services may be provided for years (Kaegebein: 3124-3133, PX 164 pp. 3-17 to 3-18).

87.   CSP reimbursement rates were increased 13% during 2004 (Kaegebein: 3133).

88.   Community support program services are an "individualized support including behavioral specialists" because community support program workers assist individuals with learning necessary skills to get to their appointments or follow up on their treatment plans (Norton: 2744-2745; DX 35 Appendix A-1; Burns: 308-309; Cohan: 2275).

### c.  Community crisis stabilization services.

89.   Community crisis stabilization services, described above in ¶ 47, are an "individualized support including behavioral specialists" because one facet of that service is that the child or adolescent and family are taught to follow through on medicine and crisis plans (Norton: 2745-2746; DX 35 Appendix A-1; Cohan:  2275).

### d.  Partial hospitalization services.

90.   Partial hospitalization services are an "individualized support including behavioral specialists."  Partial hospitalization, a short-term day program for someone previously hospitalized, is used as a transition to ease into a non-hospital routine; it includes learning skills to be successful outside the hospital and in school (Norton: 2747-2749, 2757-2758; DX 35

17

Appendix A-1; Burns: 312).

### e.  Community-based acute treatment (CBAT) services.

91.  Community-based acute treatment for children and adolescents is another individualized

support including behavioral specialists.  It is a hospital-like program delivered in a community

setting, and each child or adolescent has an individualized treatment plan to teach skills and

behaviors that will help them adapt at home (Norton: 2758-2762; DX 35 Appendix A-1).

### f.  Enhanced residential care services.

92.  Enhanced residential care is another individualized support including behavioral specialists.

It is intended to increase the clinical capacity of Department of Social Services residential

programs for children and adolescents to handle children with relatively more challenging

behaviors, thereby eliminating the need to send them to a psychiatric hospital, by assigning non-

clinical staff to work with the child or adolescent to develop strategies, build skills, and support

the child's behavior and plans so that the child can successfully progress in the residential setting

(Norton: 2762-2765; DX 35 Appendix A-1).

### g.  Specialing services.

93.  "Specialing" is another individualized support including behavioral specialists; it means that

a trained staff person provides one-to-one care to a person experiencing some type of crisis,

teaching the person better skills to prevent crisis recurrence (Norton: 2766-2767; Appendix A-1;

Burns: 315).

### h.  Transitional care unit (TCU) services.

94.  Transitional care unit services are another individualized support including behavioral

specialists.  The transitional care unit is a community-based program that is a step down from

inpatient care, and is targeted for children awaiting a community placement.  It includes work with the child on skills and therapies to help the child transition into his or her next living arrangement (Norton: 2767-2771, DX 35 Amendment 8).

**C.  Notice of services available under the Massachusetts Medicaid program.**

**1.  To recipients.**

**a.  At time of enrollment.**

95.  All Medicaid enrollees who are required to enroll in managed care receive an enrollment guide to inform them about the five Medicaid health plans (Norton: 2619-2620, DX 13).

96.  The enrollment guide gives a general list of covered services, including mental health care; among the covered services listed in the guide are emergency services, inpatient services, diversionary services (including community-based acute care, partial hospitalization, family stabilization teams, and community support programs), and outpatient services (DX 13, p. DMA071168).  The guide is not intended to be highly detailed, because it tries to balance comprehensiveness with ease of understanding, and it does not specifically reference the acronym "EPSDT," because that is a legal term that could be confusing (Norton: 2621-2622).

97.  Oral information in English and other languages about available Medicaid behavioral health services is available from the 800-number customer service lines that each health plan must maintain, and from the MassHealth customer service line (a number that appears on the back of every MassHealth card) (Norton: 2622-2624, 2629-2630, DX 15).

**b.  At time of selection of a Medicaid health plan.**

98.  Once a Medicaid recipient chooses a health plan, the health plan sends the recipient a member handbook and calls them to welcome them to the plan (Norton: 2630-2631).

99.  Medicaid recipients who enroll in the Primary Care Clinician Plan receive the Primary Care

Clinician Plan Member Handbook, which is intended to describe available services and how to

access them (Norton: 2631-2632, 2637, DX 18).

100.  The Primary Care Clinician Plan Member Handbook gives a brief description of mental

health and substance abuse services covered under the plan, including emergency treatment,

mental health evaluation, counseling, psychological testing, day treatment, community support

services, family stabilization services, and psychiatric hospitalization; it also gives an 800

number to call to access services (Norton: 2637-2638, DX 18 p. 19).

### c.  During eligibility.

101.  The Massachusetts Medicaid program sends out a variety of notices to parents and

guardians of Medicaid-eligible children and adolescents reminding them that Medicaid pays for

any medically necessary care for their child, including regular check-ups.  These notices, which

are deliberately general in nature and encourage the parent or guardian to speak to their doctor

about any concerns and to arrange for follow-up treatment, are sent (1) when the child is initially

determined eligible for Medicaid, (2) when a family that has been ineligible for a period of time

becomes eligible for Medicaid again, (3) every year thereafter, and (4) if they have missed a

scheduled checkup (Norton: 2638-2644, DX 19, 20, 22, 23).

102.  MassHealth encourages doctors to make parents and guardians aware of the need for well-

child visits to a health provider on a regular schedule (Norton: 2645; DX 24).

103.  MassHealth sends out materials specifically designed to appeal to adolescent Medicaid

recipients to encourage them to have regular check-ups (Norton: 2646-2647, DX 25).

104.  The notices admitted as exhibits at trial are merely a sample of those that the Massachusetts

Medicaid program sends out to inform families about available services (Norton: 2647).

105. MBHP takes steps to educate families about available behavioral health services (Betts: 3517).

106. Examples of written materials that MBHP distributes to families to educate them about behavioral health services available to children and adolescents include:

(1) an annual Recovery and Wellness Bulletin distributed to mental health clubhouses, doctors' offices, and other places where mental health consumers may meet with information about available services (Betts:  3517-3518, DX 54);

(2) a twice-yearly mailing to all heads of households with Medicaid-eligible members, "Health Highlights," which provides information about available services in English and Spanish, for example how a crisis plan can help a child with behavioral health needs (Betts: 3518-3520, DX 55);

(3) a pocket-sized Consumer Information Guide listing telephone numbers for services, peer support, and advocacy organization, proposed as a useful resource by a formerly homeless person, and distributed through clubhouses and emergency rooms (Betts:  3520-3521, DX 64);

(4) a brochure, "How Can MBHP Help Me," containing a brief description of available services and how to access them, and distributed to Primary Care Clinician plan members through primary care physicians' offices (Betts:  3521-3523, DX 63);

(5) a brochure distributed to all families with MBHP members, "Does Your Child Need Mental Health or Substance Abuse Services," describing circumstances that might prompt a need for services, types of available services, and how to obtain them (Betts:  3523-3526, DX 62);

(6) a "Crisis Planning Guide for Parents" explaining how to obtain crisis services and

how to develop a crisis plan for a child or adolescent (Betts:  3526-3528, DX 61);

(7) a "Guide to Crisis Prevention and Planning" in English and Spanish, developed specifically for foster and adoptive parents caring for children with behavioral health issues, and currently being revised for use by all families (Betts:  3528-3533, DX 57);

(8) a Family Stabilization Fact Sheet for Families describing how FST can help a family and how to obtain it (Kaegebein: 3093-3095, DX 58); and

(9) a guide to "How to File a Complaint About Your Healthcare" (Betts: 3533-3534, DX 59).

### 2.  To health care providers.

107.  MassHealth takes steps to educate health professionals about the services it will pay for (Norton:  2647).

108.  The Massachusetts Medicaid program has established specific billing guidelines for EPSDT services; all Medicaid providers receive a booklet containing those guidelines (Norton: 2647-2651, DX 26, 27).

109.  The MassHealth EPSDT billing guidelines explain to health care providers how to bill MassHealth for performing required screenings; by doing so, providers can obtain enhanced fees, and the MassHealth program is able to track EPSDT participation (Norton: 2648-2651, DX 26, 27).

110.  MassHealth sends all Medicaid providers a fact sheet on well child care screenings and diagnosis services required by EPSDT.  The fact sheet includes an 800 number that providers can call to obtain information about services available to their patients, including behavioral health services, with the goal that providers be well-informed about EPSDT (Norton: 2651-2653,

DX 28).

111.  All primary care clinicians contracted with the Massachusetts Medicaid program receive a catalog of health education materials that they can request free of charge, a number of which are specific to behavioral health; these include guides to MassHealth behavioral health services that providers can distribute to their patients, such as "A Guide to Crisis Prevention and Planning for Foster/Adoptive Families," "How Can MBHP Help Me?  A Guide for PCC Plan members," "Tips for Those Who Take Medications," and reminder cards that providers can use to remind parents to bring children in for EPSDT screenings, as well as screening tools that providers can use to assess their patients' behavioral health (Norton: 2653-2660, DX 34).

112.  The Massachusetts Behavioral Health Partnership educates providers about available behavioral health educational materials and also collects data about providers' use of behavioral health services to be used in improving the quality of services (Norton: 2655-2657).  An example of information about available services is the Family Stabilization Team Brochure for Providers, which explains how a provider can obtain FST services for a patient (Kaegebein: 3095-3097, DX 52).

113.  One means by which MBHP notifies its providers of network related matters is by issuance of Network Alerts, which go to all providers to inform them about administrative matters such as changes in rates.  As an example, MBHP Network Alert No. 119, dated March 18, 2004, alerted providers to a rate increase of 5.2%, and MBHP Network Alert no. 120, also dated March 18, 2004, alerted board-certified and board-eligible child psychiatrists to a rate increase of 43% (Betts: 3535-3538, DX 49).

114.  The March 2004 rate increase was associated with the expectation that providers would

begin collecting data using outcome tools as part of MBHP's treatment outcome initiative (Betts: 3538).

115.  MBHP informs providers about clinical matters through Clinical Alerts; as an example, MBHP Clinical Alert Vol. 6 # 4 dated July 26, 2002 informed primary care doctors about the availability of targeted outreach and community support services for their clients, and the use that primary care doctors could make of those services in ensuring that their patients show up for appointments and follow through on treatment plans (Betts: 3538-3540, 3937-3938, DX 50).

116.  MBHP informs providers about quality improvement matters through Quality Alerts; as an example, MBHP Quality Alert No. 10, dated May 10, 2004, notified providers about new requirements related to measuring behavioral health treatment outcomes (Betts: 3540-3541, DX 51).

## II.  Massachusetts state agencies provide mental health and child welfare services to children and adolescents.

117.  Because Massachusetts agencies provide services in addition to Medicaid, a child with behavioral health issues may be involved with multiple state agencies.  Planning and Review Teams are intended to bring together, on a regular basis, all of the state's child-serving agencies to identify and resolve problems with individual children and perform coordination.  Beginning in September 2005 there will be six regional planning and review teams, each with representatives from all the state's child-serving agencies and from families (Mikula: 4358, 4362-4366; Lambert: 2428-2432).[10]

## A.  Department of Mental Health (DMH).

---

[10]Joan Mikula is the assistant commissioner for child and adolescent services at the Massachusetts Department of Mental Health (DMH) (Mikula: 4305-4307).

118.  The Massachusetts Department of Mental Health, DMH, is the state agency responsible for providing services to seriously mentally ill adults and seriously emotionally disturbed children. Eligibility for DMH services for children is based on criteria that include the diagnosis of a relatively serious mental illness or emotional disturbance, duration of disorder of at least one year, and functional impairment (Mikula: 4308-4309, 4390-4392).

119.  DMH provides child and adolescent services to individuals under the age of 19, and adult services to individuals aged 19 and above.  In state Fiscal Year 2004, DMH spent close to $81 million on mental health services for children and adolescents (Mikula: 4310-4311, 4317-4318; DX 41).

120.  DMH generally serves children aged five and up; while its guidelines allow the agency to provide child and adolescent services to any individual 18 and under who needs those services and meets eligibility criteria, the mental health needs of aged 4 and under are generally more appropriately met by the Department of Public Health's Early Intervention program (Mikula: 4311-4312).

