UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROSIE D. ET AL., | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) C.A. No. 01-cv-30199-MAP |
| | ) |
| CHARLIE BAKER ET AL., | ) |
| Defendants. | ) |

<u>MEMORANDUM AND ORDER RE:</u>
<u>DEFENDANTS' MOTION REGARDING SUBSTANTIAL COMPLIANCE AND
TO TERMINATE MONITORING AND COURT SUPERVISION</u>
(Dkt. 848)

February 7, 2019

PONSOR, U.S.D.J.

## I.   <u>INTRODUCTION</u>

In this class-action litigation Plaintiffs charged that
Defendants' provision of services for Medicaid-eligible
children suffering from serious emotional disturbances
("SED") failed to satisfy the requirements of the federal
Medicaid statute.  42 U.S.C. § 1396 <u>et seq</u>.[1]  On January 26,

---

[1] The definition of a child with serious emotional
disturbance includes the following elements:
- Persons from birth up to age 18;
- Who currently or at any time during the past year;

1

2006, following a lengthy non-jury trial, the court issued its opinion on liability, ruling that Defendants had violated Medicaid provisions mandating early and periodic screening, diagnosis, and treatment ("EPSDT") services, as well as the statute's "reasonable promptness" requirements, for SED children.  Rosie D. v. Romney, 410 F.Supp.2d 18 (D. Mass. 2006) ("Rosie D. I").

The portion of the class suffering "extreme functional impairment" at the time of this judgment comprised approximately 15,000 children in Massachusetts.  Id. at 23. Diagnoses for the named class members included Attention Deficit/Hyperactivity Disorder, Post-Traumatic Stress Disorder, Pervasive Developmental Disorder, Oppositional Defiant Disorder, and Schizoaffective Disorder.  Id. at 45-

---

- Have had a diagnosable mental, behavioral, or emotional disorder of sufficient duration to meet diagnostic criteria specified within DSM-III-R; and
- Which has resulted in functional impairment which substantially interferes with or limits the child's role or functioning in family, school, or community activities.

Individuals with Disabilities Act ("IDEA"), 20 U.S.C. § 1401(3)(A)(i), 58 Fed. Reg. § 29422-02 (1993).  DSM-III-R refers to the 1987 revision to the Diagnostic and Statistical Manual of Mental Disorders, published by the American Psychiatric Association.

50.  These impairments were sometimes complicated by bi-polar disease, extreme neglect, or physical and sexual abuse.  Id.

Following the ruling on liability, the court directed the parties to negotiate a joint remedial order that would cure the statutory violations.  After discussions failed to produce an agreed-upon plan, the court ordered the parties to submit their separate proposals.  On July 16, 2007, the court issued its final judgment, adopting with minor modifications the version of the proposed remedial order offered by Defendants.  Rosie D. ex rel. John D. v. Romney, 474 F.Supp.2d 238 (D. Mass. 2007), modified sub nom. Rosie D. v. Patrick, 599 F. Supp. 2d 80 (D. Mass. 2009) ("Rosie D. II").  This judgment was never appealed.[2]

The court offered two reasons for adopting the remedial order proposed by Defendants, rather than Plaintiffs.  First, citing Lewis v. Casey, 518 U.S. 343, 362 (1996), the court noted the importance of maintaining respect for the Commonwealth's sovereignty by allowing state authorities to

---

[2] The judgment is sometimes referred to below as the "remedial order" or the "judgment and remedial order."  The full text of this document is not contained in the reported decisions but appears on the docket as Dkt. 368.

craft their own remedy.  Second, the court observed that "there is some force in being able to say to Defendants: you have endorsed this plan, now implement it." (Dkt. 354 at 3.) "Undue delay or ineffective programming," the court observed, would not be excused by complaints that Defendants were "being forced to implement a plan they never bought into." (Id. at 3-4.)

After many years attempting to implement the remedial order, Defendants now seek to terminate court oversight, arguing that they are in substantial compliance.  For the reasons set forth below, the court will deny this motion. While progress has been made in satisfying portions of the remedial order, one crucial provision, at a minimum, still awaits implementation.  Defendants have failed, despite persistent prodding and numerous extensions, to comply with Section I(C), ¶¶ 20-30, of the remedial order, which requires Defendants to provide "Intensive Care Coordination and Treatment Planning" for the SED children.  (Dkt. 368 at 11-14.)  Defendants have so far failed to provide these clinical services to a large portion of the Plaintiff class with anything approaching "reasonable promptness."

4

The test for reasonable promptness under the Medicaid statute is simple: to comply, the applicable regulation requires Defendants to provide an initial appointment for a child seeking intensive care coordination ("ICC") services within two weeks of the child's request.[3]  The undisputed facts of record confirm that for a very substantial portion of the Plaintiff children, Defendants have for years failed, and continue to fail, to satisfy this straightforward requirement.  Depending on the particular month and year, between thirty and sixty percent of the Plaintiff children seeking ICC services continue to wait beyond the fourteen-day period for their first appointment, often for much longer. These delays have grave potential consequences for the health and welfare of these vulnerable children, as Plaintiffs' evidence confirms.[4]

---

[3] The original deadline in 2007, when the remedial order issued, was three days.  The more generous deadline was adopted by the court in 2010 at the request of Defendants, over Plaintiffs' objection, with the understanding that it would eliminate waiting lists.

[4] As will be seen below, Defendants in recent years have begun to rely, or purport to rely, on other system components, specifically In-Home Therapy ("IHT") and Out-Patient therapy ("OP"), to provide intensive care coordination for the children.  Where this tactic has been used, the evidence demonstrates that the care coordination has not been provided in a timely fashion for roughly the

Recent reports ominously suggest that the fail rate for providing timely ICC services is increasing, not diminishing.  Moreover, and most frustratingly, Defendants in status conferences over the past eighteen months have offered <u>no concrete plan</u> to rectify this situation and have begun to profess themselves neither able nor obliged to take any specific steps to alleviate this glaring failure in compliance.

