UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 01-30199-RGS

ROSIE D., et al.

v.

CHARLES BAKER, et al.

MEMORANDUM AND ORDER ON CROSS-MOTIONS
TO MODIFY OR TERMINATE JUDGMENT

June 19, 2021

STEARNS, D.J.

This case returns to the district court on remand from the First Circuit. With leave of court, the parties have filed cross-motions to modify – or, in the case of defendants, to terminate – the final judgment entered after years of mostly constructive litigation on July 16, 2007 (the Judgment) (Dkt # 368). For reasons to be explained, the court will (1) deny plaintiffs' Motion to Modify Paragraph 52 of Judgment (Monitoring Mot.) (Dkt # 910); (2) deny plaintiffs' Motion to Modify Judgment to Incorporate Defendants' EPSDT Timeliness Standard (Timeliness Standard Mot.) (Dkt # 918); (3) deny plaintiffs' Motion to Modify Judgment to Incorporate Outpatient Therapy (Outpatient Therapy Mot.) (Dkt # 920); and (4) allow defendants'

Motion to Alter and/or Terminate Judgment (Termination Mot.) (Dkt # 936).

## BACKGROUND

The court assumes the reader's familiarity with the procedural and factual history of the litigation. It accordingly will provide only a brief overview of the portions of the Judgment that figure in the parties' cross-motions.

Plaintiffs brought the initial lawsuit against the defendants in 2001, alleging violations of Title XIX of the Social Security Act (the Medicaid Act), 42 U.S.C. §§ 1396, *et seq*. Following a non-jury trial, the court (Ponsor, J.) found that defendants had failed to provide eligible children suffering from serious emotional disturbance "early and periodic screening, diagnostic, and treatment services" (EPSDT), *id*. §§ 1396a(a)(10)(A), -(a)(43); *id*. §§ 1396d(r)(5), -(a)(4)(B), and had violated the "reasonable promptness" provisions of the Medicaid Act, *id*. § 1396a(a)(8), in delivering such services as were available.

The court issued a Judgment in the form of an injunction ordering defendants to "systematically execute" a number of "program improvements," J. ¶ 34, including, as relevant here:[1]

- "ensur[ing] that EPSDT services include a clinical assessment process" beginning with clinical intake and leading to diagnosis and treatment, *id.* ¶ 13; *see also id.* ¶¶ 14, 16(a)-(d);
- requiring providers to use the Child and Adolescent Needs and Strengths (CANS) measure,[2] a nationally used multi-purpose tool designed to assess a child's behavioral needs and to monitor the outcome of services tailored to the treatment of the individual child, *id.* ¶¶ 15, 16(e);
- "provid[ing]" Intensive Care Coordination (ICC) "including a Care Manager" trained in the "wraparound process"[3] to facilitate the

---

[1] The parties previously agreed that defendants have satisfied Subsection A of the Judgment and paragraphs 36 and 39-42 of Subsection E. *See* Oct. 7, 2020 Order (Dkt # 908); *see also* Pls.' Mem. in Supp. of Monitoring Mot. (Dkt # 911) at 3 n.5.

[2] The CANS measure is an open source tool developed by The Praed Foundation.

[3] "The 'wraparound process' refers to a planning process involving the child and family that results in a unique set of community services and natural supports individualized for that child to achieve a positive set of outcomes." *Id.* ¶ 22.

creation and implementation of an individualized care plan in coordination with a family-centered care planning team and to ensure that the child receives integrated services, *id.* ¶ 19; *see also id.* ¶¶ 20-22 (Care Manager); *id.* ¶¶ 23-25 (Care Planning Team); *id.* ¶¶ 26-29 (Individualized Care Plan); and

- "cover[ing]" medically necessary services (subject to federal approval and funding for those services), including home-based and community-based services such as in-home therapy, *id.* ¶ 31; *see also id.* ¶¶ 32-33.

The Judgment further ordered defendants to develop "a defined scheme for monitoring success" which would include "performance measures" or "performance specifications." *Id.* ¶¶ 34, 38(c)(vi)-(vii). Finally, the Judgment provided for the appointment of a "Court Monitor" tasked with reviewing the performance data and monitoring defendants' compliance with the Judgment.[4] *See id.* ¶ 48.

---

[4] The Judgment initially stipulated that the Reporting and Monitoring provisions would "terminate five years after the date of entry of this Judgment." *Id.* ¶ 52. With the consent of the parties, however, the court extended this deadline for discrete six-month periods on ten successive expiration dates. The final period of agreed-upon extensions expired on December 31, 2018.