**1.  DMH services provided in inpatient and psychiatric residential treatment facilities.**

121.  DMH operates one continuing care inpatient unit with eighteen beds for adolescents between the ages of 13 and 18 at Taunton State Hospital and contracts for a 30-bed adolescent unit at Westborough State Hospital.  A child would be placed in one of those units if, after a period of acute hospitalization, it were determined that he or she was not able to return to the community without significant additional hospital-level care.  DMH does not have inpatient units for young children because it determined that their needs would be better met by residential care and other community services (Mikula: 4312-4313, 4318-4321, 4354).

25

122.  Intensive residential treatment programs (IRTPs) are the most highly structured and intense, and most highly staffed, residential programs for children.  They are locked facilities for adolescents who are dangerous to themselves or others by reason of mental illness (Mikula: 4348).

123.  DMH has two 15-bed "behavior intensive residential treatment programs" (BIRTs) for children in DSS custody who are aggressive and/or exhibit sexually problematic behaviors; one is targeted to cognitively limited children (Mikula:  4348).

124.  "Clinically intensive residential treatment"(CIRT) is a structured 24 hour environment for children 12 and under.  DMH has one such program, Three Rivers, in Springfield, and one in Boston.  A child would be placed in such a program following hospitalization if he still had needs too great to be accommodated in a group home or residential setting.  If a parent lives far away from a CIRT (or other DMH residential treatment program) transportation for visits is provided.  A child placed at a CIRT would have a DMH case manager to work on discharge planning (Mikula: 4349-4350, 4352-4354).

125.  Medicaid reimbursement is available for the various DMH inpatient and psychiatric residential treatment facilities (Mikula: 4347, 4349).

**2.  DMH services provided in community settings.**

126.  DMH employs approximately ninety child and adolescent case managers.  DMH case managers provide care coordination, advocacy, information, and linkages for the child and family to DMH services, other state agencies, the education system, and providers.  They also help create treatment plans for each child or adolescent and ensure that those plans are implemented (Mikula: 4312-4316, 4323-4325).

127.  Medicaid reimbursement is available for DMH case management services provided to Medicaid eligible children (Mikula: 4408-4409).

128.  DMH case managers have 20 children, on average, and are expected to meet with their clients at least once per month.  They also meet with other persons involved with the child, such as teachers, other agencies' staff, and service providers (Mikula: 4324).

129.  Under DMH regulations, any child eligible for DMH services is automatically eligible for case management (Mikula: 4321-4322).  As a result, DMH has a wait list for case management services of approximately 1,400 children, not all of whom actually need those services.  About 70% of children on the wait list are in fact receiving services from DMH contracted providers, including care coordination.  The average time on the wait list is 40 days, but high risk children receive immediate case management.  DMH will be reprocuring most of its community services in 2006, and in doing so will be assessing the role of case management in its services delivery system (Mikula: 4326-4331, 4404-4407).

130.  DMH individual and family flexible support is a highly individualized array of services selected and authorized by the case manager to address specific issues in a child's and family's situation.  Among the services that can be purchased with flexible support dollars are recreation programs, music therapy, evaluations, tutoring, mentoring, summer camp, and after school activities for the child; there are no formal limitations on the type of services that might be purchased with flexible support dollars, and the guiding principle is to purchase what the child needs in order to make gains (Mikula: 4335-4336, 4338-4340).

131.  DMH spent $13.7 million on flexible supports in state Fiscal Year 2004, all of which was state-appropriated funds; Medicaid did not provide reimbursement for those expenditures.

Flexible support spending is increasing, as part of a movement to redirect spending from residential to non-residential community care (Mikula: 4338-4339, 4346-4347, 4413).  While there are no time limits on flexible support services, DMH looks for positive gains; if it appeared that those services were not having the desired outcome, as defined both by the parent and the child's treatment plan, then the services would be withdrawn (Mikula: 4340-4341).

132.  Respite care is days or hours of temporary relief to give breathing time to families caring for a child with mental illness and allow them to do other things.  It can be provided in a home or a structured respite program.  DMH spent $1.3 million on this service during state Fiscal Year 2004; all of that amount was state-appropriated funds.  Medicaid did not provide reimbursement for these services (Mikula: 4347, DX 41).

133.  DMH child/adolescent residential services are supervised living arrangements in the community; they are staffed by clinicians, mental health workers, and counselors, and are typically offered to children and adolescents who cannot be at home for an extended period of time (Mikula: 4347).

**B.  Department of Social Services (DSS).**

134.  The Massachusetts Department of Social Services, or DSS, is the state child welfare agency (Betts: 3500-3501).

135.  A DSS "open case" is a family to which a case manager is assigned to provide necessary services; usually, open cases involve all family members.  As of March 2004, DSS had 22,988 open cases, and was providing services to 39,937 children (Wentworth: 4146-4149).[11]

---

[11]Robert Wentworth is the Director of Integrated Services for the Massachusetts Department of Social Services, responsible for its family-based services and residential services; he is a licensed certified social worker (Wentworth: 4145-4146).

136.  DSS cases are usually opened as a result of determination that there is reasonable cause to believe that abuse or neglect of a child occurred; they can also commence as the result of a petition for a child in need of services, or a request for voluntary services where the parent does not give up custody (Wentworth: 4149-4151, 4255; Betts: 3502-3303).

**1.  DSS medical and behavioral health services.**

137.  All children who enter DSS care or custody are determined for Medicaid eligibility as soon as they enter the state's care or custody.  Children adopted after being in DSS care or custody remain eligible for Medicaid post-adoption regardless of their adoptive parents' income through their 18th birthday, or their 21st birthday if they remain in school (Betts: 3501-3502).

138.  Children in DSS care or custody generally receive their behavioral health services through MBHP (Betts: 3502).

139.  DSS must arrange a medical screening within 7 days, and a comprehensive medical evaluation within 30 days, for all children entering its care or custody (Betts: 3510).

**2.  DSS placements.**

140.  A DSS "placement" means that a child is in a paid placement with a foster home or in a congregate care facility; there is no minimum age for placement, and children can remain in placement up to age 22 if they have educational or developmental needs (Wentworth: 4151-4152; Betts: 3503).

141.  DSS looks for the least restrictive placement that best matches the child's clinical needs (Betts: 3503).

142.  Children can receive services from DSS while living at home; a child with a DSS open case who is not in placement is living at home (Wentworth: 4152).

143.  At the end of March 2004, 26% of children with open DSS cases, or approximately 10,000 children, were in placement (Wentworth: 4153).

144.  DSS has two main kinds of placements, foster care and residential care.  A foster care placement is a family setting with a home in the community and foster parents.  Residential care is care in a congregate setting, with 24/7 supervision, for children whose needs cannot be met safely in the community.  At the end of March 2004 there were 8,031 children in foster care, and 2,660 children in residential care  (Wentworth: 4153-4156; Betts: 3503, 3505-3508).

145.  One type of DSS foster care is therapeutic foster care for children with behavioral health needs.  In a therapeutic foster home, which is a home in the community, the foster parents have been trained to work therapeutically with children with a variety of behavioral and emotional needs; one parent must be always available to the child and cannot have outside employment; and DSS staff make frequent visits to the home to ensure that the child's needs are met through counseling and other mental health services.  There can be at most two therapeutic foster children in such a home.  A higher reimbursement rate is provided for this type of foster care.  At the end of March 2004 there were 1,696 children in therapeutic foster care (Wentworth: 4153-4154, 4156-4161; Betts: 3512-3513).

146.  Medicaid reimbursement is not available for the costs of room and board in a foster care setting or for locating foster parents (Betts: 3523).

147.  DSS offers a variety of types of foster care, including foster care with relatives, for children whose level of need is not so great as to require therapeutic foster care; regardless of type, foster care is provided in homes in the community.  DSS will place a child in foster care with relatives or family friends when possible; the goal is always to place a child in the most homelike and

least restrictive setting consistent with safety (Wentworth: 4161-4167; Betts: 3508-3509).

148.  DSS will seek a residential care placement rather than a foster care placement if the child needs a more secure environment because, for example, he or she poses a risk of harm to self or others, a risk of flight, or needs on-site educational or clinical services (Wentworth: 4166; Betts: 3509-3510).

149.  DSS has a variety of residential models and settings, depending on a child's needs (Wentworth: 4167).

150.  The most intensive level of DSS residential care is provided by chapter 766 residential schools, of which there are approximately 90.  These schools provide special education, psychiatric, counseling, medication, therapy, monitoring, and nursing services on site.  A child would be placed at a chapter 766 school based on a school district's determination that such a placement was necessary to meet the child's needs.  Chapter 766 programs generally house children in cottages or dormitories in a campus setting, and staffing is 1 staff member to 3 children.  There were 591 children in chapter 766 placements in March 2004 (Wentworth: 4167-4168, 4179-4182, 4184).

151.  Group homes are a less intensive level of DSS residential care.  Group homes are more community based, and are for children whose behavior can be managed in the community. Group homes are typically large Victorian or ranch style houses in neighborhoods; on average, 10-16 youths live in a group home, and they attend community schools and can participate in community activities.  Staffing is less intensive than with chapter 766 schools, and can vary from 1:4 to 1:8 depending on the type of group home.  DSS has regular group homes and specialized group homes, such as for children with developmental disabilities, pregnant parenting teams,

children aged 6-10, gay and lesbian youth, or youth whose sexual behavior has led to some exploitation (Wentworth: 4168, 4185-4192).

152.  Children in DSS residential care placements are reviewed every three months to determine if the placement remains appropriate.  In addition, every child in DSS placement (foster care and residential care) receives a foster care review every six months concerning the appropriateness of his or her current setting (Wentworth: 4175-4176, 4197-4200).

153.  Commonworks is a DSS program to coordinate care and services for children in therapeutic foster care, chapter 766 programs, or group home placement.  Commonworks coordinates residential services and any additional services needed to support a child in a placement; it also provides aftercare for up to six months after a child leaves a placement, to transition the child back into the community.  There were 1,283 children receiving services from Commonworks in March 2004, or about half the children in residential or group home placement.  Length of stay is determined by need (Wentworth: 4169-4179, 4182-4185).

**3.  DSS family-based services.**

154.  DSS family-based services are intended to support families and prevent out-of-home placements (Wentworth: 4192, 4236).  They include intensive family intervention services (one or two counselors going into the home several times per week for a period of time), three or six months of "tracking" (a worker meets with a child several times per week in the community to build a relationship), parent aid services, and care coordination.  There is no prescribed duration for these services (Wentworth: 4192-4193, 4244).

**4.  DSS case management.**

155.  DSS case management is the responsibility of a DSS social worker.  It includes making

determinations about the safety of, and possible risk to, a child, and testifying when necessary, as well as developing permanency plans.  Since a DSS case manager may act as a child's guardian when a court has awarded custody to DSS, it is not clear that their responsibilities could be assumed by a case manager from outside DSS (Wentworth: 4193-4195, 4206-4208, 4265-4266).

**III.  The named plaintiffs and the children involved in plaintiffs' clinical review are receiving medically necessary behavioral health services and other state agency services.**

**A.  Named plaintiffs.**

156.  Of the eight named plaintiffs, six (Anton B., Devin E., Jerry N., Joshua D., Shaun E., and Sheena M.) live at home (Alintuck: 69; White: 545; Barbara E.: 2460; Pelechowicz: DX 134 pp. 4-5; Emelie D.: DX 132 pp. 26-29; Earp: 412; Bannish: 3812).[12]  As of September 2004, plaintiff Rosie D., who had been at home, was admitted to a Crisis Stabilization Unit and being considered for placement in a therapeutic foster home (PX 1157R, DX 128 p. RD 2812).  Plaintiff Tyriek H. lives in a DMH-contracted residential program (Christine H.: 1093-1094).[13]

157.  Anton B. was born prematurely and received Early Intervention services (occupational, physical, and speech therapy) until age 3.   He was diagnosed with attention deficit hyperactivity disorder (ADHD) at age 4 following a comprehensive four-day evaluation at Children's Hospital and thereafter received weekly psychotherapy and medication management.  After being

---

[12]Lisa Alintuck is the mother of named plaintiff Anton B. (Alintuck: 47).  Marcia White, a social worker, testified for plaintiffs (White: 453, 480).  Barbara E. is the grandmother and guardian of named plaintiff Devin E. (Barbara E.: 2460).  Susan Pelechowicz is the mother of named plaintiff Jerry N.; citations to her testimony reference her deposition, DX 134 (Pelechowicz: DX 134 p. 4).  Emelie D. is the mother of named plaintiff Joshua D.; citations to her testimony reference her deposition, DX 132 (Emelie D.: DX 132 p. 61).  Jacqueline Earp is the grandmother and guardian of named plaintiff Shaun E. (Earp: 412).  Parents and guardians who share a surname with a named plaintiff are referred to by first name and last initial.