Plaintiffs contend that several other provisions of the judgment and remedial order, in addition to ICC, also remain unsatisfied, including sections relating to assessments (Section I(B)) and home-based services (Section I(D)).  The manifest and easily quantified failure to comply with the "reasonable promptness" requirement of Section I(C), however, makes denial of Defendants' motion to terminate oversight inevitable and discussion of these other issues for the time being unnecessary.[5]

---

same proportion, or an even greater proportion, of children needing ICC services.

[5] Absence of discussion of Plaintiffs' additional arguments, particularly deficiencies in the quality of services, should not be taken to imply either acceptance or rejection of them.  They may be taken up, as needed, by the judge to whom this case will now be transferred.

The length of time needed to achieve reasonable compliance with the remedial order and terminate the court's oversight is in the hands of Defendants.  The two-week deadline to initiate ICC services is not onerous. With sufficient effort, Defendants have the capacity to comply with it.  Indeed, some agencies providing these services to class members regularly meet the deadline now. Even with Defendants' clearly inadequate compliance with Section I(C), the Court Monitor has recently lowered her hours to half-time (with court approval and without objection from Plaintiffs) based on progress in other areas.  Complete termination of monitoring and supervision at this time, however, would require the court to turn a blind eye to Defendants' persistent, substantial violation of the remedial order -- a violation that continues to put many SED children at serious risk of harm.  An overview of the order and the process of implementing it so far makes this clear.

## II.  THE JUDGMENT AND REMEDIAL ORDER

The substantive elements of Defendants' proposed remedial order, as substantially adopted by the court in 2007, took shape in five sections: (A) Education, Outreach,

and Screening; (B) Assessment and Diagnosis; (C) Intensive
Care Coordination and Treatment Planning; (D) Covered
Services; and (E) Implementation, including data collection
and monitoring.  (Dkt. 368.)

A. Education, Outreach, and Screening

Pursuant to Section I(A) of the remedial plan, the
first responsibility assumed by Defendants was to ensure
that eligible SED children, their families, their care
providers, and other interested parties were made aware of
the enhanced EPSDT services.  Notices and handbooks were to
be prepared or updated, regulations amended, and public
meetings held.  Educational materials were to be drafted
and distributed, and a web-based "Virtual Gateway" would be
employed with access available to hospitals, community
health centers, and other entities to assist children and
families to enroll in the new and expanded services.  (Id.
at 3-7.)

Defendants' response to this part of the remedial order
was robust and effective.  Affirmative steps are now taken
to make sure that all eligible SED children in
Massachusetts, their families, and their care providers are
aware of EPSDT services and Defendants' commitment to

8

provide them promptly.  Handbooks have been distributed,
staff trained, a website has been created and regularly
updated, and applicable regulations modified.  Perhaps most
importantly, virtually all children entering the medical
system in Massachusetts now receive behavioral health
screenings.  As a result, a much greater proportion of SED
children who need further assessment and referral to
treatment are identified.  Plaintiffs agree that Defendants
are now in reasonable compliance with this first segment of
the remedial order.  No further oversight or monitoring is
needed regarding this portion of the order.

    B. <u>Assessment and Diagnosis</u>

Section I(B) of the remedial order described the
process whereby SED children would receive comprehensive
assessments for possible treatment, typically commencing
with the child's clinical intake or when an eligible child
was discharged from an inpatient facility or community-
based treatment setting.  The results of these assessments
were to be condensed into a well-established clinical
format known as the Child and Adolescent Needs and
Strengths (CANS) and then entered into a single database
administered by the Commonwealth.  (Dkt. 368 at 8-9.)  This

would ensure consistency in the assessments and permit the
Commonwealth to keep track of the children being served.

While they acknowledge that progress has been made in
this area, Plaintiffs do not agree that Defendants have
reasonably complied with this portion of the remedial
order, particularly the timely administration and quality
of clinical assessments.  Their observations have force,
but as noted above the court does not need to address them
here in order to rule on Defendants' motion.

### C. Intensive Care Coordination and Treatment Planning

Under Section I(C) of the remedial order, once an
eligible SED child was screened and assessed as having a
need for EPSDT services, that child would be referred to
ICC for treatment planning and referral to one or more care
providers. The evidence at trial established, and the
court's liability ruling heavily underlined the fact, that
the absence of adequate, timely intensive care coordination
was a crippling deficiency in the Commonwealth's system of
care for SED children.

> Children with SED are particularly challenging to treat
> because of the severity of their needs and the number
> and intensity of services they require.  The danger for
> these children, given their complex problems, is that
> they will not only receive insufficient services, but
> that a lack of coordination among the service providers

will undermine the effectiveness of the treatment that
they do receive.  Comprehensive assessments and
scrupulous service coordination are essential parts of
the Commonwealth's EPSDT responsibility to children
with SED.  Defendants' provision of these services has
been markedly lacking.

Rosie D. I, 410 F. Supp. at 32.

In response to these concerns, the provisions of the
remedial order regarding care coordination are especially
detailed and clear.  A care manager is to coordinate
services for the SED child; a care team is to be assembled,
and this team is to work with the child, the parents, and
the service providers.  The development of an
individualized care plan follows, setting forth, among
other things, a description of the child's strengths and
needs, the child's treatment goals with timetables for
achieving them, and the necessary services to be provided.
A key element of the coordination responsibility is the
careful management of services when the child is receiving
treatment from multiple providers simultaneously.  (Dkt.
368 at 11-14.)