Defendants now move to vacate the Judgment pursuant to Fed. R. Civ. P. 60(b)(5) as either satisfied or no longer enforceable as a matter of equity. Plaintiffs oppose and seek to expand the scope of the Judgment by imposing a presumptive fourteen-day timeliness standard and mandating outpatient therapy for certain child-clients. Plaintiffs also seek an indefinite extension of the monitoring period.[5]

## DISCUSSION

Fed. R. Civ. P 60(b) authorizes the court to modify a judgment if "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or . . . [for] any other reason that justifies relief." In *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992), the Supreme Court expanded on this standard, noting that a modification under Rule 60(b) may be warranted when "changed factual conditions make compliance with the decree substantially more onerous," "a decree proves to be unworkable because of unforeseen obstacles," or "enforcement of the decree without modification would be detrimental to the public interest." *Id.* at 384

---

[5] Plaintiffs alternatively move for modification under paragraph 50 of the Judgment, which reserved jurisdiction for the court to modify the terms of the Judgment "for good cause." Because plaintiffs' good cause arguments mirror their Rule 60(b) arguments and would not change the outcome, the court will not address good cause as a separate issue.

5

(citations omitted). The Court cautioned, however, that a modification should not as a rule "be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Id.* at 385.

When a decree has the effect of preempting governmental discretion over the delivery of state services or imposes a drain on state resources, the Rule 60(b) analysis "serves a particularly important function." *Horne v. Flores*, 557 U.S. 433, 447 (2009). The continued enforcement of an injunction regulating the behavior of a public institution raises significant federalism concerns and may well fail to account for changes in circumstances as the injunction ages. *Id.* at 448. As a corrective, courts are reminded that "injunctions should not operate inviolate in perpetuity." *In re Pearson*, 990 F.2d 653, 658 (1st Cir. 1993). In service of that admonition, the Supreme Court has cautioned "that courts must take a 'flexible approach' to Rule 60(b)(5) motions." *Horne*, 557 U.S. at 450, quoting *Rufo*, 502 U.S. at 381. Courts reviewing the prospective viability of an injunctive remedy are to consider, among other factors, whether there is a risk that "the original constitutional violation will be continued [if] the decree is lifted" and "whether the goals of the consent decree have been met" for all practical purposes. *Boston Chapter, NAACP, Inc. v. Beecher*, 295 F. Supp. 3d 26, 34 (D. Mass. 2018), citing *Labor/Cmty. Strategy Ctr. v. Los Angeles Cnty.*

*Metro. Transp. Auth.*, 564 F.3d 1115, 1120 (9th Cir. 2009); *cf. Holland v. New Jersey Dep't of Corr.*, 246 F.3d 267, 284 (3d Cir. 2001) ("Courts have extended a decree or parts of a decree when a change in circumstances thwarted the basic purpose and intent of the decree, when there had been 'pervasive violations' of the decree by one party, and when one party was in substantial non-compliance with the decree.") (citations omitted).

## I. Timeliness Motion

Plaintiffs move to amend the Judgment to incorporate the fourteen-day standard adopted by defendants in 2012 as a performance specification for measuring the timely delivery of EPSDT services. They argue that the modification is warranted based either on changed circumstances or on a continuing need to protect the public interest. The court declines to modify the Judgment on either ground.

First, with respect to changed circumstances, the court does not agree that the revision of the timeliness standard in 2012 from three days to fourteen days and the disavowal by the Commonwealth in 2018 of timeliness-based disengagement criteria constitute substantial or unforeseen changes. The Judgment itself granted defendants the discretion to determine the relevant timeliness standard – it required only that "performance measures" or "specifications," including a timeliness standard,

7

be defined. *See* J. ¶ 38. It did not establish any specific timeline, and nothing in the Judgment limited the right of defendants to make unilateral revisions of the time standards as implementation of the Judgment progressed. *See Ricci v. Patrick*, 544 F.3d 8, 21 (1st Cir. 2008) (finding "no significant change in factual circumstances" when a particular state facility closed because "[t]he parties, and the Disengagement Order, recognized that the Commonwealth might choose to close any of the residential facilities"). *But see Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 404 F.3d 821, 828 (4th Cir. 2005) ("[T]he issue is whether the parties *actually* anticipated the events giving rise to the modification request; that the events were theoretically foreseeable does not foreclose a modification.") (emphasis in original). And the disengagement measures cited by plaintiffs were never incorporated into the Judgment by the court or even fully agreed upon by the parties as binding compliance standards. The disavowal thus cannot fairly be characterized as "unexpected."