[13]Christine H. is the mother of named plaintiff Tyriek H. (Christine H.: 1066).

diagnosed with bipolar disease at approximately age 7, he began receiving services from Dr. Janet Wozniak, a child psychiatrist with expertise in pediatric bipolarity, whom he still sees regularly; he also receives DMH services, including a case manager, therapy, after-school and weekend programs, and, at certain times, a "special" (a mental health worker who would take him on outings several times per week). He has received Family Stabilization Team services several times (Alintuck: 48-50, 52-53, 56-65, 71, 78-83, 85-87, 95; White: 547)

158. Anton B. receives "a lot of mental health services"; Dr. Wozniak, his psychiatrist, is "excellent" and "relentless in her commitment to find the appropriate combination of medication and treatment interventions to enable Anton and his mother to make progress" (White: 545, PX 1092B p. 22). It's not clear that any intervention will eliminate Anton's symptoms, and, because of his instability, Dr. Wozniak has made frequent changes in his medication; at least one of his hospitalizations may have been caused by a medication change (Wozniak: 116-117, 137-138, 149-150).

159. Anton B. had private health insurance as his primary coverage, with Medicaid as secondary coverage, for much of his life; he became enrolled with MBHP in March 2005 (Alintuck: 59-60, 66, 78, 84, 87, 95-96, 105; Kaegebein: 3139, 3143).

160. Devin E. began receiving Early Intervention services at age 2 after his grandmother observed aggressive behavior by him, and has received medication and therapy since a psychiatric evaluation at age 4. After a comprehensive assessment at Children's Hospital at age 6 he was diagnosed with post traumatic stress disorder, reactive attachment disorder, and possible bipolar disorder. Devin's treating psychiatrist and others have recommended residential care for him, and his school district has proposed several residential school placements for him,

but his grandmother is unwilling to consider residential care.  Devin has an intensive clinical

manager from MBHP and receives in-home behavioral specialist services from a Family

Stabilization Team; in addition, he receives a 1:1 aide and speech and occupational therapy at

school, and has a stipend for respite services.  While Barbara E. would like to have someone take

Devin on outings, this is difficult to arrange because of his history of assaulting caregivers,

including with a baseball bat.  Nonetheless, his problematic behaviors "have diminished quite a

bit" to the point where he is able to stay in school (Barbara E.: 2462-2466, 2468-2470, 2476-

2481, 2498, 2514-2522; Beyer: 1520-1522; Bannish: 3787-3791, 3796-3803, 3870-3871; PX

71B p. 7).[14]

161.  Jerry N. has been diagnosed with mood disorder, ADHD, and a chromosomal abnormality

(he has an extra Y chromosome) which causes short attention span.  His mental health care is

managed by a psychiatrist, Dr. Madias, whom he sees every two weeks, and he also receives

therapy every two weeks.  Jerry received Community Support Program services between

November 2003 and June 2004.  The services he received improved his stability; he has not been

hospitalized since 1998 (Pelechowicz: DX 134 pp. 34-40, 42-43, 55-62; PX 541A, 541B; White:

543).

162.  Joshua D. has been diagnosed with pervasive developmental disorder and obesity.  He has

an intensive clinical manager and is receiving Community Support Program services from

MBHP; his CSP worker meets with him weekly, takes him swimming, and works on social skills

with him.  He also receives psychiatric services and medications (Bannish: 3803, 3806-3811;

Emelie D.: DX 132 pp. 65-67, 69, 72, 99, 162).

---

[14]Marty Beyer, a clinical psychologist, testified for plaintiffs (Beyer: 727).

163.  Rosie D. has been diagnosed with bipolar disorder, post traumatic stress syndrome, oppositional defiant disorder, dyslexia, and attention deficit hyperactivity disorder (DX 228 p. RD2160).  As of August-September 2004, Rosie was receiving (in addition to medication and weekly or biweekly therapy) an extensive array of services intended to support her at home with her mother, including Community Support Program services, respite, tutoring, summer camp, being taken outside the home for therapeutic recreational activities, and monitoring of her progress in school; she had an outreach worker in her home 15 hours per week (DX 128 pp. RD 2715-2725; PX 1157O; Beyer: 1518-1520).  However, during the summer and fall of 2004 she was repeatedly violent toward her mother, culminating in an incident on September 12, 2004, when she threatened her mother with a butcher knife and punched two holes in the wall of their house, and was consequently admitted to a Crisis Stabilization Unit (DX 128 pp. RD 2721, 2723-2725, PX 1157R).  After that, her mother did not feel safe having Rosie at home, and as of September 22, 2004 she was being considered for therapeutic foster care (PX 1157R).

164.  Shaun E. has been diagnosed with pervasive developmental disorder, mood disorder, attachment disorder, and ADHD.   As of spring of 2004 he was receiving psychiatric, medication, and outpatient therapy services, as well as a DMH case manager, an advocate, and two "life coaches" who would take him out for activities several times per week; however, Shaun displayed increased agitation and aggression beginning in approximately April 2004, and among other incidents destroyed the windows of his life coach's car (PX 1036O p. 4; Earp: 416, 420-426, 429).  Shaun was hospitalized twice, in May and June 2004 (PX 1036M, 1036O; Earp: 430).  An unsuccessful attempt was made to provide Family Stabilization Team services (Earp: 430-431).  Shaun was admitted to The Walker Home and School, a Chapter 766 residential

school, on July 27, 2004 (Earp: 431; PX 1036P; Wentworth: 4180-4181).  Ms. Earp is very

pleased with The Walker Home and School, where Shaun is presently in the day program, which

she considers "awesome" and homelike (Earp: 432, 442).  The Walker School provides medical,

nursing, case management, and group therapy to Shaun, and Shaun has made great progress there

(Earp: 442-445, 447-448; White: 544-545).

165.  Sheena M. has been diagnosed with mild mental retardation, mild symptoms of psychosis,

and non-specific anxiety (DX 130 p. SM 1376).  She has been living with her father since early

2004 and receiving a variety of supportive services, including psychiatric services, an intensive

clinical manager from MBHP as well as case management services from other agencies,

"tracking" services (a person to check on her at home, call her in the morning to make sure she

has gotten up and gone to school, etc.), alternative school and vocational services, therapy, and

respite.  She has made "enormous gains" at her father's home and recently graduated from high

school (Bannish: 3811-3817, 3829, 3858; DX 130 p. SM 1351; Beyer: 1530).

166.  Tyriek H. has been diagnosed with schizoaffective disorder and receptive and expressive

learning disorders; he suffers from psychosis that is likely related to a major mental illness that

he will have for the rest of his life (DX 80A pp. THR 790, 802).  Tyriek was at Three Rivers, a

DMH Clinically Intensive Residential Treatment Facility (see ¶ 124 above), from the time he

was seven until he was eleven (Christine H.: 1099-1100, DX 80A p. THR 803); the length of his

stay there was due to difficulty diagnosing him (he was assessed by four different child

psychiatrists) and participation in a medication trial (Mikula: 4350-4351).  He was discharged to

the Northampton Center for Children and Families, a DMH-contracted residential program with

a lower level of intensity than Three Rivers, in late 2004, due to progress he made at Three

Rivers (Christine H.: 1093; DX 80A pp. 802-803; Beyer: 1523).  His mother has not been able to accept his diagnosis; she believes that "all kids see ghosts" and "imagine things," but acknowledged that he could not return home without 24 hour care (Christine H.: 1092, 1094, 1096, 1115-1116; Beyer: 1523, 1528).  Parents sometimes have difficulty accepting that a child suffers from symptoms of psychosis such as visual and auditory hallucinations (Beyer: 1524).

**B.  Children involved in clinical review.**

167.  Plaintiffs' experts reviewed services provided to 35 children and adolescents (PX 1092B p. 14).

168.  At the time of the review, two of the review group were in hospitals.  Tom G., who has both developmental and mental health needs, was hospitalized for medication evaluation; in general, he lives at home and receives in-home family support from the Massachusetts Department of Mental Retardation including respite care, personal care assistance, and in-home crisis services (PX 1092B pp. 35-36, White: 553-554).  Janice B., whose diagnosis includes serious medical as well as psychiatric needs, was in the University of Massachusetts Adolescent Treatment Program at Westborough State Hospital, which is a DMH funded continuing care inpatient unit (see ¶ 121 above); her aggressive behaviors (explosive and severe aggressions, flashbacks, and self-mutilation) had diminished, and she had recently begun working off campus and preparing to transition to a community setting (PX 1101 pp. 9-14, Joyner: 624).[15]

169.  Matthew H. was in a Community Based Acute Treatment (CBAT) program (see ¶ 91 above); he had an extensive history of physical aggressiveness, and it was not clear that the structure and stability available in the CBAT program could be replicated by any home program

---

[15]Narell Joyner, a consultant, testified for plaintiffs (Joyner: 591-592).

(Whitaker: 949-950; PX 1095 pp. 26-29).[16]

170.  Christine Q. was in a Behavior Intensive Residential Treatment (BIRT) program (see ¶ 123 above) because of her combination of cognitive impairments and behavioral needs (PX 1101 pp. 30-34).

171.  Thirteen of the review group were in DSS placements at the time of the review.  Eight of them (Chelsea T., Forrest W., Laura D., Tashira F., Danielle H., Terrence M., Marc S., and Christopher T.) were in DSS residential care placements (see ¶¶ 148-150 above) because of the risk of harm to self or others posed by their behavior (for example, Chelsea T.'s history of cutting herself and risky sexual behavior, Tashira F.'s history of refusing food to the point of requiring a feeding tube, and Marc S.'s alleged sexual abuse of a younger sibling) (PX 1072 pp. 65-72 [Chelsea]; PX 1095 pp. 6-9 and Whitaker: 929-932 [Forrest]; PX 1095 pp. 20-23 and Whitaker: 944-946 [Laura]; PX 1095 pp. 30-33 and Whitaker: 950-951 [Tashira]; PX 1101 pp. 14-19 and Joyner: 624-625, 629-630 and Greer: 745, 748, 750-751 [Danielle]; PX 1101 pp. 19-24 and Joyner: 630-633 [Terrence]; PX 1101 pp. 34-38 and Joyner: 639-642 [Marc]; PX 1101 pp. 46-50 [Christopher]).[17]

172.  Of the remaining five children and adolescents in DSS placements, three (Sarah B., Shentelle G., and Ralph B.) were in group homes (see ¶ 151 above) because of risks posed by their behavior (for example, Shentelle G.'s history of aggression, explosiveness, sexualized behavior, and running away, and Ralph G.'s history of fire-setting in foster homes) (PX 1072 pp.

---

[16]Beth Whitaker, a "psychological associate" licensed in North Carolina, testified for plaintiffs (Whitaker: 874).

[17]Dr. James Greer, a child psychiatrist from Rhode Island, testified for plaintiffs (Greer: 669-670, 781).

8-14 [Sarah]; PX 1072 pp. 35-42 [Shentelle]; PX 1101 pp. 5-9 and Joyner: 619-620, 622

[Ralph]).  Jose M., age 18 at the time of the review, was in an adult group home; Richard G. was

in a foster home, see ¶¶ 144-147 above (PX 1092B pp. 32-34 [Jose]; PX 1072 pp. 424-48

[Richard]).