Defendants agree that federal law requires a state
Medicaid agency to establish time standards for provision
of these services.  42 CFR § 441.56.  It is undisputed that
the Massachusetts standard now sets "an outside limit of .

. . [fourteen] days between [the] time of request for ICC
and the first meeting with ICC staff to establish
enrollment." (Defs.' Status Report of January 13, 2012 at
2, Dkt. 562 (quoting the recommendation of the Board of the
New England Council of Child and Adolescent Psychiatry
("NECCAP"), which the court permitted Defendants to adopt,
over Plaintiffs' objection).)[6]

Prior to 2010, the time limit between a request and a
meeting for enrollment in ICC services had been three days.
See n.3 supra. Very significantly, the NECCAP
recommendation observed:

> The current 3-day limit should be adhered to whenever
> possible, recognizing that there is evidence that
> engagement in services is most likely to occur if the
> response to a request can occur as soon as possible
> after the need is first expressed.

Id.

As will be seen, the review mechanisms in place to
gauge compliance with this aspect of the remedial order
reveal that this fourteen-day limit is regularly being
violated, often grossly violated, for a substantial portion
of Plaintiffs. Years into the implementation process, a

---

[6] The original proposal from NECCAP was ten business days,
but this was later modified to fourteen calendar days for
simplicity. See id.

third to more than half of eligible SED children still wait
more than the fourteen days for their first meeting with an
ICC provider, with some children waiting many weeks for
their first appointment.

The failure, as noted, can have very serious
consequences.  If a Medicaid-eligible child had
appendicitis, no one would suggest that a "reasonably
prompt" response would be an appointment within two weeks
of onset.  SED children face crises -- albeit crises
arising from their extreme functional impairments -- that
can be analogously acute.  Delays in treatment can lead, in
fact have led, to violent physical outbursts, summoning of
the police, removal from the home, and traumatizing
unnecessary hospitalizations.  Given the vulnerability of
this population, fourteen days is a very generous
interpretation of the Medicaid statute's "reasonable
promptness" requirement.[7]

---

[7] Any suggestion that the remedial order requires Defendants
to develop services, but not to deliver them with
"reasonable promptness" because the remedial order does not
contain the phrase "reasonable promptness" flies in the
face of the explicit liability finding, the manifest import
of the remedial order, and, most importantly, the clear
language of the Medicaid statute itself and the law's
regulations.  42 U.S.C. § 1396a(a)(8) (assistance must be
"furnished with reasonable promptness to all eligible

Uncoordinated efforts to patch together services while an SED child awaits this first, critical ICC appointment are not an adequate response to the child's clinical needs. Chronic, substantial delays in access to these services constitute a critical deficiency in the service system that the remedial order aimed to correct.  In addition, serious concerns exist, with substantial objective verification, regarding the quality of some of the care coordination being provided.  Finally, evidence suggests that thousands of SED children who are receiving treatment primarily through In-Home Therapy ("IHT") or Out-Patient ("OP") program components suffer the same delays in access to care coordination or fail to receive care coordination at all. Further discussion of these deficiencies is set forth below.

D.  <u>Covered Services</u>

Section I(D) of the remedial order spells out the services to be developed by Defendants to ensure compliance

---

individuals" (emphasis added)); 42 C.F.R. § 435.930 (2005) (state agencies must "[f]urnish Medicaid promptly to recipients without any delay caused by the agency's administrative procedures"); and <u>Rosie D. I</u>, 410 F. Supp. 2d at 27-29 (discussing the "reasonable promptness" requirement).

with the Medicaid statute's EPSDT and timeliness provisions.  These include crisis management through mobile crisis intervention, as well as identified home and community-based services, including In-Home Therapy ("IHT").  (Dkt. 368 at 15-18.)[8]

The central goal animating these covered services is the retention of the SED child in the home to the maximum extent possible.  Placement of SED children in inappropriate clinical settings, such as emergency rooms or longer-term in-patient facilities due to the absence of responsive home-based services, can be extremely damaging to these fragile children and was a primary shortcoming of the pre-2006 system that the remedial order aimed to rectify.

Again, while recognizing that significant progress has been made in this area, Plaintiffs contend that more work remains to be done before Defendants may be said to have complied with the remedial order in this area.  Plaintiffs

---

[8] As implementation of the remedial order has evolved, Defendants have begun, in some cases, to fold the care coordination functions of the ICC program into the IHT service component.  Unfortunately, as will be seen, access to IHT has been plagued by the same delays in access as ICC.

point to shortcomings in the quality of care sometimes
being offered by the service providers (referred to as
Community Services Agencies or "CSAs") as a particular
concern.  As with assessments, it is not necessary to
address these arguments specifically to resolve Defendants'
motion, with one exception.

Provision of IHT services, which Defendants have
identified as one service "hub" responsible for care
coordination, regularly fails to comply with the fourteen-
day deadline adopted by Defendants.  The well documented
failure to provide timely care coordination either through
the ICC or the IHT program components, makes denial of the
Defendants' motion to suspend court supervision inevitable.

E.   <u>Implementation</u>

The final substantive section of the remedial order,
I(E), sets forth a timetable for development of the service
enhancements, with implementation initially scheduled for
completion at the end of June of 2009.  (Dkt. 368 at 18-
28.)  This was, all parties now acknowledge, an
unrealistically optimistic deadline.  Perhaps recognizing
this, Section II of the remedial order confirmed that it
was subject to modification for good cause upon application

16

to the court or by the agreement of the parties.  (Dkt. 368 at 28.)  Apart from a timetable, the last section of the remedial order spelled out details of data collection, tracking, reporting, and monitoring.  The final sentence noted that the reporting and monitoring provisions would terminate five years after entry of judgment, meaning (as originally contemplated) in July of 2012.