With respect to the public interest, plaintiffs argue that the court must incorporate the fourteen-day timeliness standard in the Judgment to preserve its overarching goal. But the purpose of the Judgment was to remedy defendants' failure to timely and predictably provide EPSDT services to children with severe emotional distress (SED), not to guarantee a specific

8

envelope of time during which such services would be provided.[6] *See* Mem. and Order Regarding J. (Dkt # 367) at 5 (noting that "[t]he absence of [ICC] for most class members constituted one of the major shortcomings in Defendants' Medicaid service network; the deficiency was at the root of the court's finding that a violation of the Medicaid statute had occurred"); Mem. of Decision (Dkt # 331) at 93, 96 (concluding that defendants had necessarily violated the reasonable promptness requirement where they failed to provide EPSDT services to children with SED); *accord Rosie D. by John D. v. Baker*, 958 F.3d 51, 58 (1st Cir. 2020) (noting that nothing "in the text of the Judgment at any time imposed an obligation on the Commonwealth to see that its providers initiated services within a fourteen-day period," even after defendants undertook to adopt this standard as desirable). And as plaintiffs acknowledge, defendants have succeeded over the life of the Judgment in erecting, under the guidance of the court, a complex program of EPSDT services for the benefit of children with SED. The principal violation targeted by the Judgment, in other words, has been remedied.

---

[6] Even assuming the Judgment did seek to define the contours of what might be deemed "reasonable promptness," plaintiffs concede that a failure to comply with the fourteen-day standard would not be a *per se* violation of the standard. *See* Pls.' Reply to Defs.' Opp'n to Timeliness Mot. (Dkt # 952) at 4 n.2.

In so saying, the court does not mean to imply a finding that the defendants' program, as implemented, complies with the reasonable promptness mandate of the Medicaid Act (although the court notes that Congress in setting "reasonable promptness" as the standard in the Act chose not to give the term any specific quantitative definition). Plaintiffs have produced evidence that children with SED often face significant delays in obtaining EPSDT services – in some cases as long as 12 weeks, *see generally* Ex. 14 to Pls.' Opp'n to Termination Mot. (Dkt # 955-15) – which raises concerns as to whether defendants, however willing, have achieved the capacity to consistently provide reasonably prompt services to children in need. All that the court determines here is that this Judgment is not the load-bearing vehicle needed to address this issue. *See Rufo*, 502 U.S. at 389 ("Federal courts may not order States or local governments, over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated."), citing *Milliken v. Bradley*, 433 U.S. 267, 281 (1977); *see also Milliken*, 433 U.S. at 281-282 ("The well-settled principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the constitutional violation itself.").

## II. Outpatient Therapy Motion

Plaintiffs move to amend the Judgment to expand the definition of Care Manager to include "any professional who serves as the primary service coordinator in" providing In Home Therapy (IHT) and outpatient therapy. Pls.' Mem. in Supp. of Outpatient Therapy Mot. (Dkt # 921) at 19. Plaintiffs argue that defendants' use of outpatient therapy as a "hub" to provide service coordination for a subset of children with SED is an unanticipated and material change in circumstances.

The court is not convinced that its prior decision, which found that outpatient therapy is often insufficient, by itself, to meet the needs of all SED children, renders as "unexpected" the use of outpatient therapy as a hub for a subset of children with SED. But even if that were the case, the court does not believe the change to be substantial. The Judgment mandates the provision of ICC for children with SED who choose to receive this service and for whom such coordination is medically necessary. Mem. and Order Regarding J. at 5-6 (acknowledging the possibility that "in some instances (probably rather infrequent), a Medicaid-eligible SED child may in fact not require intensive care coordination" and stating that "[n]either the court nor, presumably, Plaintiffs have any desire to require Defendants to provide any service that is not, in fact, clinically required"); *accord* J. ¶ 31 (requiring

11

defendants to cover ICC and IHT "for Members who have SED when such services are medically necessary"). The Judgment, in other words, did not establish an entitlement to care coordination for *all* children with SED.

Plaintiffs, for their part, accuse defendants of using outpatient therapy as a hub to "avoid[] meeting specific service coordination standards." Pls.' Mem. in Supp. of Outpatient Therapy Mot. at 17. But defendants would be evading their obligations under the Judgment only if children using outpatient therapy as a hub had a medical need and desire for ICC services that defendants refused to provide. Plaintiffs offer no evidence that this is the case.