173.  Seventeen of the review group were living at home and receiving behavioral health

services and other state agency services:

(1) Raymond B.: FST, community support worker, DMH case management and

therapeutic after school program, medication management, individual and family therapy (PX

1072 pp. 14-20, Beyer: 1517-1518).

(2) Robert T.: individual and family therapy, medication management, crisis services,

FST post-hospitalization, DMH outreach worker (PX 1072 pp. 58-61).

(3) Kemelly D.: medication management, FST post-hospitalization, therapy (PX 1092B

pp. 23-24).

(4) Mark C.: previously received in-home therapy, life coach, mentoring services; family

declined additional therapy services; doing well at time of review (PX 1092B pp. 26-28; White:

548-549, 551).

(5) Lisa K.: school-based counseling, outpatient therapy, medication management, FST

(PX 1092B p. 40).

(6) Kristen P.: outpatient therapy, medication management, visits with nurse concerning

eating disorder, psychiatric services (PX 1092B pp. 42-43).

(7) John M.:  wide range of intensive mental-health services over many years both in and

outside the home, including medication, therapy, family stabilization services, mentoring,

therapeutic recreational services, and case management (PX 1092B pp. 45-48, White: 561-62).

(8) Tabitha R.: early intervention services, in-home services through the Department of Mental Health, and an after-school program (PX 1092B pp. 48-51, White: 563-64).

(9) Emil M.: after-school program that led to improvements in his behavior; FST services (PX 1095 pp. 4-6, Whitaker: 921-22, 923-24, 927).

(10) Giovanni S.: CFFC, therapy, summer camp program (PX 1095 pp. 9-11, Whitaker: 933-34).

(11) Jennifer C.: just returned home from a year in a structured residential program and was transitioning back to a public school with the assistance of in-home services such as individual and family therapy, respite, crisis services, and medication management; made great progress; recently hired to work in a beauty salon on weekends (PX 1095 pp. 11-15, Whitaker: 934-937).

(12) Kristin P.: recently transitioned home from a residential treatment program and was doing well; receiving a new type of in-home-service array that included a worker in the home twice a week and telephone contact (PX 1095 pp. 16-19, Whitaker: 938-39).

(13) Luis N.: FST, medication management, summer and recreation programs, therapy (PX 1095 pp. 24-25, Whitaker: 947-48).

(14) Trudy G.: an active mentor who assisted Trudy in gaining insight into her mental illness; assistance to Trudy's mother with behavior management and medication compliance; FST led to increased stability, decreased impulsive behaviors, and cessation of suicidal ideation (Whitaker: 951-53; PX 1095 pp. 33-36).

(15) Dillon O.: therapy, FST (Joyner: 634-637; PX 1101 pp. 24-30).

41

(16) Gregory S.: medication, tutoring, outreach worker (PX 1101 pp. 38, 40).

(17) Dawn T.: individual and family therapy, medication management (PX 1101 p.42).

174.  Vanessa W., aged 19 ½ and expecting a baby, was living in shelters with her boyfriend and not receiving outpatient psychiatric services since leaving DSS custody (PX 1092B pp. 28-32).

175.  Of the 35 children and adolescents who were the subject of plaintiffs' review, 34 are MBHP members; MBHP has authorized that every service requested on behalf of those members be provided.  In other words, no requested service has ever been denied (Kaegebein: 3135-3139).

176.  If MBHP denies or modifies a request that services be provided to a Medicaid recipient, the recipient can appeal that decision.  During the period between February 2001 and February 2003, MBHP received approximately 11 appeals; of those, seven were granted and four denied.  Where MBHP decides an appeal adversely to the appellant, a further appeal to the Medicaid Board of Hearings may be taken (Straus: 2993-2997, 3006-3010, 3033-3036; DX 60).

**IV.  Massachusetts has not adopted a statewide "system of care" approach to the delivery of children's behavioral health services but instead is testing that approach on a limited basis, consistent with the state's discretion to organize the delivery of Medicaid services, the current state of research, and its own experience.**

**A.  A "system of care" is a specific manner of organizing the delivery of children's mental health services.**

177.  A "system of care" is a manner of organizing the delivery of children's mental health services that includes a continuum of services (ranging from outpatient, to intermediate level services such as home and community-based services, to inpatient hospitalization) and an underlying philosophy (Bickman: 3229; Foster: 3612-3613; Burns: 282-284).[18]  A system of care

---

[18]Leonard Bickman is a professor of psychology, psychiatry, and public policy at Vanderbilt University, where he also holds the position of associate dean for research; he is also the director of the Center for Evaluation and Program Improvement at Vanderbilt, which

is organized so that there is a single team and case manager to provide mental health services to children with serious emotional disturbance (Norton: 2793-2794).

178.  Plaintiffs' expert, Dr. Robert Friedman, was one of the creators of the system of care approach to children's mental health services and is a "proud advocate" of that approach (Burns: 284; Friedman: 351).[19]

**B.  Plaintiffs' definition of "home and community-based services" describes a system of care, not a discrete clinical intervention.**

179.  Plaintiffs have defined the services they seek, "home and community-based services," as follows:

> Home and community-based services are a well-established behavioral health intervention for children designed to meet the child's needs in his/her home and home community.  They may be provided in the child's natural or foster home, or in the community where the child lives. The planning and provision of home and community-based services require a specific, individualized process that focuses on the strengths and needs of the child and the importance of the family in supporting the child.  Home and community-based services incorporate several discrete clinical interventions, including, at a minimum, comprehensive strength-based assessments, crisis services, case management, clinical teams, and individualized supports including behavioral specialists. These services must be provided in a flexible manner with sufficient duration, intensity, and frequency to address the child's needs. (Plaintiffs' Chalk 1).

180.  The Massachusetts Medicaid program provides the "discrete clinical interventions" that are part of plaintiffs' definition of "home and community-based services," i.e. "comprehensive strength-based assessments, crisis services, case management, clinical teams, and individualized

---

conducts evaluations in the area of mental health services for children and adolescents (Bickman: 3221-3224, DX 91).  Michael Foster is an economist and professor of health policy at Pennsylvania State University; his specialty is the cost effectiveness of behavioral health programs for children and adolescents (Foster: 3595-3610, DX 92).

[19]Robert Friedman is the chairman of the department of child and family studies at the University of South Florida (Friedman: 338).

supports including behavioral specialists" (Norton: 2829-2830).

181.  Plaintiffs' definition of "home and community-based services" as a whole describes a system of care (Norton: 2792-2793; Bickman: 3286-3287).

182.  There is no single intervention known as "home and community-based services"; home and community-based services reflect a whole continuum of resources and supports (Metz: 3449-3450; Burns: 285-286; Friedman: 391-392).[20]

**C.  Research has not demonstrated that systems of care result in better clinical outcomes for children than traditional service delivery systems or managed care systems, or that systems of care are less costly.**

183.  Dr. Bickman conducted an evaluation of a system of care for dependents of military personnel stationed at Fort Bragg, North Carolina.  Prior to creation of the Fort Bragg system of care, the health insurance available to military dependents only paid for outpatient mental health services, and residential treatment centers and hospitalization; the purpose of creating the system of care was to test the theory that a system of care providing intermediate, home-based levels of care would be more effective and less costly.  The evaluation was funded by the Department of the Army and the National Institute of Mental Health (Bickman: 3252-3256, 3259-3260).

184.  The Fort Bragg evaluation involved data from approximately 1000 children.  About half of them were enrolled in the system of care at Fort Bragg; the other half were a control group consisting of children at two other military posts (Fort Stewart in Georgia and Fort Campbell in Tennessee) who received "treatment as usual," that is, mental health services delivered in the

---

[20]Peter Metz is a child psychiatrist with over twenty years' experience practicing in Worcester, Massachusetts.  Dr. Metz is an associate professor of psychiatry and pediatrics at the University of Massachusetts Medical School; he helped found and is the principal investigator for Worcester Communities of Care, described below (Metz: 3417-3420, DX 93).

44

traditional way rather than through a system of care (Bickman: 3254-3257, 3260).

185.  The Fort Bragg evaluation involved collection of data using a variety of outcome measures over a period of five years, and this was important because the real question is what happens to children in the long run, not just for a short time following treatment (Bickman: 3257-3259, 3261-3262, 3359-3359).

186.  The children in the Fort Bragg system of care and the children in the Fort Steward and Fort Campbell comparison group both improved equally over time.  As a result, Dr. Bickman and his team concluded that the system of care did not produce better outcomes than the care provided at the comparison sites.  At the same time, the system of care was more expensive than the comparison sites (Bickman: 3262, 3269-3270, 3277).

187.  Costs at the Fort Bragg demonstration site were higher than at the two comparison sites because more children and youth were served, because they stayed in services longer, and because the intermediate settings were used in addition to inpatient care rather than instead of inpatient care (Foster: 3610-3611).

188.  Increasing access to services is not a good in itself unless the services are effective (Bickman:  3410; Burns: 328-329).

189.  Dr. Bickman conducted a second evaluation of a system of care, this one located in Stark County, Ohio, and again funded by the National Institute of Mental Health.  The children in the Stark County system of care were primarily Medicaid recipients.  The Stark County study, like the Fort Bragg study, had a comparison group of children receiving mental health services from a traditional delivery system rather than from the system of care, random assignment of children to the system of care or the treatment-as-usual traditional delivery system, and collection of data

using a variety of outcome measures over a period of time. There were approximately 175 children in each group. The purpose of the Stark County study was to see whether the Fort Bragg results were replicable (Bickman: 3272-3277, 3383).

190. The children in the Stark County system of care and the children in the comparison group both improved equally over time, and the system of care was more expensive. Dr. Bickman and his colleagues again concluded that the system of care did not produce better outcomes than treatment as usual (Bickman: 3277).

191. The United States Surgeon General cited the Fort Bragg and Stark County studies in his 1999 Report on Mental Health and concluded that "[t]he effect of systems of care on cost is not yet clear," and "[n]or has it yet been demonstrated that services delivered within a system of care will result in better clinical outcomes than services delivered within more traditional systems" (Friedman: 395-399; Bickman: 3280-3283, 3285; DX 118 pp. 191-193).

192. The Fort Bragg and Stark County evaluations received awards for excellence from the American Evaluation Association (the professional scholarly association of program evaluators in the United States), the American Psychological Association, and the Florida Mental Health Institute (of which plaintiffs' expert, Dr. Robert Friedman, is a chairman) (Friedman: 338; Bickman: 3223, 3227-3229, DX 91 p. 1).

193. There has not been a completed study of the effectiveness of a system of care subsequent to the Fort Bragg and Stark County studies (Bickman: 3277-3280, 3285) The data that has been presented concerning other studies came to the same conclusion as the Fort Bragg and Stark County studies, namely that system of care sites and control sites showed equal improvement, and that there is no data-based demonstration that one particular system results in greater

46

improvement (Bickman: 3391-3394).

194.  There is no evidence that systems of care save money (Foster: 3649).

195.  The American Academy of Child and Adolescent Psychiatry creates "practice parameters," which are accepted definitions of standards for the care of a particular domain.  The academy does not yet have a practice parameter for community-based systems of care because the evidence for that approach is promising rather than conclusive (Metz: 3443-3448).

196.  There is no scientific evidence to support the opinion that home and community-based services as plaintiffs defined them would do anything different than the services currently being delivered, or that they would improve the functioning of children with serious emotional disturbance (Bickman: 3287-3289).

197.  A more promising approach to improving the effectiveness of children's behavioral health services lies in improving the feedback data available to clinicians (Bickman: 3296-3298).

**D.  Massachusetts is experimenting with the system of care approach to delivery of children's mental health services in a deliberate, evidence-driven way.**

198.  Massachusetts' delivery system for health and human services for children with emotional disturbance is not a statewide "system of care" consistent with plaintiffs' definition (Norton: 2796).

199.  Massachusetts has created several systems of care serving particular communities so that children's outcomes can be evaluated (Norton: 2796-2798, 2975-2978).