### III.  <u>THE PROGRESS OF IMPLEMENTATION</u>

A month-by-month summary of the implementation process over the past decade would draw this discussion out unnecessarily.  Neither party has requested an evidentiary hearing in connection with Defendants' motion; the basic facts needed to provide a foundation for the court's ruling are not in serious dispute.

It deserves recognition that much of the implementation news is good.  Due to the hard work of Defendants (through evolving iterations of responsible staff), the Plaintiffs, and the Court Monitor, a system of care for Medicaid-eligible SED children has emerged in the Commonwealth that bears little resemblance to the random, meager programming available when this lawsuit was filed.  Families and caregivers are informed of EPSDT services, and screening

and assessments identify a significant portion of eligible SED children.  Mobile crisis intervention services attempt to minimize unnecessary separation of children from their families.  Intensive care coordination teams work with many families both to develop care plans for SED children and to refer them to responsive services, again with the goal of supporting families and keeping children in the home.[9]

Through these years, counsel have submitted numerous progress reports, met frequently with the Court Monitor, and appeared in court regularly for status conferences.[10] In general, the court's approach during implementation has been to allow the parties to work out disputes through discussion and mutually agreed modifications of the remedial order's written terms, with the assistance of the Court Monitor.  These modifications have sometimes been in writing, but more often implicit, reflecting a flexible and

---

[9] These services come under various names for programs tailored to the child's specific needs, including Family Partners, In-Home Therapy, Therapeutic Mentoring, and In-Home Behavioral Services.

[10] The court held status conferences with the parties approximately every three to six months for the subsequent ten years.  (See Dkt. 370, 391, 403, 420, 450, 469, 478, 509, 537, 552, 560, 573, 579, 587, 604, 608, 618, 642, 655, 660, 671, 682, 724, 735, 747, 759, 802, 818, 840, and 845.) On February 26, 2018, Plaintiffs filed their thirty-fifth status report.  (Dkt. 828.)

informally negotiated process.  While Defendants have resisted imposition of court orders extending beyond what they view as the explicit requirements of the judgment and remedial order, they have regularly taken voluntary steps to address Plaintiffs' concerns and thereby render court intervention unnecessary.

An example of this approach occurred in July of 2008, when Plaintiffs moved for an order requiring Defendants to provide interim services to class members while the longer-term remedial efforts were under way.  Defendants resisted formal imposition of any court order but made voluntary commitments that addressed the Plaintiffs' and the court's concerns.  (See Dkt. 419 at 2-3.)

Another example of this flexible approach occurred in January of 2009, when Defendants filed a motion to modify the remedial order to postpone implementation of In-Home Behavioral and Therapy Services, Therapeutic Mentoring and Crisis Stabilization services for one year.  (Dkt. 431.) After receiving submissions from Plaintiffs, the court eventually allowed this motion in part.

Keeping track of the development of this evolving system, which assists thousands of children, through

hundreds of caregivers, providing a range of different services at scores of sites throughout Massachusetts, has not been simple.  Early on, the parties developed a review mechanism that would give counsel and the court a picture of how the system was functioning through an agreed sample of different service modalities -- for example mobile crisis intervention, in-home therapy, and intensive care coordination.  This review mechanism has been known by different acronyms over time, but it is now called the Massachusetts Practice Review ("MPR").  Along with other methods of keeping track of the system, including visits to programs and receipt of specific feedback, the MPR methodology has provided the parties and the court invaluable, accurate insight into the actual performance of the new system.  As will be seen below, the MPR reports have identified critical ways in which the system at present falls short of satisfying the remedial order.  These deficiencies have left unacceptably large numbers of SED children waiting too long for ICC and IHT services or with no services at all.

A critical point in the implementation process came on June 25, 2012, the five-year deadline set in the remedial

order for termination of reporting and monitoring.  Since
Defendants' current motion highlights this juncture, it is
important to make clear exactly what happened at that time.

Prior to this conference, Defendants submitted a
lengthy report outlining their efforts to comply with the
remedial order.  While suggesting that much had been
accomplished, the conclusion of Defendants' report conceded
the existence of "open items identified in the preceding
text" that had not at the time been "fully implemented."
(Defs.' Status Report of May 16, 2012 at 111, Dkt. 575.
See also Status Conference Tr. 7:8-10, June 25, 2012, Dkt.
579.)  Plaintiffs, in their eighteenth status report,
responded to the Defendants' pre-conference report by
agreeing with Defendants that "open items" indeed existed
and by pointing out additional areas where, in their view,
reasonable compliance had also not been achieved.  (Dkt.
578.)

Faced with Defendants' concession that more needed to
be done before compliance with the remedial order would be
complete, and Plaintiffs' contention that even more
remained unfinished than Defendants were acknowledging, the
court proposed that the parties attempt to negotiate a

"plan for disengagement." (Dkt. 579 at 8.)  Under this approach Defendants would develop their "own road map of what needs to be addressed and how it would be addressed with a view towards bringing an end to the court's oversight." (Id.)  This "road map" would be shared with Plaintiffs and the Court Monitor; Plaintiffs would respond to it in writing; the parties would appear before the court for a conference or adversarial hearing; and the final outline for completion of compliance with the remedial order would emerge.  This approach, as the court noted, would "give us a chance to sit down and roll up our sleeves and think about where the next phase will go and what it will take, what it will involve, and what the triggers will be." (Id. at 9.)