In so concluding, the court is not expressing an opinion as to whether children with SED using outpatient therapy as a hub are actually receiving adequate EPSDT services. As in the case with a binding definition of "reasonable promptness," all the court determines here is that the Judgment as written does not require the implementation of care coordination for children who do not elect ICC.

### III. Termination Motion

In their Termination Motion, defendants offer a detailed, section-by-section account of their historical efforts to comply with the Judgment. Plaintiffs challenge only a small portion of this history. They argue that

12

defendants have not complied with the provision requiring timely access to remedial services because (1) they are not meeting their own EPSDT timeliness standard and performance specifications,[7] and (2) they have not established an adequate network of providers with sufficient capacity to provide the access required. They also argue that defendants have not sufficiently met the optimum goals for providing (3) adequate care coordination, (4) ICC and IHT, (5) clinical assessments, and (6) crisis services, as contemplated by the Judgment.

Plaintiffs' first complaint is foreclosed by the First Circuit's decision on appeal, which distinguished between an obligation to set standards for timeliness and the responsibility for the failure of contractors to comply with those standards. *See Rosie D.*, 958 F.3d at 58. While the First Circuit's decision did recognize the possibility "that the processes that have been employed by the Commonwealth are not sufficient to satisfy the regulation," *id.*, plaintiffs do not argue on remand that the measures employed by defendants (*e.g.*, writing the fourteen-day standard into service contracts) are insufficient to "ensure timely initiation of treatment," 42 C.F.R.

---

[7] The First Circuit rejected the argument that either the Medicaid Act or the Judgment defined "reasonable promptness" to mean fourteen days, and plaintiffs do not argue a failure to comply with the reasonable promptness requirement other than the Commonwealth's failure to meet the fourteen-day standard.

§ 441.56(e). They instead seek to hold defendants accountable for the failure to achieve compliance itself, which is contrary to the First Circuit's interpretation of the obligations the Judgment imposed on the Commonwealth.

As for the second argument, defendants offer evidence that they have substantially increased the number of service providers since 2009 and have, within the constraints of a strained state budget, several times increased the providers' wages. Although plaintiffs consider these efforts as inadequate to fully address the needs of children with SED, principles of federalism (and the absence of any evidence of bad faith) forbid this court from directly requiring the Commonwealth to expand its workforce or revise the salaries it pays to its employees.[8] *See Horne*, 557 U.S. at 448 ("Federalism concerns are heightened when, as in these cases, a federal court decree has the effect of dictating state or local budget priorities."). "States and local governments have limited funds," after all, and funds appropriated by a federal court for one program often have the effect of "tak[ing] funds away from other important programs." *Id*.

---

[8] The court does note that the Commonwealth's capacity to deliver EPSTD services has greatly increased over the life of the Judgment. *See* Exs. 14 & 15 to Pls.' Statement of Material Facts (Dkt ## 955-15, 955-16).

14

Plaintiffs' third argument is based on noncompliance with paragraphs 12 and 20-22 of the Judgment. Paragraph 12 requires defendants to distribute written guidance establishing protocols for client referrals and to "work with" agencies "to enhance the capacity of their staff to connect children with SED" with the appropriately tailored services. J. ¶ 12. Defendants have indisputably distributed written guidance, so the issue boils down to whether they have adequately "worked with" stated-based agencies. As evidence of noncompliance, plaintiffs note that referrals from two state-based juvenile justice agencies have been miniscule in the past two years and that, according to at least one nonprofit agency, many "youth involved in the juvenile justice system are not referred to or engaged with home-based services" despite their mental health needs. Ex. 2 to Pls.' Statement of Material Facts (Dkt # 955-3) ¶ 5. But the court cannot make a finding that defendants have failed to "work with" state-based agencies simply because referrals from a single isolated source have decreased in recent years. Even assuming children with SED in the juvenile justice system are not being properly referred for treatment, nothing ties this shortcoming to a failure on defendants' part to "work with" the agencies in question.

Paragraphs 20 through 22 detail the services a Care Manager is expected to provide. Plaintiffs argue that the current system discriminates

against children in outpatient therapy because they do not receive the services of a Care Manager. The Judgment, however, only requires these services for children who elect ICC – it does not require Care Manager services for children whose parents choose outpatient therapy.