200.  Wisconsin, like Massachusetts, has systems of care in two cities and in the rest of the state provides access to a full range of Medicaid services through providers and managed care organizations; these are just different ways of organizing services.  A Wisconsin resident can get access to a full array of home-based services even though she may not have access to a system of

47

care (Kamradt: 1733-1738, 1742-1743).[21]

## 1.  The Mental Health Services Program for Youth (MHSPY).

201.  The Mental Health Services Program for Youth (MHSPY) was started as a pilot program

by the Massachusetts Medicaid program and other state agencies in 1997 with grant funding

from the Robert Wood Johnson Foundation; the first child was enrolled in March 1998 (Grimes:

1576, 1578, 1585-1586, 1643).[22]

202.  MHSPY is a system of care (Norton: 2794, 2804; Bickman: 3293; Grimes: 2010-2017;

Foster: 3615; Burns: 328).

203.  MHSPY has "blended funding," that is, it receives funding not only from Medicaid but also

from DSS, DMH, and other state agencies; for that reason, it can spend for services for which

Medicaid reimbursement is not available (Grimes: 1648, 1650; Norton: 2794-2796, 2974).  All

the Medicaid services available through MHSPY are available statewide to children not enrolled

in MHSPY through the Medicaid health plans as set forth in their contracts, for example DX 35,

the MBHP contract (Norton: 2794-2795, 2974-2975, DX 35).

204.  At the beginning, MHSPY served children in Cambridge and Somerville, Massachusetts; in

2002 the program was expanded and a second site, known as the "Tri-City" site, was added to

serve Malden, Everett, and Medford (Grimes: 1586-1587, 2024-2026).

205.  On average during 2004 MHSPY served 63 children per month (Grimes: 2019-2021).

206.  The Child and Adolescent Functional Assessment Scale (CAFAS) is a well-established

---

[21]Bruce Kamradt, the director of a system of care known as Wraparound Milwaukee, testified for plaintiffs (Kamradt: 1670, 1732).

[22]Katherine Grimes, the medical director for the Mental Health Services Program for Youth (MHSPY), testified for plaintiffs (Grimes: 1576).

measure of functional impairment; a higher CAFAS score means a greater degree of functional impairment.  A child with a CAFAS score of 100 might have symptoms of depression, sleep disturbance, oppositionality, argumentativeness, irritability and home and at school, declining grades, withdrawal from friends, and some suicidal ideation but not actual suicidal behavior.  A CAFAS score of 130 for the same child would reflect more functional impairment, such as substance abuse, truancy, a suicide plan or attempt.  A CAFAS score of 170 for the same child would reflect maximal functional impairment including as psychotic thinking, delusional depression, or paranoia; might have been expelled from school or arrested for some illegal activity (Metz: 3422, 3428-3438).

207.  One cannot extrapolate outcomes from a less functionally impaired population and assume that the same treatment approach will lead to the same outcomes in a more functionally impaired population (Metz: 3430).

208.  MHSPY had some difficulty replicating its program at the newer Tri-City site because the Tri-City area is less resource rich than Cambridge and Somerville, and because the children at the Tri-City site are more challenging (Norton: 2977).  The more challenging nature of the Tri-City children is reflected in their higher average CAFAS scores on intake (106 compared to 93), and the fact that they are more likely than Cambridge/Somerville children to have been referred by DMH, to have a parent with mental illness, and to have experienced domestic violence (Grimes: 2027-2034, 2042).

209.  Children at Tri-City use inpatient psychiatry services at twice the rate of children at Cambridge/Somerville (Grimes: 2035-2036), and are more expensive to treat than children at Cambridge/Somerville (Tri-City per member per month cost of $5,112, compared with

Cambridge/Somerville cost of $3,968) (Grimes: 2038-2039).

210.  The MHSPY program has always included an evaluative component intended to determine whether MHSPY improved children's outcomes.  An evaluation of a program such as MHSPY requires collection of data over a period of time; under the best circumstances, it might require years (Grimes: 2044-2045, 2047).

## 2.  The Worcester Communities of Care (WCC) program.

211.  Worcester Communities of Care (WCC) is a community-based system of care that serves approximately 50 youth and their families within the urban area of Worcester, Massachusetts.  It was set up with state support and federal funding, and began enrolling children in September 1999 (Metz: 3420-3421, 3439, 3431, 3448-3449, 3456-3457).

212.  The average CAFAS score of children entering WCC is in the mid 130s (Metz: 3426-3427).

213.  There is an ongoing evaluation of WCC to determine what elements are effective.  Among the questions being studied are whether children improve and are able to sustain improvements, whether all children benefit, whether some children don't benefit and if so who and why (Metz: 3433-3435).

214.  Over the time period between October of 2000 and June of 2003, while the majority of children (61%) in WCC improved, a significant minority (24%) got significantly worse, while 15% stayed the same (Metz: 3436-3442, DX 79C, 79B).

215.  It is important to determine why some children don't benefit from WCC because the program is not inexpensive, and time is short for kids; it is not desirable to provide an intervention that isn't helpful.  The WCC evaluation is trying to determine the reason why some

children in the program get worse, among other things (Metz: 3442-3443).

216.  Massachusetts has submitted an application to the federal government to create a program similar to WCC in the suburban and rural areas of central Massachusetts; if the application is successful, that effort would begin in September 2005 (Metz: 3431-3432, 3486-3487).

### 3.  The Coordinated Family Focused Care (CFFC) program.

217.  After several years' experience with MHSPY, MassHealth decided to create a system of care with more children with a higher level of functional impairment than MHSPY and in more cities, and to evaluate those results in a deliberate way.  It used the Massachusetts Behavioral Health Partnership as the platform for that effort because MBHP operates statewide.  The Coordinated Family Focused Care (CFFC) program was the result of that determination (Norton: 2793-2794, 2796-2798, 2975-2978; Fields: 3659).[23]

218. CFFC began enrolling families in July 2003; Worcester Communities of Care became a CFFC provider at that time (Fields: 3658-3659; Metz: 3432).

219.  CFFC has multiple funding sources; in addition to MassHealth, it also receives funding from the Massachusetts Departments of Mental Health, Social Services, and Education (Fields: 3660; Norton: 2794-2796, 2974).

220.  CFFC operates in five Massachusetts communities: Brockton, Lawrence, New Bedford, Springfield, and Worcester.  Those communities were chosen based on an assessment of community risk factors including socioeconomic status, prevalence of Medicaid recipients, and

---

[23]Suzanne Fields has been the Director of Child and Adolescent Services at the Massachusetts Behavioral Health Partnership since March 2005.  Before that she was MBHP's manager for systems of care, and responsible for the startup and implementation of (CFFC); she retains responsibility for CFFC in her new position.  She is a licensed social worker (Fields: 3655-3657).

violence (Fields: 3661-3662; Betts: 3515-3516).

221.  50 children are served at each CFFC location, for a program total of 250 (Fields: 3662).

222.  There are eligibility criteria for CFFC.  Among other things, to be eligible for CFFC a child must be at risk of placement in a facility with 24 hour per day level of care, and must have a minimum CAFAS score of 100.  The program is intended for children with a level of needs too intense to be served with outpatient services (Fields: 3660-3665, DX 67 p. 6).

223.  Across all five CFFC sites, the average CAFAS score is 140 (Fields: 3663).

224.  Another eligibility requirement for CFFC is that the child's family or guardian consent to the referral and agree to participate in the program.  The reason for this requirement is that CFFC is a family driven model, meaning that the family helps determine the goals of participation. There is a time commitment, and the family needs to be willing to participate (Fields: 3665, DX 67 p. 6).

225.  While there are more children who want to be in CFFC than the program can accommodate, this does not mean that children who cannot enroll are not given services; rather, they are referred to other services, such as Family Stabilization Team services (Fields: 3666-3667).  All the Medicaid services available through CFFC are available statewide to children not enrolled in that program through the Medicaid health plans as set forth in their contracts, for example DX 35, the MBHP contract (Norton: 2794-2795, 2974-2975, DX 35).

226.  A child and family in CFFC have an individual care plan focused on sustaining the families' needs around the child's behavioral health needs.  They may also have other plans, such as a special education plan developed with the child's school, and a plan relating to protective services developed by the Department of Social Services.  Having a single plan

52

dealing with all those domains is not necessarily desirable because a single plan would be very long and confusing, and challenging for the family.  Instead, CFFC coordinates the various plans (Fields: 3667-3670; DX 67 pp. 11-13).

227.  For a child not enrolled in CFFC, the coordination of various plans is available through intensive clinical management, which is similar to CFFC case management (Fields: 3670-3672, 3688).

228.  CFFC uses state funds from DMH and DSS as "flexible funds" to provide babysitting, respite, in-home supports, recreational activities such as camps, after-school programs, reconnecting telephone service following a move, auto repair and other non-medical transportation, and a mentor (such as a "big brother" or "big sister").  Federal Medicaid reimbursement is not available for these expenditures.  Families find the "flexible funds" expenditures very helpful (Fields: 3672-3674, 3723-3725, 3744-3745; DX 67 p. 14 and Appendix 10; Norton: 2795-2796, 2974).

229.  Children are discharged from the CFFC program when they meet the program's discharge criteria; there is no firm time limit on how long someone can be in the program.  While the average length of enrollment is 12-14 months, 20% of children (or approximately 100 children) have been in the program for longer than 14 months, and no application to stay longer than 14 months has ever been denied (Fields: 3676-3678, 3685-3686, 3717, DX 67 p. 17).

230.  The CFFC program is a pilot examining a model for a different way of working with families, and a major aspect of the program is gathering information to decide how to go forward with the model (Fields: 3684, 3744).

231.  CFFC outcome and cost data is being collected for analysis by a researcher from the

53

University of Massachusetts for the purpose of understanding the effectiveness of the CFFC model. So far there has been a preliminary report; a final report is expected in December 2005 (Fields: 3674-3676; PX 1061; Norton: 2975). While the initial data is promising, it is very preliminary (Fields: 3729-3740; Norton: 2975; Kamradt: 1752-1753).

**E.  Massachusetts' experience with systems of care has not demonstrated that that approach to the delivery of children's mental health services should be adopted statewide.**

232.  The MHSPY data presented at trial is insufficient to establish the effectiveness of the program because there is no comparison group, and as a result it is impossible to determine whether children in the program who improved, improved as the result of the program (Bickman: 3293-3295).

233.  The estimate by Mr. Valentine, plaintiffs' expert, concerning the cost of creating a statewide system of care in Massachusetts like MHSPY is not convincing because of the uncertainty associated with his calculations, in that he used a very small sample and did not take into account the availability of providers or other startup costs, or whether the children to be served would be the same. As a result, the cost of such a program could be significantly higher than he estimated (Foster: 3615-3619, 3623-3630).

234.  Mr. Valentine's estimate of potential cost savings that might be realized from statewide adoption of a system of care like MHSPY is likewise not compelling because he did not establish that the reduction in expenditures noted during the first year of MHSPY operation was properly attributed to that program, nor did he explain how he arrived at a 20% savings figure used repeatedly in his calculations (Foster: 3630-3633).

235.  Mr. Valentine's analysis does not meet scientific standards and is so poorly documented that it's hard to know whether it's right or wrong (Foster: 3644).

54

236.  Data is lacking to know if children's needs would be better met if the MHSPY program were replicated across Massachusetts.  Among other things, it would be necessary to know if there are certain cultural groups that might not be responsive to that program, and whether there are variations with respect to working with families in rural settings (Metz: 3452-3454).

237.  It is essential to do a community needs assessment in order to determine whether a community-based system of care will work in that community (Metz: 3454).

238.  Neither MHSPY nor WCC should be extended into a rural area without some attempt to assess the area's needs and modify the program accordingly (Metz: 3454-3456; Kamradt: 1746-1747, 1751, 1752).

239.  WCC is not ready to be replicated statewide in Massachusetts absent local needs assessment and adjustment to reflect community specifics, and in addition some idea of why some kids don't respond to the program (Metz: 3456).

240.  The point of getting outcome data that goes beyond enrollment is to know whether gains are sustained; as yet, there is no CFFC data concerning longer term outcomes (Metz: 3481).