Defendants embraced this approach.  In fact, during the conference Defendants referred to a "debate we had internally" about submitting a motion asking the court to hold that they were "in compliance and that the monitoring period [should] end." (Id. at 15.)  They acknowledged that they "elected" not to do this and made a "conscious choice" not to formally seek a termination of oversight and monitoring. (Id.)  At the June 25, 2012 conference, after

further discussions with the court, and an off-the-record
consultation between counsel, both parties agreed that in
the weeks following the conference counsel would confer
with the assistance of the Court Monitor and identify areas
of agreement and disagreement.  They would then submit a
plan for the wind-down phase of monitoring that would
either be agreeable to all parties or would narrow the
issues to be addressed by the court.  Counsel for
Defendants agreed that this was "the next logical step" in
the implementation process.  (Id. at 17.)

While no formal action was taken by Defendants,
Plaintiffs, or the court, this reasonable strategy
constituted an obvious voluntary modification of the
remedial order's oversight and monitoring provision, as
contemplated by Section II of the order.  (Dkt. 368 at 28.)
The parties and the court sensibly agreed that counsel
would meet with the Court Monitor and negotiate an approach
to the final phase of implementation satisfactory to both
sides, or, failing that, return to court for argument and
rulings on their differences.  In the meantime, the parties
agreed that court oversight and monitoring would continue,

despite the remedial order's suggestion that it would terminate after five years.

It is important to emphasize the narrow topic under discussion at the time of the June 25, 2012 conference, which was the eventual wrap-up of the reporting and monitoring requirements of the remedial order.  Whatever happened, the court would retain jurisdiction over the process aimed at remediating the violations of the Medicaid statute, exercising "ongoing jurisdiction" to take action if Defendants failed to address the violations effectively. Rosie D. II, 474 F. Supp. 2d at 240.  Significantly, at the conclusion of the June 25 hearing, Defendants confirmed that the Court Monitor's budget had already been approved for an additional year, through June of 2013.  (Dkt. 579 at 36.)[11]  In the years thereafter, the court issued ten additional uncontested orders extending the Court Monitor's term.

_____

[11] To the extent that Defendants' memorandum seems to suggest that their position in June 2012 was that they had substantially complied with the remedial order and that termination of oversight and monitoring was proper at that time (see e.g., Dkt. 858 at 6, n. 2), this contention constitutes a misrecollection of their actual position at the conference, as the transcript plainly reveals.

What emerged from the June 2012 conference was a series of agreements provisionally defining measures that, when taken by Defendants, would lead to an agreed end of active court supervision and monitoring. Defendants' position during this period was slightly ambiguous but clear in its basic import. At times, Defendants appeared to contend that they in fact had reasonably complied with the terms of the remedial order, but they were agreeing to take certain steps voluntarily to avoid formal litigation on this point. At all times, Defendants at a minimum made clear that, whatever issues might exist with compliance, their voluntary actions were <u>not</u> required by the remedial order. Plaintiffs consistently took the position that Defendants had not reached reasonable compliance with the remedial order and that the steps Defendants were committing to take <u>were</u> mandated by the remedial order.

The court's position during these years was anchored on the rhetorical question: Why argue about whether certain steps were required by the judgment and remedial order if Defendants have agreed to take these steps anyway, albeit voluntarily? Once the steps were taken, whether mandated or voluntary, and the agreed milestones reached, the

litigation could enter a phase where active oversight and monitoring could be terminated.

This has been the approach that the parties, the Court Monitor, and the court have adopted in the years since 2012. During this period two major efforts to concretize the progress toward agreement on remedial compliance have been attempted.

Following the court's request that the parties negotiate a "road map" for termination of oversight and monitoring, Plaintiffs and Defendants developed and submitted to the court in June 2013 a joint disengagement document, which laid out four areas where Defendants would engage in data collection and analysis regarding access, utilization, effectiveness, and uniformity of services. (Dkt. 621-1.)

The process of acquiring the pertinent data and analyzing it, as it turned out, required more time than expected. In the end, it led to progress but also left significant disagreements between the parties regarding Defendants' full compliance.

In response to this, in 2016 the parties negotiated specific numerical targets for year-over-year improvements

in the remedy network.  The baseline was to be Fiscal Year ("FY") 2016, with seven specific projected commitments for improvement in various areas in FY 2017 and FY 2018.  If these targets, called "disengagement measures," were hit, the assumption was that both sides would agree to wind down court oversight and monitoring.

Five of the disengagement measures, numbered 2 through 6, set agreed goals for quality improvements in the ICC, IHT, and OP services, in assessments, and in clinical progress.  (Dkt. 847-1.)  The final disengagement measure, numbered 7, set forth Defendants' commitment to draft a sustainability plan for review by Plaintiffs with the goal of submitting it to the court.

Disengagement measure number 1 set a goal for improvements in access to ICC and IHT services, the area that this memorandum is most concerned with.  Counsel agreed that as of June 2016, only 63% of class members seeking ICC services were being offered initial appointments within the fourteen-day Medicaid standard, meaning obviously that Defendants were out of compliance regarding 37% of the children needing services.  (Dkt. 768-1 and 769-1.)  The parties' filings also confirmed that

less than half of class members seeking IHT services, 48%, were receiving initial appointments within fourteen days. (Id.) Plaintiffs' initial proposal contemplated a ten percent increase in this level of compliance by December 31, 2017, and a further ten percent by December 31, 2018. (Dkt. 762-1.) When Defendants balked at this, the court established a goal of a 7.5% improvement by December 31, 2017, with the further goal for December 31, 2018 to be decided once the 2017 performance was known. Even as to this lower goal, however, Defendants reserved "their right to object to this measure for purposes of disengagement." (Dkt. 769 at 2, n.1.)