Plaintiffs' fourth argument relies on poor scores on two measures used to assess compliance with the ICC and IHT requirements. The Judgment, however, does not mention, let alone require, that defendants achieve a specific grade on either of these measures as a test of compliance.

Plaintiffs' fifth argument suffers from the same infirmity as the first. The Judgment requires defendants to "implement an assessment process" using the CANS measure "where appropriate" in discharging clients from inpatient behavioral health care. J. ¶¶ 16, 16(e). Defendants' managed care contracts require providers to complete the CANS measure during the discharge process. That some providers may breach their contractual obligations in this regard does not mean that defendants have failed in their obligation to set the standard.[9] *Cf. Rosie D.*, 958 F.3d at 58.

---

[9] It is possible that writing the requirement into service contracts is insufficient to fulfill the mandate to implement an assessment process using the CANS measure. Plaintiffs do not raise this issue, and the court need not address it further.

Finally, plaintiffs' sixth argument fails. The Judgment makes clear that the provision of crisis services is contingent on federal approval and funding, neither of which the defendants have received despite making the appropriate requests.

In sum, because defendants have offered persuasive evidence that they have substantially complied with the requirements of the Judgment as written, the court will return "responsibility for discharging the State's obligations" to defendants and terminate the Judgment as satisfied. *See Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 442 (2004) (noting that, when a judgment creates a detailed framework for compliance "and the decree in effect mandates the State, through its named officials, to administer a significant federal program, principles of federalism require that state officials with front-line responsibility for administering the program be given latitude and substantial discretion," and that "responsibility for discharging the State's obligations [be] returned promptly to the State and its officials" once "the objects of the decree have been attained"); *cf. King v. Greenblatt*, 53 F. Supp. 2d 117, 136-137 (D. Mass. 1999) (noting upon terminating a consent decree on the grounds that "the underlying conditions that existed when the decree[] [was] entered have been remedied," that "plaintiffs remain free to initiate a new round of proceedings designed to show that post-

termination conditions actually do violate their federally protected rights")
(internal citations and quotation marks omitted).

## IV. Monitoring Motion

Because the court finds that defendants have substantially satisfied the Judgment, the issue of extending the monitoring provisions of the Judgment is moot.

## V. Conclusion

It would be wrong to close on anything but a note of high praise for the parties – both the Commonwealth and the plaintiffs – and for the tireless trial judge (Ponsor, J.) for what has been achieved through the litigation and the Judgment in this case. The accomplishments are in large part attributable to the hard work of the parties and their willingness to collaborate for well over a decade in creating a comprehensive system of services to rectify an embarrassing and systemic failure of the Commonwealth to comprehensively address the needs of its emotionally disturbed children. To highlight some of the many achievements:

- From the beginning, the parties have sought to ensure that services implemented pursuant to the Judgment are available to all children with SED throughout the Commonwealth, rather than simply to a small subset of children on a regional basis.

- The Commonwealth has regularly published the reports and data, favorable or not, that have been gathered pursuant to the Judgment, and it has used this information to continuously develop and improve the child service programs.
- The Commonwealth identified thirty-two organizations as key local agencies early in the development process, ensuring a large measure of predictability and providing a consistent avenue of access for families to information, consultations and assessments, and/or services.
- The providers now receive internal and external training at both the regional and the local level, and the Court Monitor has determined this training to be thorough and thoughtful in its substance.
- Through these mutual efforts, children, families, and behavioral health providers can regularly depend on a reliable network of community support.

In listing these successes, the court does not mean to imply that more cannot and/or could not be done. It merely wishes to acknowledge how far things have come from the largely vacant child services landscape that existed in 2007. Massachusetts now, thanks to the Judgment and the parties' efforts, stands out among states in the efficacy of its programs of assistance to

children with emotional needs. The court would also be remiss in failing to acknowledge the dedicated service of Karen Snyder, the Court Monitor, whose impartial and knowledgeable advice and encouragement has guided the parties and the court to this mostly satisfying outcome.

**ORDER**

For the foregoing reasons, the court <u>DENIES</u> plaintiffs' Motion to Modify Paragraph 52 of Judgment; <u>DENIES</u> plaintiffs' Motion to Modify Judgment to Incorporate Defendants' EPSDT Timeliness Standard; <u>DENIES</u> plaintiffs' Motion to Modify Judgment to Incorporate Outpatient Therapy; and <u>ALLOWS</u> defendants' Motion to Alter and/or Terminate Judgment.

SO ORDERED.

/s/ Richard G. Stearns_____
UNITED STATES DISTRICT JUDGE