241.  The CFFC model is not ready to be copied elsewhere in Massachusetts.  It is currently in year two of its three-year pilot period, and there are a number of questions that remain to be answered; a primary unanswered question is which families benefit from the program and which do not.  That is one of the questions that the University of Massachusetts evaluation is designed to answer.  There are also questions as to whether its staffing patterns and array of covered services should be modified (Fields: 3694-3695; Betts: 3944-3945; Burns: 331; Kamradt: 1752-1753).

242.  The initial results of the CFFC evaluation are insufficient to come to a judgment about the

55

program because the question is whether those results are sustainable over time (Norton: 2797-2798, 2978-2979; Mikula: 4435).

243.  MBHP is currently working on an initiative to attempt to replicate a CFFC-type program for children and families involved with DSS at two or three sites using only services for which Medicaid reimbursement is available (Fields: 3689-3693, 3697-3698; DX 109 p. 12; Norton: 2979-2982).

244.  The issues in children's mental health are complex, and one size does not fit all.  As Massachusetts gathers more data, it will be able to take the appropriate action based on which children benefit from a particular model and which children do not (Norton: 2797-2798).

**V.  Plaintiffs' clinical review does not establish that services are inadequate.**

**A.  The clinical reviewers and the guidelines they followed were not impartial or neutral on the subject of home-based services.**

245.  Marcia White, designer of the client-review process, and reviewers Narell Joyner and Beth Whitaker all worked together at the North Carolina Department of Mental Health.  Ms. White formerly had supervisory authority over Ms. Joyner and Ms. Whitaker (White: 532; Joyner: 615-616; Whitaker: 917-18).

246.  Ms. White recruited Ms. Joyner and Ms. Whitaker to act as client reviewers based in part on their knowledge of home-based services (White: 566-67).

247.  Ms. White did not think it important to recruit reviewers with knowledge and experience different from her own.  To the contrary, it was important to Ms. White that the reviewers all had a "common mind-set" (White: 567).

248.  In fact, a reviewer for a study such as the clinical review should put aside her personal

beliefs and let the data speak for themselves (Magnus: 3985).[24]

249.  The reviewers, while experienced and knowledgeable, had an obvious bias in favor of the type of service-delivery system that the plaintiffs are seeking here, which is not a universal perspective in the field (Magnus: 3993).

250.  Ms. White generated a set of guidelines for conducting the reviews that all reviewers followed (White: 569; Joyner: 601, 618-619; Whitaker: 882-83, 917-18; Beyer: 1531-32).

251.  The guidelines included a listing of reasons why home-based services might be needed, but no corresponding listing of reasons why home-based services might be inappropriate or contraindicated (White: 573; Magnus: 3981-82).  This imbalance inserts bias into the review process in favor of finding a need for home-based services (Magnus: 3984).

252.  The guidelines instructed reviewers to consider the appropriateness of home-based services even where comprehensive, in-depth assessments of the children have not resulted in recommendations for such services, despite the fact that Ms. White and the other reviewers were not attempting to replicate the intensity of the comprehensive assessment process (White: 572-573).

253.  Due to the bias inherent in the clinical review design and in the reviewers themselves, it is not surprising that the reviewers found a large unmet need for "intensive home-based services," as that term was defined by the plaintiffs (Magnus: 4006).

**B.  Data was not gathered in a thorough or objective way and was not presented in a way that showed the services being received or obstacles to delivery of other services.**

---

[24]Stephen Magnus holds a Master's Degree in Public Health from Harvard University, a second Master's degree in Applied Economics and a Ph.D. in Health Services Organization and Policy from the University of Michigan, and is currently employed as Outcomes Data Manager for the Massachusetts Behavioral Health Partnership (Magnus: 3962, 3964).

254.  According to the plaintiffs' own expert, it is important to collect objective outcome data concerning the effect of services on children with mental- and behavioral-health needs and it is important to collect that data in a standardized way (White: 532-33).

255.  In order to aggregate data, that data must be collected in a standardized manner (White: 533-34).

256.  Using a standardized research instrument to collect data promotes confidence in the research findings and it would not have been inappropriate to use such an instrument for the clinical review here (Rogers: 1022).[25]

257.  It is expected in social-science research that a standardized data-collection instrument will be used to ensure objectivity (Magnus: 3973, 3976).

258.  The Child and Adolescent Functional Assessment Scale (CAFAS) is a widely used method of collecting data on the functioning of children with mental- and behavioral-health needs (Magnus: 3975).

259.  An objective data-collection tool, such as the CAFAS, should be used in conjunction with individual clinical judgment in conducting a needs assessment for behavioral-health services, except where administering the CAFAS instrument might be traumatic for a child.  The decision of whether administering the CAFAS instrument might be traumatic for a child should be made on a child-by-child basis (Magnus: 3973-76, 4038).

260.  Ms. White and the other reviewers did not use any objective or standardized instrument to gather and record information about the children they reviewed, those children's service needs,

---

[25]Erna Sally Rogers, Ph.D., testified for the plaintiffs on the value of the clinical review. (Rogers: 958-59).

services the children were receiving, or obstacles to service delivery (White: 573).

261.  For example, information concerning families' refusal of services was not systematically gathered.  Such refusal is one obstacle to service delivery (Magnus: 3982-83).

262.  For the most part, the reviewers did not meet with the children's psychiatrists or case managers (White: 539-540, 548, 550; Joyner: 622, 633, 638; Whitaker: 921; Greer: 744; Beyer: 1519, 1525).

263.  While the reviewers listed the services they believed each child needed, they did not list each service that was being delivered as of the time of the review (White: 546, 576; Joyner: 644; PX 1072, 1092B, 1095, 1101).

264.  The absence of this information made it difficult to identify unmet service needs or obstacles to service delivery (Magnus: 3988-90).

265.  At the request of counsel for the plaintiffs, Ms. White and the other reviewers made individual judgments about how the children they reviewed should be categorized; for example as currently needing home-based services, needed home-based services in the past, or not needing home-based services (White: 575-76; Whitaker: 922-23)

266.  It was not obvious from the text of the reviewers' reports which children had been placed in which categories or how to replicate the categorization process (Magnus: 3986-87).

**C.  Plaintiffs' counsel involved themselves in the review process, calling into question its objectivity and reliability.**

267.  The designer of the client-review process did not participate in the creation of the letter sent to families of potential review subjects; plaintiffs' counsel drafted that letter (White: 536).

268.  The reviewers were not privy to communications between plaintiffs' counsel and families or service providers (White: 541; Joyner: 617).

59

269.  Counsel for the plaintiffs selected and provided the children's treatment records to the reviewers, arranged all interviews for the reviewers, and accompanied the reviewers to most, if not all, appointments with children, family members, and service providers (White: 540-41; Joyner: 604, 616-617, 620, 624, 633, 657-58; Whitaker: 928-29, 930, 932-33, 935-36, 938, 946, 949; Greer: 740; Beyer: 1531).

**D.  The sample size for the clinical review was not selected according to statistical principles and was too small to provide reliable information, given the huge margins of error associated with such a small sample.**

270.  Ms. White and Dr. Beyer decided, in conjunction with plaintiffs' counsel, that they and their review team could realistically conduct reviews of 40-50 children given the available time and resources.  Then they asked Dr. Conroy whether that number would be sufficient.  The size of the sample therefore was determined by the availability of resources rather than objective statistical criteria (White: 566; Conroy: 1365, 1367, 1378).[26]

271.  Dr. Conroy is not a statistician (Conroy: 1357).

272.  The ultimate sample size was 35, which is a "very small" sample size.  The associated margins of error are "quite large" (Conroy: 1368, 1379)

273.  This sample came from 4 sub-group samples, ranging in size from 7 to 12 children (Goldstein: 4055-56, 4069).[27]

274.  The margins of error associated with using such a small sample ranged from 15.5% for all four sub-groups taken together to 28.8% to 40.6% for each of the sub-groups calculated

---

[26]James Conroy, Ph.D., testified for plaintiffs concerning selection of children for the clinical review (Conroy: 1132-33).

[27]Richard Goldstein, Ph.D., is a statistician who evaluated the statistical soundness of the sample drawn by Dr. Conroy (Goldstein: 4047, 4054).

separately (PX 1093B).

275.  Margins of error approaching 50 would fatally undermine a study, according to Dr.

Conroy, plaintiffs' expert (Conroy: 1379).

**E.  The sample was not randomly selected due to potential selection bias from the large numbers of non-responders and the presence of duplicate names in the sampling frame which were treated inconsistently by the plaintiffs.  These deficiencies mean that the margins of error–already large–were actually understated.**

276.  The need to obtain consent means that the sample group of 35 children was not randomly

selected (Conroy: 1360).

277.  The need to obtain consent from potential study subjects is the greatest cause of selection

bias.  Selection bias means that the people who participate in the study may be qualitatively

different than the larger group about which you are attempting to draw conclusions (Conroy:

1357-58).

278.  When conducting an assessment of the need for services, it is important to survey people

who are interested in receiving the services as well as people who are not interested in receiving

them (Magnus: 3999).

279.  In order to assess selection bias, you want to know as much as possible about the people

who did not consent to participate in the study.  Here, very little is known about the children who

did not participate in the clinical review process (Conroy: 1358).

280.  There are statistical tools to try to assess selection bias.  Dr. Conroy used only one such

tool: he compared the ages and genders of the drawn sample of 195 with the ages and genders of

the total sampling frame of 3,226.  This is a "fairly weak" test for selection bias.  In addition to

being weak, this test was implemented in such a way as to de-emphasize differences between the

drawn sample and the larger population.  Finally, Dr. Conroy did not compare the ages and

genders of the reviewed sample of 35 with those of the total sampling frame of 3,226 before

memorializing his opinion about the soundness of the reviewed sample of 35 (Conroy: 1372,

1376, 1382; Goldstein: 4066-67, 4074).

281.  Had Dr. Conroy used other, more rigorous tools to address selection bias, his margins of

error would have been even higher than they were (Goldstein: 4064-65).

282.  The plaintiffs' experts were inconsistent about whether the four sub-groups of children that

made up the larger sampling frame should have been mutually exclusive (meaning no

duplicates).  First, the Hale and Dorr employee who sorted the data tried to remove duplicates

from the sampling frame, but missed a lot of them (Goldstein: 4060-61).  At trial, however, Dr.

Conroy and Dr. Rogers both testified that the duplicates should not be removed (Conroy: 1368-

69, Rogers 1389-90; Goldstein: 4062-63).

283.  There were between 400 and 500 duplicate names in the total aggregated sampling frame

of 3,226 (Goldstein: 4058).

284.  The problem with including duplicate names is that each child does not have a equal

probability of being selected for the clinical review, which is Dr. Conroy's definition of

"random" (Conroy: 1362-63; Rogers: 1390; Goldstein: 4057).

285.  Unless you know the number of duplicates and account for that in a manner such as

weighting, then each child does not have a known probability of being selected, which is another

definition of "random" (Rogers: 1024, 1390; Goldstein: 4089).

286.  Having duplicates in the four sub-groups is that it renders the "total" margin of error

calculated by Dr. Conroy invalid, leaving only the four sub-group margins of error (Goldstein:

4069-70).

287.  Having duplicates in the four sub-groups also means that the four sub-group margins of error (28.8% to 40.6%) are understated (Goldstein: 4070-71).

288.  Even Dr Rogers, plaintiffs' own expert, would not try to defend any of Dr. Conroy's four sub-group margins of error, which range from 28.8% to 40.6% (Rogers: 1394-95).

**F.  Overall, the clinical review does not meet any standard of reliability.**

289.  The plaintiffs' clinical review process did not adhere to accepted standards for social-science research (Magnus: 3967-69, 3972-74).

290.  Plaintiffs' own experts, Dr. Rogers and Dr. Sutherland, hold the opinion that the clinical review study is both "exploratory" and "preliminary" in nature (Rogers: 1397; Sutherland: 1045).[28]

291.  Exploratory studies such as the clinical review can be useful in identifying topics for further discussion, but do not provide information that is generalizable to a larger population (Magnus: 3991-92, 3995).  The plaintiffs' expert, Dr. Rogers, concurs that the information gathered in the clinical review may be useful, but it is not generalizable to any larger group (Rogers: 1413).