Unfortunately, Defendants failed to meet nearly all the disengagement targets for 2017. Most importantly, for purposes of this memorandum, only 58.7% of the SED children received initial appointments for ICC services, less than the 2016 baseline, and only 49.7% for IHT services during calendar year 2017. (Dkt. 847 at 3.) In other words, from 2016 to 2017 Defendants were doing worse with regard to reasonably prompt access to ICC services and were stalled regarding IHT services. Statistics for 2018 are not yet available, but preliminary discussions suggest that no

significant improvements in complying with the Medicaid access standard for ICC and IHT will emerge for this year either.[12]

It is important to be clear about the significance of these numbers.  The fact that they confirm a failure of Defendants to satisfy the <u>disengagement measures</u> is beyond dispute, but not central to the court's current analysis. What is central is that these numbers make clear that Defendants have failed to comply with Section I(C) of the <u>judgment</u>, which requires Defendants to comply with the Medicaid statute's "reasonable promptness" requirements in providing ICC and IHT services.  As will be seen below, while courts obviously have the duty to ensure compliance with their orders in general, the responsibility is especially compelling when the order is designed to remedy an acknowledged violation of federal law.

During the first half of 2018, the court continued to prod Defendants to come up with a plan to address the failure to comply with the Medicaid standard regarding

---

[12] The arithmetic used to calculate these percentages is extremely favorable to Defendants, since it is based on only nine of the twelve months in the year, with the three worst months, by agreement, disregarded.

access to ICC and IHT services.  At the status conference
on January 16, 2018, for example, the court reminded
Defendants that the ICC and IHT services were "right at the
heart of the remedial order" and "they have to be provided
promptly." (Status Conference Tr. 6:11-14, January 16,
2018, Dkt. 824.)  The court made clear that it was looking
for "concrete steps that the defendants are taking that
have a realistic possibility of making a substantial
difference in terms of access." (Id. at 6:25-7:2.)
Defendants' status report filed prior to the January 16
conference had mentioned putting the access issue on the
agenda of a meeting of its behavioral health directors.
(Dkt. 820 at 2.)  At the status conference, the court
questioned Defendants:

> Well, that's great.  Was it on the agenda?  What was
> discussed and what did you decide to do?  That's what I
> want to know.  Putting something on an agenda is nice.
> I could do that for you.  But who was there, what was
> discussed, and what did you decide to do?  Can somebody
> tell me that?

(Id. at 7:25-8:5.)  No satisfactory answer was offered.

At the next status conference on April 26, 2018, the
court pursued the same issue, asking: "What is the plan?"
(Status Conference Tr. 23:24-25, April 26, 2018, Dkt. 840.)
By the end of the conference, the court concluded that it

had "no confidence that we have a plan to deal with the access issue."  (Id. at 32:6-7.)

At the conference on June 13, 2018, counsel continued to disagree about the status of Defendants' compliance with the access requirements of the judgment and remedial order. (See Dkt. 845.)  Defendants' counsel argued, first, that Defendants were not required to satisfy the disengagement criteria in order to comply with the remedial order and, second, that they had in fact substantially complied with the judgment and remedial order itself.  Further, Defendants contended that, if Plaintiffs took the position that they remained out of compliance, it was Plaintiffs' obligation to file a motion for contempt and carry the burden of demonstrating this lack of compliance.

Plaintiffs, for their part, argued that Defendants were not in compliance.  They contended that the court should amend the remedial order to incorporate the previously negotiated disengagement targets and require Defendants to satisfy them before it terminated monitoring and oversight. It was Defendants, according to Plaintiffs, who bore the burden of demonstrating compliance before monitoring could end.

31

In response to this dispute the court decided to bring the matter to a head and ordered Defendants to file the current Motion Regarding Substantial Compliance and to Terminate Monitoring and Court Supervision (Dkt. 848) and Plaintiffs to file their corresponding Motion to Approve and Order Disengagement Measures.  (Dkt. 847.)[13]

## IV.  DISCUSSION

Before addressing the central issue in this case -- whether Defendants have achieved reasonable compliance with the judgment and remedial order -- two preliminary distractions need to be brushed aside.

First, the court need not, and will not, address the issue of whether Defendants must comply with the negotiated disengagement measures in order to achieve compliance with the judgment and remedial order.  It is not necessary to do this.  Defendants' failure to comply with the judgment and remedial order itself, without reference to the parties' agreed-upon disengagement measures, is glaring.  For approximately half the Plaintiff children, the evidence is undisputed that Defendants have failed to comply with their

_____

[13] Plaintiffs' motion will be addressed in a separate memorandum.

own Medicaid access standard.  Worse, they have no plan to
eliminate, or even substantially to ameliorate, this
failure of compliance.

Second, it is not necessary for the court to resolve
the parties' dispute about who has the burden of proof in
determining when court oversight and monitoring should
terminate.  The principle that a court has the authority,
and responsibility, to enforce its own orders is so
embedded in the law that it scarcely requires a citation.
An apt example of the impact of this axiom is the Supreme
Court's decision in Frew v. Hawkins, 540 U.S. 431 (2004),
which also involved the EPSDT provisions of the Medicaid
statute.  In that case, a successful lawsuit to enforce the
Medicaid Act led to a consent decree with specific
provisions aimed at remediation of the conceded statutory
violations.  When Defendants failed to comply with the
court's remedial order, the district court required the
parties to submit proposals for possible steps to bring
Defendants into compliance.  Defendants appealed,
contending that under the Eleventh Amendment the court had
no power to order it to take specific measures aimed at

satisfying the consent decree, and the Fifth Circuit agreed, reversing the district judge.