292.  Nothwithstanding these limitations, the plaintiffs offered the clinical review "so that generalizations could be made about the class and a much larger group of children with serious mental health needs in Massachusetts" (Magnus: 4007; PX 1093B).

293.  The clinical review findings should not be used to generalize to the plaintiff class or to Massachusetts children outside the plaintiff class (Magnus: 4007-08).

---

[28]Michael Sutherland, Ph.D., testified for the plaintiffs on the value of the clinical review (Sutherland: 1032-35).

294.  While the clinical review may provide a starting point for further research or discussion, but any usefulness of the clinical review results must take the bias of the reviewers in favor of the plaintiffs' conception of "home-based services" into account (Magnus: 3992-93).

## VI.  Defendants' efforts to support and enhance children's mental health service delivery are solving the "stuck kid" problem.

## A.  What is the "stuck kid" problem.

295.  "Stuck kids" are children in a placement that is not appropriate because the child does not have a medical need for that level of services; the phrase is generally used of children "stuck" in inpatient hospital settings or Community-Based Acute Treatment (CBAT) programs.  They tend to be children without a home or place to return to following hospitalization (Betts: 3543, 3551, 3893, 3896-3897; Mikula: 4367-4368).

296.  In general, children become "stuck" because they were admitted to an acute inpatient psychiatric unit during a behavioral crisis and their prior placement refuses to take them back after the crisis; this can occur because the child committed a violent act during the crisis such as injuring or killing an animal, breaking things, or injuring people, and the prior placement is scared by the child's behavior and unwilling to have the child return (Betts: 3546-3548).

297.  The majority of "stuck" kids are aged 13 to 18, though there have been younger children (Betts:  3551).

298.  90% of the children "stuck" in acute hospitals or CBAT programs are in the care or custody of DSS and are awaiting a DSS residential placement, enhanced therapeutic foster care, or regular foster care; they cannot return to their families of origin either because those families will not take them back, or because their needs don't allow them to return to those families

64

(Betts: 3543-3545, 3553; Mikula: 4380; Matteodo: 1451-1452).[29]

299.  Because children in DSS care or custody are enrolled with MBHP, the other Medicaid

health plans have few if any "stuck kids" (Betts: 3941-3942).

300.  "Stuck kids" are waiting for a home, not a Medicaid service (Betts: 3893-3895, 3911-

3912).

**B.  Massachusetts has initiatives to address the "stuck kid" problem.**

301.  Solving the "stuck kid" problem has been a priority for the state (Matteodo: 1447).

302.  In the context of "stuck kids," "diversion" means intervening by some service other than

hospitalization.  Massachusetts has two initiatives relating to emergency services intended to

divert children from hospitalization (Mikula: 4370-4371).

303.  Different regions of Massachusetts vary with respect to the rates at which children are

hospitalized following an encounter with emergency services due to a behavioral health crisis,

and this has implications for the stuck kid situation because every child admitted to a hospital is

a potential stuck kid if there is no ready discharge plan.  For that reason, Massachusetts has an

initiative to compile data on children going through emergency services to determine why some

end up in hospitals rather than diverted, as a means toward preventing children from becoming

stuck (Mikula: 4371-4372).

304.  If a child in a residential placement experiences a behavioral health crisis, it is frequently

desirable to keep them in that placement rather than hospitalizing them.  Massachusetts has

initiatives aimed at addressing the different rates of hospitalization of various residential

---

[29]David Matteodo is the executive director of the trade association of private psychiatric
hospitals in Massachusetts; he testified for plaintiffs (Matteodo: 1416, 1418).

programs, as a means toward preventing children from becoming stuck (Mikula: 4373).

305.  In the context of stuck kids, "transition time" means the time between when a child no longer needs inpatient care and when she is discharged to the community.  Massachusetts has several initiatives related to shortening that time (Mikula: 4373-4374).

306.  One transition time initiative involves the use of information technology to improve communication between community placement providers and hospitals.  Another relates to enhancing communication among residential schools, hospitals, and DSS.  Both these initiatives seek to move children out of hospitals and into the community more quickly (Mikula: 4376-4378; Matteodo: 1448-1450, 1457-1458).

307.  MBHP initiated a treatment improvement series and worked closely with hospitals to improve their discharge planning processes, as a means to speed up the process of putting elements of care and services in place so that children can leave the hospital sooner (Mikula: 4378; Matteodo: 1459-1460).

308.  MBHP developed Transitional Care Units specifically for "stuck kids," to create a more normalized environment for them to await their next placement than an inpatient hospital setting (Betts: 3545).

309.  DSS has added a licensed social worker to each of its regions in the state specifically to address the "stuck kids" problem (Matteodo: 1448).

310.  Since September 2002, DSS has been working on a long term project to reprocure the contracts related to its residential placements, Commonworks, and family based services.  In the state agency context, to "reprocure" contracts means to issue a new request for response when a contract expires, seeking parties interested in providing the services.  The purpose of the DSS

reprocurement is to reduce reliance on group care services, keep children in the community, and achieve permanency more quickly for children, by shifting the state's spending from long term residential placements to community-based care. The DSS reprocurement will affect about $300 million in state spending on children's services beginning July 1, 2005 (Wentworth: 4200-4205, 4210-4211, 4213-4216, 4222-4223; Betts: 3506-3507).

**C. The state's "stuck kid" initiatives are working, and are a better approach to the problem than plaintiffs' proffered solutions.**

311. Because the MHSPY and CFFC programs require the participation of a child's family or guardian, those are not a possible placement for many stuck children, who don't have a home or placement identified (Betts: 3549, 3553; Mikula: 4380; Fields: 3665-3666, 3695-3697).

312. There has been a decline in the number of "stuck kids" since 2002; specifically, the average number has declined from a high of 129 in 2003 to 109 in 2004 (Betts: 3558-3560; Mikula: 4379).

313. There are typically about 100 to 110 children stuck in hospitals or CBAT programs (Betts: 3548).

314. Between Fiscal Years 2002 and 2004, the trend has been for more "stuck kids" to be served in a CBAT program rather than an inpatient hospital setting; this is significant because CBATs are more normalized environments than hospitals in that they are unlocked and often located in residential areas, so that children can go outside to a playground or for activities; for that reason, a CBAT is a better place for a child awaiting a placement (Betts:  3550-3551, 3559-3562).

315. The average time children spent "stuck" in a facility more highly structured than they needed was 35.7 days in state Fiscal Year 2004 (Betts: 3550, 3561).

316. A delay in a child's being able to move from one placement to a less restrictive placement

may be caused by the need to coordinate services, particularly educational services, so that the next placement will meet the child's needs; it is not necessarily the result of insufficient services (Wentworth: 4234-4236).  "It would be completely inappropriate to send the child out into the community without having those services in place"; if a child presents a complicated case, it may take some time to get all the needed services in place (Greer: 781-782).

## DEFENDANTS' PROPOSED CONCLUSIONS OF LAW

**I.  The Massachusetts Medicaid program provides services to children, and notice of the availability of services, as required by the EPSDT provisions of the Medicaid Act.**

**A.  EPSDT requires states to provide Medicaid-covered services necessary to correct or ameliorate children's mental illnesses and conditions, and to give notice that such services are available.**

1.  Medicaid is a cooperative federal-state program that provides federal funding for state medical services to the poor.  Frew v. Hawkins, 540 U.S. 431, 433 (2004), 42 U.S.C. § 1396 et seq.

2.  A state that participates in Medicaid must have an Early and Periodic Screening, Diagnosis, and Treatment (EPSDT) program.  Frew v. Hawkins, supra, 540 U.S. at 433, 42 U.S.C. §§ 1396a(a)(43), 1396d(r).

3.  EPSDT programs provide health care services to children to reduce lifelong vulnerability to illness or disease.  Frew v. Hawkins, supra, 540 U.S. at 433-434.

4.  The EPSDT provisions of the Medicaid statute require participating states to provide medical services to eligible children and notice of the availability of those services.  Frew v. Hawkins, supra, 540 U.S. at 434.

5.  EPSDT services are defined by 42 U.S.C. § 1396d(r) as screening, vision, dental, and hearing services, and "[s]uch other necessary health care, diagnostic services, treatment, and other

measures described in subsection (a) of this section to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan."  42 U.S.C. § 1396d(r)(5).

6.  In other words, the EPSDT provisions impose on the states a two-pronged requirement:  (1) to provide services that fall into any of the twenty-eight categories of medical assistance care and services listed in 42 U.S.C. § 1396d(a), (2) where those services are "necessary" to "correct or ameliorate" problems discovered through screening, including mental illnesses and conditions, to Medicaid-eligible children under age 21.  S.D. ex rel. Dickson v. Hood, 391 F.3d 581, 588-90 (5th Cir. 2004); Collins v. Hamilton, 349 F.3d 371, 374 (7th Cir. 2003); Pediatric Specialty Care, Inc. v. Arkansas Dep't of Human Services, 293 F.3d 472, 480 (8th Cir. 2002); Miller by Miller v. Whitburn, 10 F.3d 1315, 1316-1317 (7th Cir. 1993); Pittman by Pope v. Secretary, 998 F.2d 887, 889 (11th Cir. 1993).

## B.  "Home and community-based services" as plaintiffs have defined them consist of an array of services and a process for providing them.

7.  Plaintiffs contend that the Massachusetts EPSDT program fails to provide Medicaid-eligible children with "home and community-based services," which they define as follows:

> "Home and community-based services are a well-established behavioral health intervention for children designed to meet the child's needs in his/her home and home community.  They may be provided in the child's natural or foster home, or in the community where the child lives. The planning and provision of home and community-based services require a specific, individualized process that focuses on the strengths and needs of the child and the importance of the family in supporting the child. Home and community-based services incorporate several discrete clinical interventions, including, at a minimum, comprehensive strength-based assessments, crisis services, case management, clinical teams, and individualized supports including behavioral specialists. These services must be provided in a flexible manner with sufficient duration, intensity, and frequency to address the child's needs."

8.  Plaintiffs' definition of "home and community-based services" thus encompasses both an

array of services ("comprehensive strength-based assessments, crisis services, case management, clinical teams, and individualized supports including behavioral specialists") and a process for providing them ("a specific, individualized <u>process</u> that focuses on the strengths and needs of the child and the importance of the family in supporting the child" [underlining added]).  Both sides' experts agreed that "home and community-based services" as defined by plaintiffs reflect a whole continuum of resources and supports (Metz: 3449-3450; Burns: 285-286; Friedman: 391-392).

**C.  The Massachusetts Medicaid program provides the array of services that plaintiffs have defined as "home and community-based services."**

9.  The Massachusetts Medicaid program provides the array of services listed in plaintiffs' definition of "home and community-based services" to Medicaid recipients statewide. Specifically, it provides "comprehensive strength-based assessments," Defendants' Proposed Findings of Fact (hereafter "DPFF") Nos. 24-42.  It provides crisis services, DPFF Nos. 43-51. It provides case management, DPFF Nos. 52-66.  It provides clinical teams, DPFF Nos. 67-68. Finally, it provides "individualized supports including behavioral specialists," DPFF Nos. 69-94. These conclusions are confirmed by the fact that the named plaintiffs, and the children reviewed by plaintiffs' experts, are receiving or have received these services, DPFF Nos. 156-175.

**D.  Medicaid law does not require Massachusetts to adopt any specific process for providing services, including that favored by plaintiffs.**

10.  Medicaid law does not require Massachusetts to adopt any specific process for providing services, including that favored by plaintiffs, for three reasons.

**1.  Plaintiffs' process for providing "home and community-based services" is not a category of medical assistance under 42 U.S.C. § 1396d(a).**

11.  First, plaintiffs' process for providing "home and community-based services" fails to satisfy

the definition of required EPSDT services under 42 U.S.C. § 1396d(r)(5) in that it is neither

explicitly listed as one of, nor does it fall within, the twenty-eight categories of medical

assistance care or services listed in 42 U.S.C. § 1396d(a).