In a blessedly short, emphatic, and unanimous opinion, the Supreme Court reversed the Fifth Circuit and upheld the district court's power to enforce its own orders. As Justice Kennedy pointed out, "federal courts are not reduced to issuing injunctions against state officers and hoping for compliance." Id. at 440. Here Defendants' failure to comply with the judgment and remedial order is obvious, and the court's exercise of authority stands on even firmer footing than the district court enjoyed in Frew.

First, the remedial order in this case arose from an explicit finding of a violation of federal law, anchored on evidence presented in a multi-week trial, and never appealed. This case does not involve a consent decree. The court found that Defendants failed to comply with the "reasonable promptness" provision of the Medicaid statute in providing EPSDT services. To date, Defendants are still failing to comply with federal law by consistently violating their own Medicaid standard with regard to one-third to more than one-half the Plaintiff children.

Second, the court adopted its remedial order almost verbatim from what Defendants proposed.  Plaintiffs did not consent to this form of the order but have worked to implement the order nonetheless.

Third, unlike the district judge in Frew, this court is not asserting its power to supervise and monitor Defendants in order to enforce some implementing detail of the remedial order.  Rather, it is acting to ensure that the core violation of the "reasonable promptness" provision of the federal Medicaid statute is itself remedied.  In this respect, the court's position is a classic example of an exercise of authority under Ex Parte Young, 209 U.S. 123 (1908), i.e., an enforcement of prospective injunctive relief for a specific violation of federal law.

Put differently, this is not a case where it could be argued that Defendants' performance was "good enough to comply with the mandates of federal law," but merely failed in complying with some detail of a consent decree, as the Fifth Circuit apparently found in Frew.  540 U.S. at 436. Rather, the issue here is enforcement of federal law, which requires provision of EPSDT services with "reasonable promptness."

Defendants' efforts to counter Plaintiffs' evidence regarding their failure of compliance have no traction. Their description of the general growth of the system and the number of children now participating is of course encouraging.  It is true that progress has been made and that the improvement in the care system for the Plaintiff children is to Defendants' credit.  But Defendants' lengthy description of progress fails to address the specific timeliness deficiency relating to access.

Defendants' own statement of material facts acknowledges that since 2010 over twenty percent of class members have not received initial ICC appointments within the required fourteen days.  (Dkt. 854 at 31.)  This general statistic, as disappointing as it is, glosses over the undisputed fact that the failure rate in the past three years has been much higher and continues to grow. Defendants' own status report submitted on September 13, 2017 concedes that in the seven months from January to July 2017, their rate of compliance with the fourteen-day deadline for the initial ICC appointment never exceeded 64.06% (February 2017) and fell as low as 49.18% (June 2017).  (Dkt. 813-1.)  Rates for IHT were similarly

abysmal.  (Id.)  The failure of Defendants to improve
access to ICC and IHT services was acknowledged in the next
status report, dated November 17, 2017.  (Dkt. 820.)

While some elasticity may exist in the notion of what
constitutes "reasonable promptness," Defendants are far
outside its boundary, wherever it may lie.  A helpful case
on this point is Fortin v. Massachusetts Department of
Public Welfare, 692 F.2d 790 (1st Cir. 1982).  In that
case, the issue was the thirty-day time limit for
eligibility determinations for applicants seeking Aid to
Families with Dependent Children ("AFDC") benefits and the
two-week time limit for applicants for General Relief.  At
the time of the lawsuit, the defendant was hitting the
deadline for only 66.8% of AFDC applicants and for only
52.5% of applicants for general relief.  When, following
issuance of a consent decree, the compliance rate stalled
at roughly 87%, United States District Judge Robert E.
Keeton held the defendant Commissioner in contempt and
imposed a fine of $100 per applicant for delays above
thirty days and another $100 for each sixty-day period
thereafter.  The defendants appealed, and the First Circuit
affirmed, holding that the defendants had failed to

demonstrate substantial compliance with the decree.  The
court observed that "no particular percentage of compliance
can be a safe-harbor figure," adding that "'substantiality'
must depend on the circumstances of each case, including
the nature of the interest at stake and the degree to which
noncompliance affects that interest."  Id. at 795 (citation
omitted).

As in Fortin, the vulnerability of Plaintiffs here
makes "the consequences of failure to comply quite
serious."  Id.  The evidence demonstrates not only that
delays in initiation of services can lead to grave injuries
to the children, but that a long wait list can persuade
families in crisis to give up seeking services.

A final point regarding deficiencies in provision of
care coordination services must be inserted here, regarding
Defendants' decision to use the Out-Patient service
component as a "hub," or alternate method, to provide ICC
services.  Plaintiffs have for years expressed skepticism
about this strategy, but the court has allowed Defendants
to move forward with it, provided that the care
coordination services provided through OP complied with the
judgment and remedial order with regard both to timeliness

and quality.  As of this time, the court has received no
assurance that the OP service component is actually
functioning as a hub to provide care coordination.  A long-
overdue report on this subject is still being awaited.
Defendants obviously cannot duck their obligation to
provide care coordination simply by shunting the Plaintiff
children into another service with a different acronym.
Monitoring and oversight are still needed to ensure that,
if Defendants wish to use the OP service component to
provide care coordination, proper coordination is in fact
taking place.

Defendants' criticism of the MPR reports as employing
too small a sample ring hollow, since both Defendants and
Plaintiffs have been relying on these reports to draw
general conclusions about the system for years.  Equally
importantly, Defendants, who have much more access to the
pertinent data than either Plaintiffs or the court, have
offered no data suggesting that the rates of access to ICC
and IHT services are in fact significantly better than what
the MPR reports suggest.  In the end, no dispute exists as
to the fundamental fact that, after years of outcry from
Plaintiffs and persistent prodding by the court, in any

given month Defendants are violating the Medicaid standard -- the standard that they themselves adopted -- for one-third to one-half of the SED children needing services.