12.  "Home and community-based services" are not explicitly listed as one of the twenty-eight

categories of medical assistance set forth in 42 U.S.C. § 1396d(a).  Services not explicitly listed

as one of those twenty-eight categories may nonetheless fall within a category, particularly the

broad "rehabilitative services" category, § 1396d(a)(13).  Pediatric Specialty Care, Inc. v.

Arkansas Dep't of Human Services, supra, 293 F.3d at 480-81 ("early intervention day treatment

services" fall within "rehabilitative services" under § 1396d[a][13]); Emily Q. v. Bonta, 208

F.Supp.2d 1078, 1096 (C.D. Cal. 2001) ("therapeutic behavioral services" were conceded by

defendants to be an EPSDT service without specification under § 1396d[a]); Chisholm v. Hood,

133 F.Supp.2d 894, 897-98 (E.D. La. 2001) ("psychological and behavioral management

services" provided by psychologists to children with autism fall within "any other type of

remedial care recognized under State law" under § 1396[a][6] and "rehabilitative services" under

§ 1396d[a][13], [underlining added]).

13.  In those cases, however, the question was whether a particular service sought by plaintiffs

fell within a particular statutory category of services – for instance, in the Pediatric Specialty

Care case, whether "early intervention diagnostic and therapy services" fell within the statutory

category of "rehabilitative services" under § 1396d(a)(13), that is, "other diagnostic, screening,

preventive, and rehabilitative services, including any medical or remedial services . . .

recommended by a physician . . . for the maximum reduction of physical and mental disability

and restoration of an individual to the best possible functional level."  293 F.3d at 480-481.  This

71

case differs from <u>Pediatric Specialty Care</u> and the other cases cited above and presents a wholly

novel claim:  that the Medicaid act requires not merely the provision of <u>services</u> -- a principle not

in question in this case --  but adoption of plaintiffs' preferred process for <u>service delivery</u>.

Nothing in the language of § 1396d(a) suggests that a process for service delivery can be

considered to be a type of medical assistance under that statute, nor has any case ever so held.

14.   The conclusion that the system of care approach or process cannot be considered a form of

medical assistance under 42 U.S.C. § 1396d(a) is further supported by the fact that systems of

care, in Massachusetts and elsewhere, provide both Medicaid and non-Medicaid services, the

non-Medicaid services being non-medical forms of assistance such as babysitting, recreation,

and auto repair that Medicaid concededly could not pay for, DPFF Nos. 203, 228, Kamradt:

1738-1741.  It would be anomalous to read a portion of the Medicaid statute as requiring the

state to adopt a process for delivering services that includes non-Medicaid services.  For all these

reasons, plaintiffs' process for providing "home and community-based services" is not a required

EPSDT service under 42 U.S.C. § 1396d(r)(5).

### **2.  Plaintiffs' process for providing "home and community-based services" is not "necessary" to "correct or ameliorate" mental illnesses or conditions as required by 42 U.S.C. § 1396d(r).**

15.   Even supposing that a process can be considered a Medicaid service – which defendants

dispute, as just explained – plaintiffs' process for providing "home and community-based

services" fails to satisfy the definition of required EPSDT services under 42 U.S.C. §

1396d(r)(5) in a second respect as well, in that it cannot be considered "necessary" to "correct or

ameliorate" children's mental illness and conditions within the meaning of § 1396d(r)(5).

16.   Defendants' witnesses testified that plaintiffs' definition of "home and community-based

services," taken as a whole, describes an approach to delivering children's mental health services known as the "system of care" approach, DPFF Nos. 179-182. While plaintiffs did not use the "system of care" terminology, they identified two Massachusetts "systems of care," the MHSPY and CFFC programs, as "the only two programs that offer home-based services to children in the Commonwealth," Pl. Trial Mem. p. 1 n. 3, DPFF Nos. 202 (MHSPY program is a system of care), 217 (CFFC program is a system of care). Plaintiffs also presented the testimony of two system of care directors (Mr. Kamradt of Wraparound Milwaukee and Dr. Grimes of MHSPY) as descriptive of what they seek in this litigation, while Dr. Beyer, another of plaintiffs' experts, testified that children with severe emotional disturbance "require a system of care with a range of flexible services" and that MHSPY would meet such children's needs (Beyer: 1545-1547, 1568-1569). Research and experience concerning systems of care is therefore relevant to whether plaintiffs' preferred process for providing children's mental health services is "necessary" to "correct or ameliorate" children's mental health conditions within the meaning of § 1396d(r)(5).

17. As to academic research, defendants presented the testimony of Dr. Leonard Bickman concerning large-scale evaluations he has carried out in a non-litigation context on several systems of care, and his conclusion that systems of care do not result in better clinical outcomes for children than traditional delivery systems, yet cost more, DPFF Nos. 183-190. While plaintiffs were at pains to point out various critiques of Dr. Bickman's work, the fact that the United States Surgeon General has relied on his work, the numerous awards it has received (including from one of plaintiffs' experts), and the fact that the American Academy of Child and Adolescent Psychiatry has similarly concluded that the evidence in favor of systems of care is

not conclusive (DPFF Nos. 191-195), are all evidence of the reliability of his conclusions. Academic research, therefore, supports the conclusion that since systems of care do not result in better clinical outcomes for children than traditional delivery systems, they cannot be considered "necessary" to "correct or ameliorate" children's mental illnesses or conditions within the meaning of 42 U.S.C. § 1396d(r)(5). At the very least, such research demonstrates that there is a credible professional body of work that <u>refutes</u> plaintiffs' assertion that systems of care <u>do</u> result in better outcomes.

18. Experience in Massachusetts is consistent with that conclusion. Massachusetts has created several systems of care, beginning with the MHSPY and WCC programs and continuing with the CFFC program, and is evaluating children's outcomes in those programs, DPFF Nos. 198-231. Dr. Peter Metz, one of the founders and the principal investigator of WCC, and Suzanne Fields, the manager of CFFC, emphasized that data on these programs is preliminary and that evaluation is ongoing to determine, among other things, why a substantial minority of children in the WCC program either do not improve or get worse, DPFF Nos. 213-215, 236-242.

19. Research and Massachusetts experience thus both indicate that the system of care approach to providing children's mental health services, as exemplified by the MHSPY and CFFC programs, is at the very least not superior to traditional systems for providing such services, and indeed for some children may be inferior to traditional delivery systems. It also bears emphasis that all the Medicaid services available through the Massachusetts systems of care are available to Medicaid recipient children statewide, DPFF Nos. 203, 225, so that there is no question of Medicaid-eligible children anywhere in the state foregoing <u>services</u> – what is not available statewide is a <u>service delivery system</u> that includes non-Medicaid services, and as to which, as

74

just described, there is room for doubt.  In light of this evidence, the system of care approach to

providing services, and by extension plaintiffs' preferred process for providing "home and

community-based services,"  cannot be considered "necessary" to "correct or ameliorate"

children's mental health illnesses and conditions within the meaning of 42 U.S.C. § 1396d(r)(5).

### 3.  States have discretion in organizing how their Medicaid programs provide services.

20.  The conclusion that Medicaid does not require Massachusetts to adopt plaintiffs' preferred

process for delivering services is reinforced by the principle that state have discretion in

organizing how their Medicaid programs deliver services.  Because state participation in the

Medicaid program is optional, a state has "considerable latitude" in fashioning "the particular

contours of its own [Medicaid] program," <u>Pharmaceutical Research and Manufacturers of</u>

<u>America v. Walsh</u>, 538 U.S. 644, 665-666 (2003).  The Medicaid statute extends that discretion

to decisions as to how to organize the delivery of services; for example, while states may use a

managed care model of service delivery, they are not required to do so; whether or not to adopt

such a model is at the state's option, 42 U.S.C. § 1396u-2.  42 U.S.C. § 1396a, which imposes

numerous requirements as to state Medicaid plan requirements, imposes no obligations on the

state with respect to a process for service delivery.

21.  Here, Massachusetts is exercising its discretion with respect to the organization of service

delivery in a reasonable way.  It provides all Medicaid services sought by the plaintiffs to all

Medicaid recipients statewide, regardless of whether they are enrolled in a system of care.  It is

experimenting with the system of care approach in a deliberate, evidence-based way, consistent

with academic research and its own experience.  This is a proper exercise of discretion "in the

best interest of the recipients," <u>Pharmaceutical Research and Manufacturers of America v.</u>

Walsh, supra, 538 U.S. at 665-666, citing Alexander v. Choate, 469 U.S. 287, 303 (1985).

**E.  Massachusetts gives notice of the availability of EPSDT services.**

22.  Defendants are required to inform Medicaid recipients about available EPSDT services using both written and oral methods and clear, nontechnical language, and making provision for persons who cannot read or do not speak English.  42 U.S.C. § 1396a(43); 42 C.F.R. § 441.56(a); Pediatric Specialty Care, Inc. v. Arkansas Dep't of Human Services, supra, 293 F.3d at 481.  The Massachusetts Medicaid program provides a plethora of written materials in English and other languages about available behavioral health services, as well as oral means of obtaining that information, both directly to recipients, and also to health care providers so that the information may be passed on to recipients, DPFF Nos. 95-116.  These efforts satisfy the EPSDT notice requirements.

**II.  Plaintiffs' clinical review fails to satisfy the standards for admissibility of expert proof.**

23.  To be admissible, expert testimony must be reliable, judged by the standards of the scientific, technical, or other specialized community to which the expert belongs.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141-142 (1999); United States v. Mooney, 315 F.3d 54, 63 (1st Cir. 2002) (proponent of evidence must show "that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.")  In determining whether expert testimony is reliable, the Court may consider whether a theory can and has been tested; whether there is a high known or potential rate of error; and whether the theory enjoys general acceptance within the relevant community.  Kumho Tire, supra, 526 U.S. at 149-150.

24. The expert testimony based upon plaintiffs' clinical review is unreliable on each of the factors cited in Kumho Tire and several others.  First, it is impossible to test plaintiffs' experts'

conclusions with respect to the review subjects' alleged need for home and community-based services because the reviewers did not gather the data in a thorough and objective way, did not present the data they did gather so as to show services being received, and did not set forth or otherwise explain the criteria by which they assigned particular children to particular categories, DPFF Nos. 254-266.  Second, the margins of error associated with the clinical review were unacceptably high, DPFF Nos. 270-288.  Third, the clinical review did not adhere to accepted standards for social science research, DPFF Nos. 289-294.

25.  Further evidence of the unreliability of plaintiffs' clinical review evidence is the fact that the reviewers were deliberately selected to have a "common mind-set," the absence of review guidelines to restrain reviewers' conscious or unconscious bias, and the active role played by plaintiffs' counsel in creation of the review findings – surely no part of any methodologically reliable clinical review process, DPFF Nos. 245-253, 267-269.  For all these reasons, no valid or helpful conclusions may be drawn from plaintiffs' clinical review.

## III.  Plaintiffs lack a private cause of action under the Medicaid act.

26.  This Court has previously denied defendants' motion to dismiss and summary judgment motion argument that plaintiffs lack a private cause of action under the Medicaid act based on the analysis required under Gonzaga University v. Doe, 536 U.S. 273 (2002).  For the purpose of preserving the issue for appeal, Rivera-Torres v. Ortiz Velez, 341 F.3d 86 (1st Cir. 2003), cert. denied 541 U.S. 972 (2004), defendants reassert and incorporate herein that argument (forth in the Memorandum of Law in Support of Defendants' Motion for Summary Judgment dated December 16, 2004 at pp. 14-28).

Respectfully submitted,

THOMAS F. REILLY
ATTORNEY GENERAL

Attorney for Defendants


_____/s/ Deirdre Roney_____
Deirdre Roney, BBO No. 652886
Juliana Rice, BBO No. 564918
Assistant Attorney General
Government Bureau
One Ashburton Place - Room 2019
Boston, Massachusetts   02108
(617) 727-2200, Ext. 3372

Date: July 15, 2005

I hereby certify that a true copy of this document was served upon counsel for the plaintiffs (Mr. Schwartz, Mr. Burling, Mr. Rhee, and Mr. Laski) by electronic mail on July 15, 2005.


_____/s/ Deirdre Roney_____