Defendants' primary response to this failure to comply is to suggest that "the current wait lists are a reflection of largely external factors beyond the control of Defendants, factors which show little likelihood of changing in the near future." (Dkt. 820 at 5.) This contention has at least three defects.

First, Defendants offer no specifics about what these "external factors" are beyond attorney proffer regarding difficulties in hiring, training, and retaining staff. These staffing problems, however, are the bread-and-butter challenges of any social service. Agencies typically plan for them, and Defendants have offered no plan here. It would be an abdication of the court's power to permit Defendants to flout federal law with such a flimsy justification.[14]

---

[14] Of course, if Defendants wish to take the position that compliance with the remedial order is impossible and therefore "no longer equitable" they may seek a remedy under Fed. R. Civ. P. 60(b)(5), as Frew notes. 540 U.S. at 441. This would be a difficult argument to make, since the Medicaid statute itself imposes the obligation Defendants would be seeking to avoid, and the evidence is that

Second, Defendants' argument overlooks the fact that, as noted above, some CSAs regularly succeed in meeting the Medicaid deadline.  Defendants have offered no analysis of why these differences in performance exist.  Certain outlier CSAs in fact consistently fall far short of compliance with the access mandate, causing children to wait inordinate lengths of time prior to an appointment. No strategy has been offered to address the problem of these under-performing CSAs or to draw helpful lessons from those that perform well.

Third, there is evidence of a number of measures Defendants could take that might well lead to improvement in compliance.  Defendants, particularly recently, have tended to resist any efforts by the court or by Plaintiffs to identify possible strategies to address the access problem.[15]

---

compliance is clearly within Defendants' power with reasonable effort.  Procedurally, however, Rule 60 offers Defendants the opportunity at least to make their case for impossibility to comply if they wish to do so.

[15] Indeed, there is evidence that Defendants' attitude toward compliance has become alarmingly lax.  Paragraph 47 of the judgment, for example, specifically requires Defendants to identify a Compliance Coordinator to head efforts to comply with the judgment and remedial order. (Dkt. 368 at 26.)  As of the September 2018 hearing, that position had remained open for several months following the

Defendants have resisted suggestions that they might exercise stricter oversight of underperforming agencies, for example by requiring corrective plans.  Advice that capacity in high-functioning agencies might be increased to accommodate SED children more quickly has been dodged, even when these agencies are being taxed to the maximum and could accommodate more children if they had modestly increased resources.  No initiatives to enhance training to assist in addressing the access problem have been offered to the court.  Specific proposed actions described by Plaintiffs do not appear to have been seriously considered. (See Dkt. 847-2.)

A recitation of potential tactics for addressing the access problem should not be interpreted as an attempt to dictate how Defendants should operate their system of care. The point is only to note that these tactics, and no doubt others, exist in Defendants' remedial arsenal.  Something effective must be done, some credible plan adopted,

resignation of the prior coordinator, with the slot being filled on an "acting" basis by an administrator with other responsibilities.  The Court Monitor has confirmed that the active Compliance Coordinator position has still not been backfilled as of the date of this memorandum.  As a result, Defendants' compliance efforts lack leadership.

something other than vague excuses must be offered, before court monitoring and oversight can be terminated.

As noted, no dispute exists that the court retains core jurisdiction until implementation of the judgment and remedial order is completed.  Further assistance from the Court Monitor is essential, on a reduced level, to exercise this authority.  Without this minimal help, the court would be blind -- unable to discern, let alone rectify, failure to comply.  For almost seven years, Defendants have tacitly agreed to the extension of the monitoring function.  They have failed to show that it must end now.

## V.  CONCLUSION

It bears repeating that the class members here, Medicaid-eligible SED children suffering extreme functional impairment, are profoundly vulnerable.  The overview of the named Plaintiffs set forth in the court's liability decision revealed children who suffered regular, sometimes violent, crisis episodes, repeated hospitalizations, and devastating setbacks resulting from lack of timely responsive services.  The testimony at trial underlined the critical importance of prompt, well-coordinated, and

appropriate treatment.  <u>Rosie D. I</u>, 410 F. Supp. 2d at 45-
50.

It is not necessary to speculate about what can happen
to children with these disabilities who do not receive
proper clinical services.  We know what happens.  They
frequently end up living isolated, stunted lives, in and
out of emergency rooms, housed in inappropriate residential
facilities with adults, vulnerable to abuse, or in penal
institutions.  Reasonably competent services for these
children make the difference between a life and a living
death, or sometimes a literal death.

The heart of the court's logic in denying Defendants'
motion can be summarized in four points.

1.  Federal law and Section I(C) of the judgment
require Defendants to provide care coordination services
for the class members "with reasonable promptness."

2. The definition of reasonable promptness is clear and
generous: fourteen days to offer an initial appointment
after contact.

3. Despite persistent prodding from the court,
Defendants are still grossly failing to comply with this
"reasonable promptness" requirement in the provision of

care coordination services for a substantial portion of
Plaintiffs.

4. Defendants have failed to demonstrate that they lack
the ability to bring themselves into compliance.
Defendants' recent efforts at compliance have flagged,
leadership is halfhearted, and no specific plan has been
offered, despite the existence of identified measures that
might improve performance.

Under these circumstances, the court retains the power
and the responsibility to continue its supervision and
monitoring, with the essential assistance of the Court
Monitor, until reasonable compliance is achieved.  Based on
the foregoing, Defendants' Motion Regarding Substantial
Compliance and to Terminate Monitoring and Court
Supervision (Dkt. 848) is hereby DENIED.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U.S. District Judge
